**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF ALABAMA**
**EASTERN DIVISION**

| | |
|---|---|
| ANTHONY T. LEE, et al., | ) |
| | ) |
|     Plaintiffs, | ) |
| | ) |
| UNITED STATES OF AMERICA, | ) |
| | ) |
|     Plaintiff-Intervenor and | ) |
|     Amicus Curiae, | )   CIVIL ACTION NO.:  3:70-cv-844-WKW |
| | ) |
| NATIONAL EDUCATION ASSOCIATION, | ) |
| INC., | ) |
| | ) |
|     Plaintiff-Intervenor, | ) |
| | ) |
| v. | ) |
| | ) |
| CHAMBERS COUNTY BOARD OF | ) |
| EDUCATION, et al., | ) |
| | ) |
|     Defendants. | ) |

## POST-TRIAL BRIEF OF THE CHAMBERS COUNTY BOARD OF EDUCATION

       This post-trial brief is respectfully submitted in support of the Chambers County Board of Education's (hereinafter the "Board" or the "District") Motion seeking the Court's approval of its plan to build a new consolidated high school for <u>all</u> the county students on a site located in Valley, Alabama, and for authority to temporarily consolidate the current Lafayette High School students with the Valley High School students at the current Valley High School Campus during the construction of the new school.  (See Doc. 500).  The Board respectfully incorporates and adopts herein as if fully set forth herein all arguments previously asserted in its Pre-Trial Brief. (See Doc. 555).

       The issues are framed by the Motion.  What is not before the Court is an effort by the

Board to seek unitary status based on any of the Green Factors nor is there any request before the Court by any party to approve the location of the new high school at a different place, such as Lafayette or at a site along Highway 50. Rather the issues are very narrow: (1) whether the new school may be located at the Valley site; and (2) whether the current Lafayette High School students may be temporarily housed at the existing Valley High site pending the completion of the new school.

At the outset, it is worthwhile to reiterate some obvious yet appropriate matters to consider. First of all, as this Court knows, this case has been pending for a substantial number of years and if a decision is not made, we may be still dealing with this case years from now. The Board does not want to kick the can down the road if possible. Secondly, as this Court noted in its Order entered in this case on July 5, 2022 (Doc. 493), "[a] federal court's role in this process is limited. The Court does not tell the school board how to make policy decisions and the Court cannot be a roadblock unless the school board somehow acts in an unconstitutional manner. See Harris v. Crenshaw County Board of Education, 968 F.2 1090, 1095 (11th Cir. 1992). Instead, the Court's role is to ensure that the plan is not racially motivated and that black students do not bear a disproportionate burden under the plan. *Id*. at 1097." (Doc. 493 at 7).

With this preface, the Board respectfully submits this post-trial brief in support of its position.

## I. THE PLAN

There have been discussions about building a new consolidated high school for the county for years. As Superintendent Chambley indicated in his testimony, the Board has been given a very difficult job to do regarding this particular issue. It is faced with complying with Court Orders and with being able to finance and pay for the new school while sustaining the

Board's financing for operations. It is in a "tug of war" with two different communities, and it must endeavor to provide their students with everything that they need as best they can. *See Chambley Testimony, Vol. 1[1], pp. 180:13-182:9.*

In addition to the building of the new high school at the requested site, the Board feels it is in the best interest of the students to move the remaining Lafayette High School students to the existing Valley High School Campus while the new school is being constructed. That offers the students at Lafayette opportunities that they have not been offered in the past including more classes, activities, facilities, etc. The use of the Valley High School Campus would not continue with the name Valley High nor would the colors or mascot, etc. These things would be changed and are in the process of being considered for change at the present time. This would also allow the Board the opportunity to renovate the existing Lafayette High as a STEAM Academy and make it a source of pride for the community. *See Chambley testimony, Vol. I, pp. 180:13-182:9.*

**The Plan does <u>not</u> abandon the community of Lafayette!**

At the end of the day, the Board has had to make a very difficult decision in order to move the system forward. As Mrs. Herring, a Board member testified, whatever decision is made will not please the majority of Chambers County citizens. *Herring testimony, Vol 4, p. 211:17-22.* Over the years, particularly, since 2015, discussions have been had about a new consolidated high school but no movement toward its construction has occurred. Various issues have arisen which have prevented that. The situation has caused "paralysis by analysis". In other words, the more people provide input and analysis, the more the process is paralyzed. The Board has felt all along that it needed to move forward and the current plan, though not perfect as Superintendent Chambley has candidly admitted, does provide in the opinion of the Board the most appropriate

---

[1] There are four volumes of the Court transcript. The first three volumes are designated by Roman Numerals, and the fourth volume is designated by an Arabic Numeral.

manner in which to consolidate the schools which everybody agrees needs to be done and comply with their desegregation obligations "to the extent practical".

## II.  THE 1993 AGREED ORDER

The threshold issue here is whether the 1993 Agreed Order applies and if so, whether it should be modified to allow the Plan to be implemented. In 1993, this Court entered an Order in which, among other things, the Board agreed to support a new consolidated high school for the county.  That Order indicated that the new consolidated high school site should be "readily accessible" to Highway 50 between Lanett and Lafayette.  For various reasons throughout the years, mainly to do with finances associated with the building of a new high school, a new consolidated high school has not been built.  *See 1993 Agreed Order, Plaintiffs' Exhibit 003.*

The specific provisions of the 1993 Agreed Order which are relevant here are set out hereinbelow:

> "If the Court determines that formation of a separate Valley City School District should not be permitted at this time, the district agrees to support the construction and operation of a consolidated, district-wide high school facility at a site readily accessible to Alabama state highway Route No. 50 between Lanett and LaFayette. No later than one year following issuance of such determination by the Court, the Chambers County Board of Education shall request from the County Commissioners of Chambers County such additional revenue measures as may be necessary to support the issuance of bonds or otherwise to finance the construction of such a district-wide high school.  The district will inform the other signatory parties of the disposition of such request[s]."

*Id* @ paragraph 5, page 16. (Emphasis added)

In October 2022, for the first time the provision highlighted above regarding the location of the new high school became the standard by which the Plaintiff Parties judged the efforts of the Board.  A review of the Proposed Consent Decree which was filed with this Court together with a Joint Motion to Approve the same on or about May 19, 2022 (Doc. 480), reveals that there was no mention whatsoever of Highway 50 as the location of a new consolidated high school.

4

Specifically, on page 3 of the Proposed Consent Decree (Doc. 480-1), under subparagraphs II., A., 1, the following jointly agreed language appears: "before the end of the 22-23 school year, the district will select a site for a new consolidated high school, not on any of the current Lafayette or Valley High School campuses.  The location must not impose an unequal burden on students on the basis of race, to the extent practical." *(Emphasis added)*.  The Plaintiff Parties are now pivoting once again to bring to bear an issue which has not been an issue until October 2022.

It has been almost thirty (30) years since that Order was entered and there have been substantial and material changes in the County and in the educational setting since then.  The demographics of the school system and of the county have changed over that period of time such that there are actually more black students attending Valley High School now than attend Lafayette High School. *See Defendant's Exhibit 13.* The population of the county has shifted to the Valley area also. *See Defendant's Exhibit 11.* See also *Trial Exhibit 24, p. 20-22.* Additionally, neither the Private-Plaintiffs nor the United States have come forward with any proposed location that in their opinion meets the qualifications of "readily accessible" to Highway 50.  In any event, sites along Highway 50 were considered but the focus was narrowed to other sites. *See Richter testimony, Vol. II, pp. 212:7 and 218:1-25.* Some Highway 50 sites are unavailable for various reasons (s*ee Chambley testimony, Vol I, p. 198:7-19),* and some Highway 50 sites were rejected for lack of safe road access, lack of sewer access, etc. *See Chambley testimony, Vol. I, pp. 198:20-200:16.*

After the 1993 Order was entered, there were a number of pleadings filed which in the Board's opinion indicate that this provision regarding a new high school "readily accessible to Highway 50" was no longer intended to be applicable.  Specifically, on May 16, 1995, the

Chambers County Board submitted a Petition to Amend the Desegregation Order.  In that Petition, the Board outlined the fact that a tax referendum which was designed to finance the construction of a new consolidated high school as required by the 1993 Order set out above, was defeated by a 3 to 1 margin in November of 1994 and asked that the Petition to build a new high school be replaced by another plan.  That Petition to Amend the Desegregation Order also included a proposed plan which would have superseded the 1993 Order. *See Defendant's Exhibit 1, Chambley testimony Vol. I, pp. 171:19-173:12.*  The undersigned can find nothing in the file that indicates that this Petition was ever actually granted or that the Plaintiff Parties objected to it.

Approximately two (2) years later, on January 9, 1997, a Motion to Leave to Withdraw the Petition to Amend filed in May of 1995 based on financial reasons was filed.  *See Defendant's Exhibit 2, Chambley testimony, Vol. I, p. 174:1-14.*  No mention was made by the Plaintiff Parties about a new high school as set out in the 1993 Order.

In 1998, specifically, on September 9, 1998, a Joint Petition to Amend the Desegregation Order was filed.  In that document the parties agreed to allow the reconfiguration of certain grades in certain schools in the system.  This Motion was granted by Judge Albritton on or about September 18, 1998.  *See Defendant's Exhibit 3 and 4, Chambley testimony, Vol. I, pp. 174:15-176:12.*  No mention was made about the 1993 Order.

On May 13, 1999, another Joint Petition to Amend the Desegregation Order was filed with this Court.  As a part of that Joint Petition, the parties agreed that at Valley High School two (2) buildings would be demolished and a 21-classroom new structure built.  This was done to relieve overcrowding.  In that same Joint Petition, that parties agreed that the Board could build a 35,735 square foot gymnasium to replace the old gymnasium at Lafayette High School and

would build a 2000 square foot science lab at that school.  Finally, that Joint Petition asked that the prior Orders regarding building projects be amended and that the Board be allowed to do extensive roofing repairs at Lafayette High School and to do several other things throughout the school system.  That Joint Petition dealing with construction at both high schools was granted by Judge Albritton on May 21, 1999. *See Defendant's Exhibit 5 and 6, Chambley testimony, Vol. I pp. 176:16-180:2.*  No mention was made about the 1993 Order.

All of these petitions and joint petitions to amend have been filed since the 1993 Agreed Order.  In none of those pleadings was the Agreed Order with respect to the location of the new high school mentioned.  It is therefore reasonable to conclude from the Joint Petitions, at least the Joint Petition filed in May of 1999 which included changes in the physical structure at both high schools, that the parties deemed the requirement that a new high school be built readily accessible to Highway 50 was no longer in effect.  Otherwise, the fact that these new structures were added would be questionable at best!

Finally, since 1993, the Plaintiff Parties have not asked this Court to require the Defendant to build a high school on such a location or asked the Court to hold the Board in contempt for failing to do so!!  *Chambley, Vol. I, p. 180:3-10.*

To be clear, the Board does not contend that a new consolidated high school should not be built.  On the contrary, it submits that building one high school is the most appropriate thing to assist in moving the Board towards complying with its desegregation obligations. However, the provision of the '93 Order regarding the location of a new high school is we submit no longer applicable or subject to modification as set out below.

### A.  Plaintiffs' Claim That the Terms of the 1993 Agreed Order are Binding is Barred by the Doctrine of Laches

Under the circumstances set out above, laches prevents the 1993 Order from being binding.  To assert a successful defense of laches to a consent decree, "a defendant must show 'a delay in asserting a right or claim, that the delay was not excusable[,] and that there was undue prejudice to the party against whom the claim is asserted.'"  Coffey v. Braddy, 834 F.3d 1184, 1189 (11th Cir. 2016) (quoting Black Warrior Riverkeeper, Inc. v. U.S. Army Corps of Eng'rs, 781 F.3d 1271, 1283 (11th Cir. 2015)) (alteration in original).  To be sure, where the "plaintiffs unquestionably knew about the [defendant's contrary] position regarding the consent decree . . . and yet did nothing to attempt to enforce the decree" until decades after the decree was entered, the plaintiffs' claim for relief under the decree is barred by laches.  *Id.* at 1190.  This is especially so where "the [defendant] did not conceal its decision to end compliance with the consent decree or otherwise contribute to the plaintiffs' delay."  *Id.*

This is not to say or imply that a court would or should condone blatant contempt of a consent decree.  However, a plaintiff's "inexcusable delay unduly prejudice[s] the [defendant's] *ability to defend itself*, because unclear memories and incomplete documents ma[k]e it impossible to determine where the [defendant] was, in fact, in contempt" when it acted contrary to the consent decree.  *Id.* at 1191.  In other words, even if a district court expresses "strong doubts as to the correctness" of the defendant's interpretation of the consent decree, the passage of time "renders a further determination of the issue impossible."  *Id.* at 1192.

Here, the Private Plaintiffs' delay in asserting a claim under the 1993 Consent Decree is inexcusable.  The Private Plaintiffs "unquestionably knew" about the Board's interpretation of the consent decree.  On numerous occasions after the 1993 Agreed Order was entered, the Private Plaintiffs and the Board entered into Joint Petitions to Amend the Desegregation Order. These Joint Petitions touched on matters including construction projects at the various schools

under the Board's control, all <u>without</u> <u>mention</u> of the site location mentioned in the 1993 Agreed Order.  What's more, the Private Plaintiffs, before withdrawing their consent, entered into a new Proposed Consent Order in May 2022 which made no mention of the Highway 50 location in the 1993 Order.  At <u>no</u> time in the past thirty years until the fall of 2022, did the Plaintiff Parties raise the site location listed in the 1993 Agreed Order.  Additionally, the Board did not "conceal" its position regarding the location of the consolidated high school.  It has not been an issue for almost 30 years!  Laches prevents its consideration now!!

### B.  If the Terms of the 1993 Agreed Order Are Binding, the Court must apply the Standard for Modification in Reviewing the Board's Petition.

Generally, when a school board petitions the district court for approval of a consolidation/construction plan while a consent decree is in effect, "the applicable standard [of review] is that for modification of a consent decree." See <u>Lee v. Autauga Cnty. Bd. of Educ.</u>, 59 F. Supp. 2d 1199, 1205 (M.D. Ala. 1999).  This is true even if the school board does not style its petition as a petition for modification of the consent decree.  *Id.*

In the <u>Autauga County Case</u> cited above, the school board filed a petition for approval of a plan to close a school and transfer the students to another school.  At the time this request was made, there was a consent decree in effect.  The consent decree had been in effect for approximately 2 years when the petition was filed by the board.  The Court first addressed the question of what standard should be used to govern its decision in the case.  The Court determined that the applicable standard is that for modification of a consent decree.  *Id.*

The Court noted that modification of a consent decree is governed by Rule 60(b) of the Federal Rules of Civil Procedure.  In <u>Rufo v. Inmates of Suffolk Cnty. Jail,</u> 502 U.S. 367 (1992), the Supreme Court addressed the requirements for such a modification and "articulated a

flexible, two-pronged approach to determining when courts may modify consent decrees in institutional-reform cases." *Id.* The first prong requires "that the party seeking modification of the consent decree 'establish that a significant change in facts or law warrants revision of the decree.'" *Id.* at 1205-06 (quoting Rufo, 502 U.S. at 393). If the first prong is satisfied, "the second prong requires that the modifications be 'suitably tailored' to address the new factual or legal environment." *Id.* at 1206 (quoting Rufo, 502 U.S. at 393).

Under the first prong, there are "three situations in which modification of a consent decree for a change in facts may be warranted: (1) 'when changed factual conditions make compliance with the decree substantially more onerous[;] . . . (2) when a decree proves to be unworkable because of unforeseen obstacles[;] . . . or (3) when enforcement of the decree without modification would be detrimental to the public interest." *Id.* (quoting Rufo, 502 U.S. at 384-85). Modification due to a change in facts is proper because "[l]itigants are not required to anticipate every exigency that could conceivably arise during the life of a consent decree." Rufo, 502 U.S. at 385.

The language of the paragraph contained in the 1993 Order dealing with the location of the new high school when read thoroughly indicates that the Board was required to request additional revenue measures to support the financing of the construction of the district-wide high school. The Board in fact did this! However, as shown by the May 16, 1995, Petition to Amend the Desegregation Order, the tax referendum designed to finance the construction of the new consolidated high school was defeated by a 3 to 1 margin in November of 1994. Therefore, these changed factual conditions made compliance with the 1993 Order virtually impossible, certainly more onerous, at the time since there were no funds available to finance the

construction. It also justifies the parties' assumption at the time that that Order was no longer in effect!!

Additionally, the Decree is unworkable or is detrimental to the public interest now because of the fact that the Valley site is being donated with no charge to the school system, and with existing infrastructure and athletic facilities.  The purchase of another site on Highway 50 requiring infrastructure and athletic facility expenses would be an inappropriate expenditure of the public's monies.  Moreover, in 1993, the high schools in Lafayette and Valley were substantially different than they are today.  Today, Valley High School has more African American students than Lafayette High School; it also has approximately three times as many overall students as Lafayette High School. To require three times as many students to travel to a new high school location on Highway 50 is unworkable since it creates potential safety issues which are not in the public interest. These facts were not anticipated at the time of the Decree.

Finally, enforcement of the 1993 Decree without modification would be detrimental to the public interest since today the population of the County is much larger in the Valley area than in the other areas of the County.  Schools should generally be built in or near population centers – enrollment projections drive facility planning.

Once a moving party has satisfied the first prong, "the district court should determine whether the proposed modification is suitably tailored to the changed circumstances."  Rufo, 502 U.S. at 391.  This determination is made with clear consideration of "three matters."  Id.  First, "a modification must not create or perpetuate a constitutional violation."  The proposed plan considered as a whole does not.  Id.  Second, "[a] proposed modification should not strive to rewrite a consent decree so that it conforms to the constitutional floor."  Id.  Instead, "the focus should be on whether the proposed modification is tailored to resolve the problems created by

the change in circumstances." *Id.* The proposed plan is tailored to burden the fewest number of black students. Finally, "the public interest and '[c]onsiderations based on the allocation of powers within our federal system' . . . require that the district court <u>defer</u> <u>to</u> <u>local</u> <u>government</u> <u>administrators</u>, who have the 'primary responsibility for elucidating, assessing, and solving' the problems of institutional reform, <u>to</u> <u>resolve</u> <u>the</u> <u>intricacies</u> <u>of</u> <u>implementing</u> <u>a</u> <u>decree</u> <u>modification</u>." <u>Rufo</u>, 502 U.S. at 392 (first quoting <u>Board of Educ. of Okla. City Pub. Sch. v. Dowell,</u> 498 U.S. 237, 248 (1991); and then quoting <u>Brown v. Board of Educ.,</u> 349 U.S. 294, 299 (1955)) (alteration in original). (Emphasis added). <u>Notably</u>, "[f]inancial constraints may not be used to justify the creation or perpetuation of constitutional violations, but they are a <u>legitimate</u> <u>concern</u> of government defendants in institutional reform litigation and therefore are <u>appropriately</u> <u>considered</u> <u>in</u> <u>tailoring</u> <u>a</u> <u>consent</u> <u>decree</u> <u>modification</u>." *Id.* at 392-93. (Emphasis added). Thus, a free site saves taxpayers' money.

The Board submits that the 1993 Order does not apply here due to laches but if it does, it should be modified to allow the Plan to be implemented if it meets constitutional muster. With that in mind, the Court should proceed to consider the Plan to determine if it is constitutionally permissible. We submit that it is for the reasons set forth below.

### III.  LEGAL FRAMEWORK

In reviewing a school defendant's proposed facilities plan, the district court must have "as its goal to remedy the underlying constitutional violation," but in "'devising a remedy [it] must take into account the interest of state and local authorities in managing their own affairs, consistent with the constitution.'" <u>United States v. State of Ga., Meriwether Cnty.</u>, 171 F.3d 1333, 1337 (11th Cir. 1999) (quoting <u>Milliken v. Bradley,</u> 433 U.S. 267, 280-81 (1977)).  In analyzing the school board's plan, the district court may not rely exclusively on the absence of

"intentional discrimination" or "impermissible racial animus" to give the plan its stamp of approval. See Id. However, such an "observation is certainly a relevant one under the law of [the Eleventh Circuit]." Id.

After the district court is satisfied that the proposed plan lacks intentional discrimination, it then must analyze the six factors enunciated in Green v. County Sch. Bd. of New Kent Cnty., 391 U.S. 430, 437 (1968). Id. at 1338. "The six Green factors are: student assignments, transportation, faculty, staff, extracurricular activities, and facilities." Id. (Citing Green, 391 U.S. at 437). Specifically with respect to new facilities proposed in a school board's plan, the Eleventh Circuit has noted that "well-discussed and well-bargained political compromise" in construction and financing matters related to new facility planning do not "run[] afoul of the constitutional guideposts set out in Green." Id. at 1343. Instead, Green commands "[t]hat the burden on a school board today is to come forward with a plan that promises realistically to work and promises realistically to work now." Green, 391 U.S. at 439.

Other relevant factors the district court must consider when faced with a proposed facilities plan include: "(1) population growth; (2) finances; (3) land values; (4) site availability; (5) racial composition of the student body; (6) racial composition of the neighborhood of the proposed school and the residence of the students; (7) capacity and utilization of existing facilities; (8) transportation requirements; (9) the location of a proposed school to maintain equality the burden of bussing between blacks and whites; (10) recommendations by the State Department of Education; and (11) potential for future re-segregation." United States v. Hendry Cnty. Sch. Dist., 504 F.2d 550, 552 (5th Cir. 1974). These factors are considered relevant when a school board searches "for suitable land on which a new school could be constructed." Lee v. United States, 914 F. Supp. 489, 492 (N.D. Ala. 1996) (citing Hendry factors with approval).

Moreover, political input by the community regarding site selection by way of referendum or otherwise is a factor a school board permissibly may consider in planning for new facilities. *Id.*

A non-unitary, former de jure segregated school system must not only avoid perpetuating or reestablishing a dual school system but must also "render decisions that further desegregation and help to eliminate the effects of the previous dual school system." Harris by Harris v. Crenshaw County Sch. Bd., 968 F.2d 1090, 1095 (11th Cir. 1992). On the other hand, "there is no constitutional duty to achieve maximum desegregation." Hull v. Quitman County Bd. Of Educ., 1 F.3d 1450, 1455 (5th Cir. 1993). Courts have "recognized limits imposed upon desegregation efforts by population changes and the reality of white flight, holding that `school officials who have taken effective action have no affirmative fourteenth-amendment duty to respond to private actions of those who vote with their feet!" *Id.*

When a school district under a desegregation order seeks to close a school and reassign its students, as the District does today, the Supreme Court has stated that "it is the responsibility of local authorities and district courts to see to it that future school construction and abandonment are not used and do not serve to perpetuate or re-establish the dual system." Swann v. Charlotte-Mecklenburg Bd. of Educ., 402 U.S. 1, 21 (1971). The Eleventh Circuit has indicated that "the duty to desegregate is violated if a school board fails to consider or include the objective of desegregation in decisions regarding the construction and abandonment of school facilities." Harris by Harris v. Crenshaw Cnty. Bd. of Educ., 968 F.2d 1090, 1095 (11th Cir. 1992).

## IV. THE PROCESS AND THE DECISION

Tracy Richter with Hoar Property Management (HPM) his company HPM have been working with the school system for a number of years. Prior to the time that Mr. Chambley

became Superintendent, Mr. Richter and his company were working with the school system doing master planning.  *See Trial Exhibit #24.*  During that period of time, community meetings were conducted throughout the county dealing with various issues concerning the schools and master planning.

After Mr. Chambley took office in January of 2021, Mr. Richter begin working with him on master planning.  In connection with this work, a community task force was formed which met for a number of times in the winter and spring of 2022 to review various factual matters regarding the school system and make recommendations about various school related plans for the future.

During that time also, the Plaintiff Parties and the Board were engaging in discussions about how to move forward with desegregation of a system as a whole.  These discussions culminated in the Agreement to a Consent Decree which was filed with this Court along with a Joint Motion to Approve the same on approximately May 19, 2022.  (See Doc. 480).  The Motion indicated that "the parties agree that the attached Proposed Consent Order will reasonably ensure that if fully implemented the District will eliminate the vestiges of de jure segregation and will provide equal educationally opportunity to all of the students enrolled in the District.  (See Doc. 480 at 3).  As mentioned above, this Motion and the attached Consent Decree made no mention of the 1993 Order or a requirement that a site be selected that is "readily accessible" to Highway 50.

The Private Plaintiffs later on withdrew their consent to this and it was necessary for the Board to file a Motion for Immediate Relief to Seek Approval of the Court to close certain schools for the beginning of the 2022/2023 school year.  This Motion was filed, and a hearing scheduled for the public to express their views.  Thereafter, a hearing with the parties was held

and on July 5, 2022, this Court entered an Order allowing the closure of certain schools for the 2022/2023 school year.  (See Doc. 493).

The Board then proceeded to address the issues necessary to close certain schools and open certain schools in different configurations by the beginning of school which was in early August 2022.  This involved a great deal of work by the Superintendent and his staff.

While that process was going on, the Board began working with Tracy Richter in June to identify and analyze potential sites for the new consolidated high school.  During that period of time, Mr. Richter and the School Board representatives made the decision on their own to look at Highway 50 sites without regard to any requirements of the 1993 Order.  *See Richter transcript, Vol. II, p. 266:11-13.*

HPM hired GIS Analyst, Lee Hwang to identify potential sites that were over 40 acres.  Mr. Hwang analyzed distances between student residences and various potential high school sites.  *See Hwang report, Trial Exhibit 012.*

On June 24, 2022, the City of Lafayette offered to donate land to the school board on which it could build a consolidated high school in the City of Lafayette.  The City offered up to a combined 164 acres of land it owned or had the option to buy.  (Doc. 492-1).  The City's offer included two separate options to buy land which adjoined the land the land that the City already owned.  These two options according to their terms would expire after 18 months from the date of their execution.  *Trial Exhibits 15 and 16.  See also, Joint Stipulation of Facts, Doc. 568, p. 17, para. 6.*

In July of 2022, Mr. Hwang met with Superintendent Chambly about sites he had identified, including eight (8) sites located along Highway 50, one site in Fredonia and one site in Cusseta.  *See Joint Stipulation of Facts, (Doc. 568, p. 3. para. 8, 9 & 10).*

On July 20, 2022, the City of Valley offered to donate a 74-acre parcel that the city owned in the City of Valley. The City of Valley's proposal included a number of environmental, geotechnical and topographical information which had been contained in 2016. *See Parties Joint Submission of Joint Stipulated Facts, Doc. 568, p. 17, para. 7.* This proposal according to the terms of the city's offer would expire within three (3) years of its offer.

During this time period, Mr. Richter and Mr. Chambley were involved in a number of different things including the movements to the new schools, reconfiguration of the new schools and planning for the opening of school in the fall of August 2022. *See Chambley testimony, Vol. 1, pp. 64:1 – 65:25.* The City of Lafayette and the City of Valley properties were being considered at this time along with the sites in Fredonia, and Cusseta and along Highway 50. However, at some point after the cities of Valley and Lafayette donated property, Mr. Richter recommended that the district narrow its site selection to the two donated properties. *See Joint Stipulation of Facts, Doc. 568, p. 17, para. 8; and, Richter testimony, Vol. II, p. 218:1-25.*

As time progressed, the school board personnel and their representatives and the representatives of HPM, continued to work on site selection issues. In early September 2022, the Board was advised that the Department of Justice planned to host two listening sessions in Chambers County to hear concerns and questions from the community. Since the district had planned all along to share their findings with the community and with the other attorneys, the district decided to have community meetings at the same time while the attorneys from the DOJ were in town to disseminate what information they had at the time. This was done as an accommodation to the attorneys since they would already be in town. *See Joint Stipulation of Facts, Doc. 568, p. 17, para. 9.*

On September 12 & 13, 2022, the district held community meetings to present its site selection research. These meetings were conducted primarily by Mr. Richter and consisted of a comparison of the two donated properties with information which they had available at the time. The district site selection comparison was not complete at the time of the presentation. *See Trial Exhibit 004*. It was later updated. *See Trial Exhibit 022*.

On September 13, 2022, the district requested additional information from the city of Lafayette regarding the property which they indented to donate. This information was received on September 20, 2022. *See Joint Stipulation of Facts, Doc. 568, p. 17 & 18, para. 10 & 11*.

During the week of October 17, 2022, Mr. Richter recommended that the district build a new consolidated high school on the site donated by the city of Valley. Thereafter, on October 26, 2022, Superintendent Chambley recommended that the Board approve the donated Valley site as the site for the new consolidated high school. *See Joint Stipulation of Facts, Doc. 568, p. 18, para. 12 & 13*.

Subsequently, the Board received expert reports from the Plaintiff Parties' experts. The expert report of Matthew Cropper indicated that certain sites that had been included in the original Highway 50 sites considered by the Board would be more appropriate than the Valley site based on their proximity and location. The Board inquired as to the availability of two of those sites and were told that the sites were not for sale. *See Chambley testimony, Vol I, p. 198:7-19*.

The Board also asked Mr. Chris Busby with the Chambers County Industrial Authority to research the availabilities of utilities and other issues related to some of these sites, primarily along Highway 50 between Lafayette and Lanett, and in the Valley area. Mr. Busby did that in

early November and provided his results to Superintendent Chambley for review.  *See Busby Report, Trial Exhibit 29; Busby testimony, Vol 4, p. 43:17-22.*

Ultimately, the decision was made in several steps First, the expert hired by the Board, mainly, Mr. Tracy Richter, recommended to Mr. Chambley that he narrow his focus to the two donated sites, Lafayette and Valley.  After that was done, and a comparison was made between those two sites including hearing the concerns of the Lafayette community and reviewing the materials forwarded by the City Attorney for the City of Lafayette, Mr. Richter recommended to Mr. Chambley that the Valley site should be selected since it met the criteria for the site better than the Lafayette site.  *See Defendant's Exhibit 24, p. 11.* After receiving that recommendation from Mr. Richter and considering all the issues of which he was aware, Mr. Chambley made a recommendation to the Board to select the Valley site for the proposed new high school subject to this Court's approval.  This was done on October 26, 2022.  *Trial Exhibit 13.* Even after that decision, Mr. Chambley continued to review the site selection by obtaining information from Chris Busby and local property owners concerning tracts along Highway 50 as suggested by the Plaintiff Parties' experts.

The recommendation from Mr. Richter was based on a number of things, all of which are set out in his testimony beginning on p. 242 of Vol. II.  He considered such things as infrastructure, access to utilities, access to athletic and competition fields, size, etc.

However, in the final analysis it came down to proximity of students and mileage to the site.  He also considered how the transportation would affect the outliers and felt based on his experience that you could make accommodations to minimize the impact of a bus ride on the outliers such as providing air conditioning, WIFI, personal electronic devices, etc. His analysis

of the situation is set out very thoroughly in his testimony beginning on p. 242 of Vol. II and continuing through p. 251.

During his testimony, Mr. Richter was asked by the Court about his experience with outlier problems in other school situations.  Mr. Richter detailed for the Court his experience in several systems including Duval County, Florida, Shenendoah County, Virginia, and Kodiak, Alaska.  In the final analysis, there are outlier problems in other schools that are caused by the personal choices of the residents as to where they live as well as the geography itself.  These matters have been dealt with and can be dealt with.

Mr. Chambley followed the recommendation of Mr. Richter and made the recommendation to the Board which accepted it on October 26, 2022, subject to the approval of this Court.

Of course, one of the things which impacted the decision was cost.  The donated sites freed the Board from the requirement to spend public money to purchase a site.  The athletic facilities already existing in the Valley area would also free the Board from having to spend monies on new athletic facilities if the school were built in another location.  Finally, the population growth is in the Valley area and adequate infrastructure, police and fire protection and medical facilities are available.

The Board has been considering and making efforts to reach or to build a new high school and do other facility planning for a number of years.  They have acted in good faith over a period of time to reach a reasonable conclusion which has not been based on race and will eventually further desegregation by combining student bodies and faculties and by providing more course offerings to the Lafayette High School students at a much more reasonable price per student. The Board involved a number of citizens over several years, conducted community

20

meetings, formed a Task Force, considered materials from a number of individuals including the City of Lafayette attorney and at the last, considered and investigated the expert reports from the Plaintiff Parties. This effort has not been biased or a rush to judgment but wide-ranging over several years.

The Plaintiff Parties take the position that the process utilized by the school board in coming to its conclusion about the appropriate location for the new high school was flawed and that since the "process ultimately leads to the conclusion," the result in this case is not appropriate. *See Cropper Testimony Vol. 4, pgs. 152:4-153-1.* Stated differently, Mr. Cropper believes that though he respects the District and Superintendent Chambley and the Board for the measures they have taken over the last few years, their efforts in regard to the new high school site were rushed and that they should have done just a little more research to make sure that there is nothing else available in terms of property. *Id.*

Similarly, the expert on behalf of the Private-Plaintiffs, Mr. Robert Murray takes issue with the information prepared and submitted at the community meetings in September of 2022, testifying that that information was incomplete, inaccurate, and to him biased in his presentation. *See testimony of Robert Murray, Volume 4, p. 60:23-24.* However, Mr. Murray does not have an objection to the actual ultimate decision by the Board. Nor does he take the position that there was any sort of racial motive involved in the Board's decision or that they acted in any way to dishonor their desegregation obligations. Ultimately, however, he did not make a recommendation outside of what's in his report. *See Murray testimony Volume 4, p. 88:1-89-8.*

Both of these experts focus their testimony in large part on the process. The process however is not something that is set in stone or defined anywhere of which we are aware. For example, Mr. Murray testified that there are sometimes templates but "a lot of the time it will

align with the specific needs of the school district."  He also acknowledged that the documents prepared by the school board's representatives with which he took issue, that is, the September 2022, community meeting document were working documents.  *See Murray testimony, Volume 4, p. 91:12-15.*

Likewise, Mr. Cropper indicated that the site selection process in his opinion was "incomplete and not comprehensive and inequitable".  *See Cropper testimony, Volume 4, p. 124:17-19.*

Despite the testimony of these two individuals, Mr. Murray and Mr. Cropper, there is no evidence that the Board or its representatives acted in any deceitful or racially motivated manner. The fact that a working document presented incomplete information or incorrect information is not a reason to deny the request of the Board with respect to the site selection.

Mr. Murray and Mr. Cropper are no doubt well intentioned and highly qualified individuals in their fields.  However, in this case, they focused on a snapshot of the process as opposed to looking at the entire picture.  Their efforts and their opinions are a prime example of "paralysis by analysis."  They failed to take into account the independent knowledge of the individuals who live and work and play in Chambers County on a daily basis and who are charged with making this decision.  They would have this Court require further analysis which further paralyzes the process.

Likewise, the Desegregation Advisory Committee (DAC) expressed concern that the proposed site did not comply with the 1993 Order and asked that the decision be postponed for further analysis. The Board was made aware of that request before their vote on October 26, 2022, but chose to move forward. The DAC had only been involved since late August or

September 2022 and did not know everything that the Board had done over the several years before that. Chambley testimony, Vol I, p. 212:9-214:17. *See Plaintiffs' Exhibit 007.*

This case has been under the supervision of this Court for approximately 50 years.  The time is well overdue for the Board to move out from under this Court's supervision and that is exactly what the Board has attempted to do under the circumstances.  Clearly this is a very contentious issue in the community.  The Board recognizes that and has taken steps to try to move forward rather than remaining paralyzed as has been the case in the past.  They have operated in good faith in trying to comply with its desegregation obligations.  Though people may differ on the methodology, there is no indication that that methodology was undertaken in an effort to do anything but reach a reasonable and practical conclusion under the circumstances.

At the end of the day, the ultimate issues in this case are (1) whether the Board's decision reverts the district to a dual system of segregation; (2) whether the Board's decision is racially motivated and (3) whether the black students in the county bear a disproportionate burden of the desegregation efforts.  No one has indicated to our knowledge that the Board's decision reverts the district to a dual system of segregation, and no one has indicated that the Board's decision is racially motivated.  Whether the black students bear a disproportionate burden of these efforts is addressed below.

## V.  TRANSPORTATION BURDEN

At the end of the day, as set out above, this case hinges primarily on whether the location of the new school at the proposed site in Valley imposes a disproportionate transportation burden on the black students in the county.  The Plaintiff Parties point to the fact that there will be bus rides in excess of one hour for the children in the Lafayette zone in order to attend school at the

Valley site. The Plaintiff Parties also note that the majority of these students are black. Therefore, they conclude that there is a disproportionate burden on the black students.

In analyzing this issue, one must consider the current situation versus what would be in effect if the Valley site is approved. Currently, there are a number of black students who ride the bus to the Lafayette High School area. Some of those bus rides are already in excess of 60 minutes. Currently there are eight (8) bus rides in the Lafayette zone which are 60 minutes or longer. Similarly, there are also currently 9 bus routes in the Valley area which are 60 minutes or longer. *See Trial Exhibit 003.* Thus, as the situation exists today, there are more bus rides of 60 minutes or longer in the Valley area than there are in the Lafayette area. Additionally, and importantly to this analysis, students at BOTH high schools currently ride the bus to school and then during the day ride the bus to the other high school and back to take career tech courses at their request. Then they ride the bus home from their respective school at the end of the school day.

With that as a starting point, assuming that the site is located in Valley, there will be an additional 15 miles from the Lafayette area to the Valley site which would have to be covered by the Lafayette area students. This would add approximately 25 minutes to their bus ride. *See Trial Exhibit 003.*

Exhibit 6B, the large map of the county submitted during the trial which includes the five (5) mile radius from the City of Lafayette, shows the routes that would be run in the event that the site is located in Valley. These routes include the routes that exist today with the exception of the routes along the southern boundary and along the eastern boundary of the county which will be new.

A review of *Trial Exhibit 6-B* shows that the students who live outside the five (5) mile radius from the city of Lafayette are very spread out.  The dots on *Exhibit 6-B* show where these students are picked up outside of the five (5) mile radius.  These are extreme outliers according to Court Exhibit 2.  There are 68 high school students who live more than 20 miles from the Valley site, 49 of whom are black, 17 of whom are white, one of whom is Hispanic and one of whom is characterized as "other."  *See Court Exhibit 2.*

What is not clear, however, is how far outside of the five-mile radius those <u>high</u> school students live.  For example, Mr. Mitchum testified that one of the routes, specifically, Route 4, Bus 22-7, which carries students to Eastside, JP Powell and Lafayette High School and which currently has the longest ride time of 85 minutes (*see Trial Exhibit 3*), makes its last stop for an elementary student!  *See Mitchum testimony, Vol. III, p. 247:9-17.*  So, in that situation, the longest rider is not a high school student.  The high school students on that route would not be subject to an 85-minute ride plus additional time to go to Valley.  It follows that, depending on the routes of the buses, the high school students may or may not be on the bus for the entire time the bus is covering the route, plus time to Valley.

Additionally, of the 49 black high school students who live more than 20 miles from the Valley site, if the Valley site is approved, 12 of those black students will ride the new routes in the southern and eastern section of the county, leaving 37 black students in the rest of the county who live more than 20 miles from the Valley site.  These 12 black students on the eastern and southern routes will have route times of 50 minutes and 55 minutes respectively with distances of 25 and 29 miles respectively. *See Mitchum testimony, Vol. III, pp. 174:3-176:24 and p. 254:3-13.*  Therefore, in the final analysis, there are only a maximum of 37 black high school students whose bus rides <u>may</u> be longer than 60 minutes.

In assessing the transportation burden, the question properly stated is whether there is a "disproportionate" transportation burden.  Obviously, the children in the Lafayette area will have to travel an additional distance because of where they live but the decision by the Board to adopt the Plan was not racially motivated, rather it was made in an effort to comply with its desegregation obligations to the extent practicable.

In the case of Horton v. Lawrence County Board of Education, 2022 WL 1217240 (N.D. Ala. 2022), the Court considered a similar issue about the bus ride burden.  In that case an increase in student ride time from 38.625 minutes to 51.5 minutes, an increase of 12.875 minutes was the focus. The Court in that case determined that there was no disproportionate burden of desegregation on black students.  It noted that while some black students would experience longer bus rides, those ride times were not disproportionate when compared to the transportation times of other students in the County.  Here the bus ride times would definitely be longer but not disproportionately since there remain 9 Valley area buses lasting 60 minutes or longer.  *See Trial Exhibit 3*

Similarly, in the case of Harris v. Crenshaw County Board of Education, 968 F.2 109 (11th Cir. 1992), the Court indicated that the impact of the proposed action by the Board which added 10 miles to the bus ride home for black students did not amount to a disproportionate burden.  In that case, the Court noted that adding at most 10 miles to the bus ride was not unreasonable. (Herein are adding at most 15 miles).  Moreover, the Court in the Crenshaw County case indicated that there was no reasonable alternative under the circumstances.  Here air-conditioned buses will be used on the longest routes *(Mitchum, Vol. III, pp. 254:13-255:7)* and WIFI will be available *(Chambley, Vol. I, pp. 144:4-145:5).*  Also, if the new school is built

in Valley, all schools will operate on Central time which will help the Lafayette area students. *See Chambley Vol. I, pp. 146:11-149:4.*

In March of 2022, the Justice Department's expert, Mr. Matthew Cropper rendered an opinion in which he indicated that Valley High School would be the most appropriate place to place all of the High School students in the County. He indicated that this was not a perfect plan because there would be transportation issues surrounding the outliers in the county who are predominantly black but nevertheless approved it and suggested ways to minimize that. *See Defendant's Exhibit 7, pp. 8 and 10.* However, in his report rendered in December of 2022, Mr. Cropper pivoted and testified that the location of the school in Valley would not be appropriate because in his opinion the transportation burden was disproportionate on the outliers in the county. It is interesting to note that in Mr. Cropper's report of December of 2022, which is in evidence, there is no mention of the previous March report. *Trial Exhibit 33.* This only came up when he was asked about this at deposition, at which point he indicated that changed facts resulted in the change in his opinion. In any event, though the Plan is not perfect, it certainly is not racially motivated, it does not cause the district to revert to a dual system of segregation and it does not "disproportionately" burden the black students of the County, a large number of which attend the current Valley High. If the school is located elsewhere, many more Valley area black students may have longer bus rides. Finally, the decision is made based on the <u>practicalities</u> of the situation since the Board has no reasonable alternative in terms of the bus routes because of the roads and where the citizens reside.

## VI.  TEMPORARY CONSIDATION OF ALL HIGH SCHOOL STUDENTS PENDING CONSTRUCTION OF A NEW SCHOOL

The Board has also requested that the current students at Lafayette High School be consolidated at the current Valley High School facility during the construction period for the new

high school.  This is done in order to provide opportunities to the Lafayette High School students that they do not currently have such as additional classes and more activities as well as better facilities.  *See Chambley testimony, Vol. I, pp. 181:22–182:9; 151:11-156:10.*  This also would allow the Board to begin planning for the renovation of the current Lafayette High School campus.  It would also of course provide for increased desegregation because the student bodies would be combined thus eliminating a racial imbalance in Lafayette High School.  It would also allow for the combination of faculties which would again, eliminate any questions about perceived disparities between the educational backgrounds and racial backgrounds of the teachers at Lafayette High.  The name of the high school would no longer be Valley High School but would be changed in accordance with the public's vote as specified in Mr. Chambley's testimony in Vol. I, p. 183.  There would also be a change in mascot and colors so that the perception that this was "Valley High School" would be eliminated as best possible.

The transportation issues addressed above would be the same, the benefits for the consolidation off setting those perceived transportation burdens.

## VII.  CONCLUSION

After what seems like forever, the Chambers County Board of Education has broken free of the chains of "paralysis by analysis" and refused to kick the can down the road.  They have made a difficult decision which is by no means perfect.  However, in considering the practicalities of the situation, the Plan meets constitutional muster, and we respectfully submit should be approved by this Honorable Court.  Thereafter, the Board will continue to endeavor to move toward unitary status.

Respectfully submitted,

*/s/ Robert T. Meadows, III*
Robert T. Meadows, III (MEA012)
Attorney for Chambers County Board of Education

**OF COUNSEL:**
**Capell & Howard, P.C.**
Skyway Professional Center
3120 Frederick Road, Suite B
Opelika, Alabama 36801
Telephone: (334) 501-1540
Facsimile: (334) 323-8888
Email: Bob.Meadows@chlaw.com

## CERTIFICATE OF SERVICE

I hereby certify that on this the 14th day of April, 2023, I electronically filed this Notice with the Clerk of the Court for the United States District Court, for the Middle District of Alabama, through CM/CEF, which will which will send notification of such filing to all counsel of record.

*/s/ Robert T. Meadows, III*
OF COUNSEL