**IN THE UNITED STATES DISTRICT
COURT FOR THE MIDDLE DISTRICT OF
ALABAMA EASTERN DIVISION**

ANTHONY T. LEE, et al.,

      Plaintiffs,

and

UNITED STATES OF AMERICA,

      Plaintiff-Intervenor,

v.

CHAMBERS COUNTY BOARD OF
EDUCATION, et al.,

      Defendants.

**CIVIL ACTION NUMBER**

**3:70-cv-00844-WKW**

## PLAINTIFFS' POST-TRIAL BRIEF IN OPPOSITION TO DEFENDANT'S MOTION FOR APPROVAL OF SITE SELECTION AND TEMPORARY CONSOLIDATION

## <u>TABLE OF CONTENTS</u>

TABLE OF CONTENTS ................................................................................................ ii

TABLE OF AUTHORITIES ........................................................................................ iii

INTRODUCTION ......................................................................................................... 1

BACKGROUND ........................................................................................................... 1

ARGUMENT ................................................................................................................ 2

    I.   THE 1993 AGREED ORDER REMAINS BINDING ........................................ 3

        A.   The Court Has Not Modified or Dissolved the 1993 Agreed Order. .............................. 3

        B.   The Court Should Not Sua Sponte Modify the 1993 Agreed Order. ............................... 5

    II.  THE DISTRICT'S PLAN VIOLATES THE 1993 AGREED ORDER AND EVINCES A LACK OF GOOD FAITH COMPLIANCE WITH THAT ORDER ................................... 10

        A.   It is Undisputed that the District's Plan Violates the 1993 Agreed Order. ................... 10

        B.   The District Failed to Consider Sites that Comply with 1993 Order and Fairly Distribute Transportation Burdens. ......................................................................... 11

    III.  THE DISTRICT'S PLAN PLACES A HEAVY BURDEN ON BLACK STUDENTS ... 18

        A.   Black Students Will be Disproportionately Burdened by the District's Choice to Both Place the New High School Directly Next to the Current Valley High School and by Temporary Consolidation. ................................................................................... 19

        B.   The District's Plan Disproportionately Burden Black Students by Forcing LaFayette Feeder Pattern Students to Attend High School in Valley. .................................... 20

        C.   The District's Data Highlights the Onerous Burden Placed on Black Students. .............. 22

        D.   The District's Transportation Plan for Bussing Students to Valley Disproportionately Burdens Black Children. ...................................................................................... 23

CONCLUSION ........................................................................................................... 25

CERTIFICATE OF SERVICE ..................................................................................... 27

# <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                                              **Page(s)**

*Anderson ex rel. Anderson v. Canton Mun. Separate Sch. Dist.*,
   232 F.3d 450 (5th Cir. 2000) ....................................................................................19, 20

*Arvizu v. Waco Indep. Sch. Dist.*,
   495 F.2d 499 (5th Cir. 1974) ............................................................................................19

*Cisneros v. Corpus Christi Indep. Sch. Dist.*,
   467 F.2d 142 (5th Cir.1972) .............................................................................................20

*Davis v. Bd. of Sch. Comm'rs of Mobile Cnty.*,
   483 F.2d 1017 (5th Cir. 1973) ...................................................................................19, 20

*Ensley v. Branch, N.A.A.C.P. v. Seibels*,
   31 F.3d 1548 (11th Cir. 1994) ............................................................................................8

*Fla. Ass'n for Retarded Citizens, Inc. v. Bush*,
   246 F.3d 1296 (11th Cir. 1992) ..........................................................................................5

*Green v. Cnty. Sch. Bd. of New Kent Cnty., Va.*,
   391 U.S. 430 (1968)................................................................................................ *passim*

*Horton v. Lawrence Cnty. Bd. of Educ.*,
   No. 5:66-CV- 00445-RDP, 2022 WL 1217240 (N.D. Ala. Apr. 25, 2022)............................25

*Jacksonville Branch, NAACP v. Duval Cnty. Sch. Bd.*,
   978 F.2d 1574 (11th Cir. 1992) .....................................................................................3, 4

*Kelley v. Metro. Cnty. Bd. of Ed. of Nashville & Davidson Cnty., Tenn.*,
   492 F. Supp. 167 (M.D. Tenn. 1980).................................................................................23

*Lee v. Anniston City Sch. Sys.*,
   737 F. 2d (11th Cir. 1984) ........................................................................................13, 22

*Lee v. Chambers Cnty. Bd. of Educ.*,
   849 F. Supp. 1474 (M.D. Ala. 1994) ..................................................................................7

*Lee v. Macon Cnty. Bd. Of Educ.*,
   267 F. Supp. 458 (M.D. Ala.), *aff'd sub nom. Wallace v. United States*, 389
   U.S. 215 (1967).................................................................................................................1

*Lee v. Macon Cnty. Bd. of Educ.*,
   448 F.2d 746 (5th Cir. 1971) .............................................................................................2

*Lee v. United States*,
   914 F. Supp. 489 (N.D. Ala. 1996).............................................................................21, 24

*Manning ex rel. Manning v. Sch. Bd. of Hillsborough Cnty., Fla.*,
   244 F.3d 927 (11th Cir. 2001) ........................................................................17

*McNeal v. Tate Cnty. Sch. Dist.*,
   No. 2:70-CV-29-DMB, 2022 WL 17582264 (N.D. Miss. Dec. 12, 2022) ......................24, 25

*Moore v. Tangipahoa Par. Sch. Bd.*,
   921 F. 3d 545 (5th Cir. 2019) ........................................................................10

*Paradise v. Prescott*,
   767 F.2d 1514 (11th Cir. 1985) ........................................................................4

*Planetary Motion, Inc. v. Techsplosion, Inc.*,
   261 F.3d 1188 (11th Cir. 2001) ........................................................................3

*Reynolds v. Roberts*,
   202 F. 3d 1303 (11th Cir. 2000) ........................................................................5

*Reynolds v. Roberts*,
   207 F.3d 1288 (11th Cir. 2000) ........................................................................3

*Rufo v. Inmates of Suffolk Cnty. Jail*,
   502 U.S. 367 (1992).......................................................................5, 6, 7, 8

*Sierra Club v. Meiburg*,
   296 F.3d 1021 (11th Cir. 2002) ........................................................................5

*Smith v. Sch. Bd. of Concordia Par.*,
   906 F.3d 327 (5th Cir. 2018) ........................................................................10

*Stout v. Jefferson Cnty. Bd. of Educ.*,
   882 F. 3d 988 (11th Cir. 2018) ........................................................................3, 10, 14

*Thompson v. Sch. Bd. of Newport News*,
   465 F.2d 83 (4th Cir. 1972) ........................................................................24

*United States v. Hendry Cnty. Sch. Dist.*,
   504 F.2d 550 (5th Cir. 1974) ........................................................................18, 19

*United States v. Jefferson Cnty.*,
   No. CV-75-S-666-S, 2013 WL 4482970 (N.D. Ala., Aug. 20, 2013) ........................................6

*United States v. Mississippi (Choctaw Cnty. Sch. Dist.)*,
   941 F. Supp. 2d 708 (N.D. Miss. 2013)........................................................................19, 21, 22

**Other Authorities**

FRCP 60(b)(5) ........................................................................5

iv

## INTRODUCTION

This Court held an evidentiary hearing ("Hearing") January 17 to January 20, 2023, on the motion for approval of site selection and temporary consolidation by Defendant Chambers County Board of Education ("District" or the "Board"). Doc. 500. Based on the evidence presented, the Board's proposed site for the new consolidated, district-wide high school and temporary consolidation plan evince a lack of good faith effort that ignores the Court's prior orders. Under the Board's plan, the Plaintiff Class of Black students bears an unreasonable and unconstitutional burden.

For the reasons discussed in previous filings and below, the Court should deny Defendant's motion in whole.

## BACKGROUND

In 1963, Private Plaintiffs, Black parents and students in the Chambers County School District, filed this case as part of what became a state-wide litigation challenging segregated school conditions in Alabama.  *See Lee v. Macon Cnty. Bd. Of Educ.*, 267 F. Supp. 458 (M.D. Ala.), *aff'd sub nom. Wallace v. United States*, 389 U.S. 215 (1967).  Over the years, this Court has been asked to decide a number of issues related to school facilities, school closures, student assignment, and the distribution of educational resources through the District, among other issues. For example, in 1992, the predominantly white city of Valley, Alabama, attempted to break away from the District and form its own separate Valley City School District.  This Court denied Valley's request to operate a separate school system, and instead approved the 1993 Agreed Order that resulted.

The 1993 Agreed Order required a number of measures to further desegregation throughout the District, including closing the Chambers County High School in the rural

Milltown community and reassigning its students;  enforcing inter and intra-student transfers within the District; improving the image of LaFayette High school by a date-certain, as required in a previous order; and the construction of a consolidated high school readily accessible to Highway 50 between Lanett and LaFayette, *inter alia*.

In 2022, the District moved for this Court to approve a plan that would: 1) immediately close LaFayette High School and consolidate its current students at Valley High School; and 2) construct a new consolidated high school in the City of Valley, just two miles from the current Valley High School.

In January of 2023, this Court held an evidentiary hearing on the District's motion, including the issues of LaFayette's immediate closure, temporary consolidation, and the Board's site selected for permanent consolidation.  Private Plaintiffs oppose this motion because it violates the 1993 Agreed Order and places a disproportionate burden on the District's Black students for both temporary and permanent consolidation.

For the reasons detailed below, Private Plaintiffs argue that the District's motion should be summarily denied.

## **ARGUMENT**

In school desegregation cases, a school board seeking to modify an existing student assignment plan must "establish that its proposed plan promises meaningful and immediate progress toward disestablishing state-imposed segregation." *Green v. Cnty. Sch. Bd. of New Kent Cnty., Va.*, 391 U.S. 430, 439 (1968). In examining a school board's motion to relocate a school facility or reassign students to different schools, the focus is on whether the plan is offered in good faith to further the existing desegregation order and whether the burdens of the board's plan are distributed equally among all students. *See id*; *Lee v. Macon Cnty. Bd. of Educ.* ("*Macon*"), 448

2

F.2d 746, 753-54 (5th Cir. 1971). If the Court finds either that the school board's plan violates the court's orders, or that the school board is acting in bad faith, or that the board's plan disproportionately burdens Black students, the Court must deny the board's motion to modify the existing student assignment plan. *See Stout v. Jefferson Cnty. Bd. of Educ.*, 882 F. 3d 988, 1010-13 (11th Cir. 2018).

Here, the District bears the "heavy burden" of proving that its plan to relocate and reassign students furthers the goals of desegregation. *See Green*, 391 U.S. at 439; *Stout*, 882 F.3d at 1010.

## I.   THE 1993 AGREED ORDER REMAINS BINDING

### A.  The Court Has Not Modified or Dissolved the 1993 Agreed Order.

The 1993 Agreed Order states that the Chambers County Board of Education must construct and operate "a consolidated, district-wide high school facility at a site readily accessible to Alabama state highway Route No. 50 between Lanett and LaFayette." *See* Private Pls' Ex. 3, pg. 16 ¶5. When assessing compliance with consent decrees, courts interpret the terms of the orders under principles of contract law. *Jacksonville Branch, NAACP v. Duval Cnty. Sch. Bd.,* 978 F.2d 1574, 1578 (11th Cir. 1992). Because the terms of the 1993 Agreed Order "are unambiguous, the court must uphold a decree as written." *Reynolds v. Roberts*, 207 F.3d 1288, 1300-01 (11th Cir. 2000); *see also Planetary Motion, Inc. v. Techsplosion, Inc.*, 261 F.3d 1188, 1203 (11th Cir. 2001) (quoting *King v. Allied Vision, Ltd.,* 65 F.3d 1051, 1058 (2d Cir. 1995) ("A clear and unambiguous order is one that leaves " 'no uncertainty in the minds of those to whom it is addressed,' ... who must be able to ascertain from the four corners of the order precisely what acts are forbidden.' " (citations omitted).), Tr. Vol. 2, 38:25-39:12 (the District Superintendent, Casey Chambley, testified that he saw no ambiguity as to the 1993 Order's provision requiring the construction of a consolidated school "at a site *readily accessible* to

3

Alabama state highway Route No. 50 between Lanett and Lafayette"); *see also* Private Pls.' Ex. 3, pg. 16 ¶5 (emphasis added).

At no point has the District affirmatively sought to modify or dissolve the 1993 Agreed Order. Nor has the District requested that the Court modify any of its provisions related to the location of the consolidated high school. If the District believes that it can no longer perform its obligations under the 1993 Order, the District bears the burden of proving that a modification or dissolution of the 1993 Agreed Order is necessary. *See Jacksonville Branch, NAACP*, 978 F. 2d at 1582 (citing *Rufo v. Inmates of Suffolk Cnty. Jail*, 502 U.S. 367, 369, 393 (1992)).

To date, however, the District has not even attempted to show that a significant change in facts or law warrants change, nor that any proposed modification is suitably tailored to the change, nor any of the other factors relevant to a request to modify or dissolve the 1993 Agreed Order. *See id*. at 1582-83 (listing the factors relevant to a request to modify a consent order). Nor could the District demonstrate that any changes warrant a modification. Rather, Superintendent Chambley testified that the District can comply with the 1993 Agreed Order and that it will continue to do so. Tr. Vol. 2, 31:19-22, 34:9-13. In light of this testimony by Mr. Chambley, the District has recognized the continuing existence of the 1993 Agreed Order. The District cannot now cherry-pick which provisions of the 1993 Agreed Order that it wishes to perform; nor can it claim that the 1993 Agreed Order is invalid while still performing, and agreeing to perform, some of the District's obligations under it. *See Jacksonville Branch, NAACP*, 978 F.2d at 1578 ("For the purposes of modification, consent decrees are not governed by contract law, but are treated as judicial acts, akin to injunctions."), *Paradise v. Prescott*, 767 F.2d 1514, 1525 (11th Cir. 1985) (quoting *United States v. City of Mia.,* 664 F.2d 435, 439 (5th Cir. 1981) (en banc) and affirming district court's enforcement of a consent decree in a race discrimination case)) (" A consent decree,

although founded on the agreement of the parties, is a judgment."). Since the Court has not modified it, the 1993 Agreed Order is still binding.

### B.  The Court Should Not Sua Sponte Modify the 1993 Agreed Order.

No party has sought a modification of the 1993 Agreed Order. But even if the District were to argue, or the Court were to consider sua sponte, the propriety of changing the 1993 Order,  the "strong public interest in protecting the finality of court decrees always counsels against modifications." *Rufo*, 502 U.S. at 407. "Long standing precedent evinces a strong public policy against judicial rewriting of consent decrees." *Reynolds v. Roberts*, 202 F. 3d 1303, 1312 (11th Cir. 2000). For that reason, any attempt to "modify a consent decree has a high hurdle to clear and the wind in its face." *Sierra Club v. Meiburg*, 296 F.3d 1021, 1034 (11th Cir. 2002). Without more, "the age of the case [] does not provide a basis for declining to enforce an existing order of the court." *Fla. Ass'n for Retarded Citizens, Inc. v. Bush,* 246 F.3d 1296, 1298 (11th Cir. 1992). The age of the 1993 Agreed Order alone does not warrant its modification. *See* Doc. 555 n. 3, at 3.

As explained in detail in Plaintiffs' pretrial brief, a party seeking to modify a consent order must show that: (1) the provision sought to be modified is not central to the basic purpose of the decree; (2) if provision is not central to the basic purpose of the decree, that a major change in circumstances warrants revision of decree; and (3) that the proposed modification is suitably tailored to address the changed circumstances. *See Rufo*, 502 U.S. at 383; *see also* FRCP 60(b)(5).

Here, there is no question that the relevant provision of the 1993 Agreed Order is central to its purpose. *See* Doc. 559. If the parties were solely focused on the construction of a consolidated high school at the time of the 1993 Agreed Order, they would not have taken the extra step to specify the location. Had the parties simply used terms such as "centrally located" or "in a neutral location," that alone would be enough to disqualify the site selected by Defendant; yet, the parties

5

were even more specific, identifying a central artery in the county, Alabama state highway Route No. 50 between Lanett and LaFayette, for the siting of the consolidated high school as an equitable means to remedy a *de jure* wrong.

Even if the provision at issue were not a central purpose of the 1993 Agreed Order (and it is), the change in circumstances proffered by the District are not "significant" enough under the law to overcome the high bar for permitting a modification to the consent decree. Superintendent Chambley testified that financial constraints continue to render the District unable to comply with the 1993 Agreed Order provision concerning the site of the consolidated high school. Tr. Vol. 1, 168:7-169:1. But the District provided no evidence to support this assertion as it relates to its current financial position and the cost of compliance. *See, e.g.*, Tr. Vol. 2, 44:12-45:7. In any event, the District's current financial position is of little consequence. *See Rufo*, 502 U.S. at 407 (finding that "continued claims of financial constraint" cannot provide support for modification requests where, as here, the claim merely reflects a party's "reluctance to budget funds adequate * * * to avoid prolonged noncompliance with the terms of the original decree."); *cf. also United States v. Jefferson Cnty.*, No. CV-75-S-666-S, 2013 WL 4482970, at *20 (N.D. Ala., Aug. 20, 2013) (finding that a county's bankruptcy did not excuse its obligation under a consent decree to adopt and employ policies to ensure nondiscriminatory hiring practices).

Similarly, the alleged demographic changes that Mr. Chambley testified about—that according to Census data, and based on his personal knowledge, the population in LaFayette has decreased since 1990, while the population in Valley has increased—are not significant changes of fact. Rather, these changes began as early as 1990, three years before the parties entered into the 1993 Agreed Order and, thus, are not a surprise to the District. *See* Tr. Vol. 1, 44:14-18; 45:20-23 ("Over time from 1990 until today, there has been a decrease in population for the county

6

overall".). The changes that Mr. Chambley testified to about the population decline in LaFayette and Chambers County overall from 1990 to present are not significant because they have been consistent since 1990, before entry of the 1993 Agreed Order and are thus "neither new nor unforeseen" by the District. *See* Tr. Vol. 1, 43:18-44:9; 50:11-21 ("[F]or the majority of the years from 1990 until now, there has been a decrease and decline in enrollment."); *see generally Rufo*, 502 U.S. at 405-407.

The District provided no evidence on whether the decrease in student enrollment at LaFayette High School and increase in the number of Black students at Valley High School were consistent trends or even changes that occurred in most of the years from 1990 until the present. In fact, the District's site selection expert, Mr. Richter testified that it is hard to understand why populations change or when they might change. Tr. Vol. 3, 36:22-37:1. Moreover, there has not been much of a percentage change in the racial compositions at the two high schools over the last 30 years. During the 1992 through 1993 school year, the student demographics at Valley High School were 42.4% Black and 57.6% white compared to LaFayette High School which was 94.6% Black. *Lee v. Chambers Cnty. Bd. of Educ.*, 849 F. Supp. 1474, 1481, 1484 (M.D. Ala. 1994). Thirty years later, during the 2022-2023 school year, the student demographics at Valley High School are 47% Black and 47% white compared to LaFayette High School which is 84% Black. Such a marginal change in demographics does not warrant modification or dissolution of the 1993 Agreed Order.

Even if the alleged financial and demographic changes were meaningful (and they are not), the District could still choose a site along Highway 50 between LaFayette and Lanett to build a consolidated high school, as required by the 1993 Agreed Order. The District alleges that providing power to this area or finding a proper site are difficult. These assertions are incorrect. Depending

on the site, Alabama Power or Tallapoosa River Electric Power (TREP), not the District, would be responsible for providing any utility upgrades necessary to get power to the site. Tr. Vol. 4, 44:17-45:5. Also, land along Highway 50 is still potentially available; and the Chambers County Development Authority could bear the cost of any surveys. Tr. Vol. 4, 40:1-20.

Any "issues" with the sites along the Highway 50 artery existed at the time of the 1993 Agreed Order; yet the parties agreed upon a location along the highway because they felt that it was in the best interest of students in Chambers County to site the school in a central location. *See* Doc. 559 at 17. Again, any issues concerning the feasibility and accessibility of Highway 50 are "neither new nor unforeseen." *See Rufo*, 502 U.S. 406.

Finally, there has been no change in federal law that would warrant the modification or dissolution of the 1993 Agreed Order. Above all, "[a] decree must be modified if one or more of the obligations placed upon the parties later becomes impermissible under federal law" and may be modified when the statutory or decisional law has changed to make legal what the decree was designed to prevent. *Ensley v. Branch, N.A.A.C.P. v. Seibels*, 31 F.3d 1548, 1563 (11th Cir. 1994) (citing *Rufo*, 502 U.S. at 369). No changes in fact or law justify modifying the 1993 Agreed Order. Where there is a history of noncompliance of a consent order such as is the case today, the court has "an added reason for insisting that they honor their [] commitments." *Rufo,* 502 U.S. at 407. As explained *supra*, the framework for approaching consent decrees, outlined by the United States Supreme Court, makes clear that time passed nor inconvenience are reason sufficient for a consent decree to be modified.

The Board continuously cites to subsequent joint Orders in this case, yet none of them expressly or impliedly superseded the provision of the 1993 Agreed Order at issue. In a matter such as this where the District has a list of obligations, the "*Green* factors," with which it must

comply, it is not surprising that the parties addressed various factors in a disaggregated manner throughout the years. That said, there is no Order that has ever come from this Court relieving the District from its obligation to build a consolidated high school at a site readily accessible to Highway 50 between Lanett and LaFayette.

The District continues to rely heavily on two filings to the Court as a reason that they should not be held to the terms of the Agreed Order— Defendant's Petition to Amend the Desegregation Order filed on May 16, 1995, Doc. 186, and the parties joint Proposed Consent Decree filed on May 19, 2022, Doc. . What the District fails to similarly emphasize is that both documents were later withdrawn, *see* Docs. 202 and 483, respectively, leaving the terms of the 1993 Agreed Order in Place. Furthermore, even if the 2022 Proposed Consent Decree had been granted, its terms also stated that the new consolidated high school not be located at the site of either existing high school, and that, "The location must not impose an unequal burden on students on the basis of race, to the extent practical." Doc. 480-1. Yet, the District is now asking this Court to allow it to site the new high school so close to the existing Valley High School that it will use its existing athletic facilities. Additionally, the Proposed Consent Decree stated that, "If any party objects [to the site selected by the Board], the Parties will meet and confer within ten (10) days of the written objection before seeking resolution by the Court. The District shall not purchase the site until the objection is resolved by the Court." *Id*. Thus, even if the 2022 Proposed Consent Decree had been ordered, the parties would still be requesting this Court to intervene due to the Board's selection process lacking good faith and disproportionately burdening only Black students.

## II.    THE DISTRICT'S PLAN VIOLATES THE 1993 AGREED ORDER AND EVINCES A LACK OF GOOD FAITH COMPLIANCE WITH THAT ORDER

The Court may reject the District's student assignment plan if it violates the 1993 Agreed Order or places a heavier transportation or other burden on Black students than white students. *See Stout*, 882 F.3d at 1010-11. "To enforce the consent decree, the district court did not need to find that [the District] violated the Constitution, only that it violated the consent decree." *Smith v. Sch. Bd. of Concordia Par.*, 906 F.3d 327, 336 (5th Cir. 2018). Thus, while Plaintiffs are not required to prove that the District's plan is the product bad faith to defeat its motion, *Moore v. Tangipahoa Par. Sch. Bd.*, 921 F. 3d 545, 549 (5th Cir. 2019), proof of the District plan's lack of good faith alone would instantly require the Court to reject the plan, *see Stout*, 882 F.3d at 1014.

### A.  It is Undisputed that the District's Plan Violates the 1993 Agreed Order.

In violation of the 1993 Order's requirement that the District construct the consolidated high school at a site "readily accessible to Alabama state highway Route No. 50 between Lanett and LaFayette," Private Pls.' Ex. 3, pg. 16 ¶5, the District intends to site the high school in the City of Valley. Doc. 500. Superintendent Chambley testified that the District did look at sites along Highway 50 as required by the 1993 Agreed Order. *See* Tr. Vol. 1, 211:23-212:8. But the Superintendent took that step only after the Board had already voted to approve the Valley site. Tr. Vol. 3, 126:23-127:22; 208:18-209:2. Moreover, Mr. Chambley testified that before the Board's vote, the Court-created Desegregation Advisory Committee ("DAC") informed the Board that it was concerned that the Valley site did not comply with the high school location provision of the 1993 Agreed Order. Tr. Vol. 1, 212:9-15. The Board knew that the clear terms of the 1993 Order required the new high school to be built along Highway 50 and that such a location would fairly distribute transportation burdens for all students. But rather than comply with this requirement, the Board picked its preferred site through a rushed selection process that relied on

inaccurate and incomplete information and excluded community participation, indicating a lack of good faith.

**B. The District Failed to Consider Sites that Comply with 1993 Order and Fairly Distribute Transportation Burdens.**

A proposed desegregation plan must be evaluated "in light of the circumstances present and the options available in each instance." *Green*, 391 U.S. at 439. Here, the District selected a site that violates the 1993 Order and imposes a disproportionate burden on Black students. "The availability to [a school] board of other more promising courses of action may indicate a lack of good faith; and at the least it places a heavy burden on the board to explain its preference for an apparently less effective method." *Id*. Because the Board failed to meaningfully consider less burdensome sites, it has not satisfied the heavy burden to justify its selection of the Valley site.

The Board concedes "that a centralized location high school would be the perfect scenario." Tr. Vol. 2, 40:6-7. Mr. Richter admitted that Highway 50 is "absolutely" the logical location for the new high school because "it's the easiest traversable road from west to east and east to west" and "connect[s] populations" in the county. Tr. Vol. 2, 269:4-12. Mr. Mitchum conceded that a Highway 50 site would not impose the racially disproportionate transportation burden associated with the Valley site, discussed *infra* Part III. He explained that any Highway 50 site is only about 10 minutes away from the LaFayette schools, so it would eliminate the need to hub and shuttle high school students, dramatically cutting down on their transportation times. *See* Tr. Vol. 3, 216:5-15. A Highway 50 site would also have the benefit of proximity to Inspire Academy – described at trial as the "Taj Mahal of career tech education facilities" – which would eliminate the cost and inefficiency of rebuilding career tech facilities inside the new high school. *See* Tr. Vol. 4, 69:11-24.

11

But despite the obvious fairness of a Highway 50 site, the Board did not evaluate the suitability or availability of Highway 50 sites before selecting the Valley site. Tr. Vol. 1, 206:18-207:5; s*ee also* Tr. Vol. 2, 219:1-6 (Highway 50 sites were not evaluated for suitability before selection was narrowed to donated Valley and LaFayette sites); Tr. Vol. 4, 43:17-44:1 (District requested utilities information for Highway 50 sites *after* Board voted to select Valley site). The Board cannot meet its "heavy burden" to justify selection of a site that imposes a racially disproportionate burden when it did not even investigate alternatives it knew to be more promising. *See Green*, 391 U.S. at 439.

Moreover, even the Board's post-hoc excuse that it cannot "afford" to build on Highway 50 falls flat. *See, e.g.,* Tr. Vol. 2, 40:5-10. First, the Board conceded that it does not actually know how much more expensive it would be to build on Highway 50 than on the donated land. *See* Tr. Vol. 2, 16:16-20; 271:15-17; 273:14-17; 273:24-274:2. Second, the District admitted that before land was donated, it had fully expected and budgeted to purchase land, allocating $250,000 to buy property for a new high school in 2020. *See* Tr. Vol. 2, 44:12-45:7. Finally, testimony at trial made clear that the costs of building on Highway 50 could be defrayed by other entities. The Chambers County Development Authority indicated that utilities providers – and not the Board – would bear the cost of upgrades necessary to extend utilities to sites along Highway 50. Tr. Vol. 4, 44:17-45:8. And the Development Authority itself could potentially assist the Board in purchasing and developing a Highway 50 site for the new high school. *See* Tr. Vol. 4, 46:3-9. It could, for example, cover the cost of geotechnical, environmental, and other surveys, just as it did for Valley Industrial Park Project, a portion of which became the Valley site. *See* Tr. Vol. 4, 42:21-43:7; 45:12-17. Yet the Board requested no such support from the Development Authority. Tr. Vol. 2, 46:10-13.

The District also engaged in an incomplete and post-hoc consideration of the availability of site options along Highway 50. Of the eight potential sites along the highway, the District only inquired with two landowners about selling their land at a discounted rate, and one other landowner about donating his land. But all of these inquiries took place *after* the District eliminated all potential Highway 50 sites from its site selection consideration. *See* Tr. Vol. 1, 197:7-11; 197:19-25; Tr. Vol. 2, 17:7-11.

### C. The District's Rushed Site Selection Process Relied on Inaccurate and Incomplete Information and Excluded Community Participation, Indicating Bad Faith.

When proposing a desegregation plan, a school board must act in "good faith." *Green*, 391 U.S. at 439. A school board acts in good faith when selecting a site location, where it develops a plan "after several years of public debate[,] . . . careful consideration of the available options [and a] decisionmaking process [that] involve[s] active participation by both the white and [B]lack citizens." *Lee v. Anniston City Sch. Sys.*, 737 F. 2d at 957 (11th Cir. 1984). Here, the District rushed its site selection process, relying on incomplete and inaccurate information and denying opportunities for meaningful citizen participation, showing a lack of good faith.

The District rushed its site selection process. Superintendent Chambley described the District's approach to site selection as "trying to locate a site as quickly as we could." Tr. Vol. 1, 93:11-12. In response to this haste, the District placed Mr. Richter on an expedited timeline, requiring site work to begin by early summer 2023. Tr. Vol. 2, 218:20. The District's expert testified that this tight timeline led him to narrow down the potential sites to only the two donated sites in Valley and LaFayette, despite there being other, more centrally located options. Tr. Vol. 2, 218:17-25. Mr. Richter's rush to judgment is especially concerning, because it resulted in an outcome that disproportionately burdens the District's Black students, and it was unnecessary. Mr.

13

Richter explained that he was adhering to the timeline in the proposed consent decree, but the District failed to inform him that this decree was never in effect. Tr. Vol. 3, 22:11-23:4. Mr. Richter was only informed that the proposed consent decree was never in effect in his January 2023 deposition. *Id*.

The District neglected to instruct its experts to consider options that would not be disproportionately burdensome on the basis of race, in accordance with desegregation law. Mr. Richter testified that he only understood his task to be eliminating "racially identifiable" schools, Tr. Vol. 2, 265:12-13, and that the District never requested he endeavor for student transportation times to be equalized across the county, Tr. Vol. 2, 266:14-20. Similarly, the District's GIS expert, Mr. Hwang, testified that the District did not instruct him to consider the proportion of the travel burden carried by race, nor was he instructed that he was working on a desegregation matter. Tr. Vol. 3, 122:10-18. The District's omissions are concerning given its site selection expert had not been trained with respect to school desegregation, nor ever been tasked with selecting a site in a school desegregation case. Tr. Vol. 2, 263:5-7, 263:25-264:2. Moreover, the uninformed work of these experts resulted in the Board's plan placing a disproportionate burden on Black students. *See Stout*, 882 F.3d at 1011-12 (finding that a board's proposal which ignored the interests of Black students and required them to "travel further" was discriminatory in violation of a desegregation order).

The District's bad faith is also evidenced by its failure to carefully consider the site donated by the City of LaFayette. LaFayette was the first city to donate land for the District's consideration and did so via email and hard-copy letter in June 2022. *See* Trial Ex. 11. In its letter, the city indicated that the District should reach out to the City Clerk Louis Davidson, Mayor Kenneth Vines, or the City Engineer should it have any follow up questions about the donated site. *See*

14

Trial Ex. 11, pg. 2. Even so, the District did not request any additional information in response to the City's letter. Superintendent Chambley admitted that he did not request the missing data and Mr. Richter only did so after the public presentations when he was in the same room as the LaFayette city officials. Tr. vol 2, 52:24-53:2; 228:10-229:25.

Instead, months after LaFayette sent the letter, the District presented the community on September 12-13, 2022 with a matrix that included complete information about the Valley site alongside *incomplete* information about the LaFayette site, implying that the LaFayette site was substandard. Trial Ex. 4, pg. 9; *see also* Tr. Vol. 4, 183:6-8. Even after the LaFayette community voiced their concerns about the District's lack of follow up for missing information, Chambley conceded that the Board moved forward with its October site selection vote without having all of the information about the LaFayette site. Tr. Vol. 1, 208:16-19. Superintendent Chambley explained that he allowed the Board to do so because he determined they had enough information to make a decision anyway. *Id.* At trial, Board member LaShae Herring confirmed that the LaFayette site was not given equal consideration, explaining that the District "didn't put a lot of time into finding out all the correct information." Tr. Vol. 4, 201:3-9.

The information presented about the LaFayette site was not only incomplete, but also inaccurate. In determining transportation costs to the Valley and LaFayette sites, Mr. Richter ran calculations as if each student was traveling individually, rather than together on a school bus, resulting in inflated, inaccurate figures, Tr. Vol. 2, 237:25-238:7. As a result, the information presented to the community and relied on by the Board in selecting the Valley site inaccurately reported that transportation to the LaFayette site would cost 1.3 million dollars more than transportation to the Valley site. Trial Ex. 4, pg. 16. While Mr. Richter issued a supplemental expert report in January 2023 to acknowledge this error, Def.'s Ex. 15, he did not inform Mr.

15

Chambley of the error until after the Board had already selected the Valley site. Tr. Vol. 3, 38:4-11. Moreover, Mr. Richter never actually provided the District with updated, accurate transportation costs. Tr. Vol. 2, 238:20-24.

As Plaintiffs' expert Rob Murray testified, the information presented to the community about the two donated sites was "incomplete, [and] at times, inaccurate and . . . seemed biased in its presentation to highlight [the Valley site] while not highlighting any positive attributes of [the LaFayette site]." Tr. Vol. 4, 60:21-61:1. For example, when conveying whether either site had adequate sanitary sewer service, the LaFayette site was shown as not meeting this requirement when it in fact did. Tr. Vol. 4, 64:1-12. The matrix also indicated that no road improvements would be needed at the Valley site, even though its access point does not currently extend to the property. Tr. Vol. 4, 67:7-9. Additionally, the matrix highlighted certain amenities at the Valley site but did not indicate amenities at the LaFayette site including the career tech center, as discussed *supra* II.B. Tr. Vol. 4, 69:10-24.

The careless nature in which LaFayette's land donation was treated tracks the Board's longtime pattern of preferencing the predominately white community in and around Valley in east Chambers County, while underserving the predominately Black community in and around LaFayette in west Chambers County. As Board member Herring further testified, the LaFayette community, Five Points community, and the other rural areas have been "let down so many times, and they've heard so many untruths, until there's a trust issue." Tr. Vol. 4, 201:10-18. And Board president Jeffrey Finch also admitted that the Board has been "depriving the kids of west Chambers County," lamenting that "all of these years, the kids of west Chambers County have been denied …. the same opportunity, the same courses that kids in east Chambers County had." Tr. Vol. 3, 270:4-6; 274:5-10. This mistreatment is especially concerning given LaFayette's Black students

16

stand to once again shoulder the disproportionate burden of the District's desegregation plan should its motion be granted.

Finally, the District failed to exercise good faith by undermining active citizen participation in the site selection process and constraining the Court-created DAC from voicing their concerns to the Board. The community was only provided limited opportunities to share feedback on the site selection process.  Mr. Richter testified at trial that the public was given "short notice" about the September site selections meetings. Tr. Vol. 3, 26:11-27:15. Mr. Richter also conceded that he did not know whether the allotted two weekends was enough time for the community to provide input on site selection through his online survey. Tr. Vol. 3, 26:17-21. Despite this Court's order that the DAC "shall have regular access to the Superintendent and Board of Education to address remaining desegregation issues", Doc. 493 at 12, the Board never met with the DAC during the site selection process, Tr. Vol. 1, 213:16-17, and Mr. Chambley rejected the DAC's request to speak to the Board before its October vote on the high school site. Tr. Vol. 2, 63:16-18.  Indeed, Ms. Herring testified that the school board was not even made aware that the DAC wished to speak with the Board about its site selection concerns prior to their vote. Tr. vol 4, 201:21-24. These constrained opportunities for community members and the DAC to voice their concerns are a far cry from precedent where courts have found a district to have acted in good faith. *See, e.g., cf.*, *Manning ex rel. Manning v. Sch. Bd. of Hillsborough Cnty., Fla.*, 244 F.3d 927, 946 (11th Cir. 2001) (finding that district acted in good faith where, inter alia, it consulted extensively with the African American community, including plaintiffs.).

In sum, the Board's selection of a site that imposes a racially disproportionate burden is unconstitutional and it has not met its burden to justify selection of such a site when less burdensome alternatives existed and were willfully unconsidered by the Board. Indeed, the

Board's failure to meaningfully consider Highway 50 sites indicates a lack of good faith. *Green*, 391 U.S. at 439. Furthermore, the District presented no evidence to justify burdening Black students almost exclusively by temporarily consolidating them at the existing Valley High School. Though the District says that its goal is to use temporary consolidation as a means to integrate sooner and allow for the renovation of the existing LaFayette High School for a new STEAM academy, no effort has been made to develop a timeline, architectural or financial plan for such a renovation. Rather, the District proposes to disproportionately burden Black students by displacing them into a historically white school, which causes significantly increased travel time, while building a new school essentially next door. The clear effort to ensure that white students are not burdened and the lack of any real effort to comply with the 1993 Agreed Order is unconstitutional, demonstrates a lack of good faith, and violates the terms of the 1993 Agreed Order.

## III.   THE DISTRICT'S PLAN PLACES A HEAVY BURDEN ON BLACK STUDENTS

Even if the 1993 Agreed Order were not a consideration, Defendant's proposals of building a new consolidated high school next to the current Valley High School, and temporarily consolidating LaFayette students at Valley High School until then, disproportionately onerates Black children. On the question of "whether the proposed location of the new school is a proper one under all the circumstances," the court must "ensure that the burdens of desegregation are distributed equally among all classes of citizens." *United States v. Hendry Cnty. Sch. Dist.*, 504 F.2d 550, 554 (5th Cir. 1974). Requiring only the students of the predominantly Black part of the county to suffer extended bus rides and transportation obligations while placing no such responsibilities on white students is a clearly one-sided distribution of the District's desegregation obligations and Defendant's motion must be denied. *See id.*

18

A. **Black Students Will be Disproportionately Burdened by the District's Choice to Both Place the New High School Directly Next to the Current Valley High School and by Temporary Consolidation.**

While federal courts are not tasked with determining if the location of a new school is the "best choice," they must decide whether the choice of a site violates the constitution or federal law. *United States v. Mississippi (Choctaw Cnty. Sch. Dist.)*, 941 F. Supp. 2d 708, 718 (N.D. Miss. 2013) (citing *Anderson ex rel. Anderson v. Canton Mun. Separate Sch. Dist.*, 232 F.3d 450, 454 (5th Cir. 2000)). To make that determination "federal courts ask only whether the proposed location fails to further desegregation *or places an inequitable transportation burden on black students*." *Id.* (emphasis added). If either answer is in the affirmative, deference should not be given to the school board. *See Anderson*, 232 F.3d at 454; *Hendry Cnty. Sch. Dist.*, 504 F.2d at 554 (5th Cir. 1974) ("[w]e must also ensure that the burdens of desegregation are distributed equally among all classes of citizens"); *see also Choctaw Cnty. Sch. Dist.*, 941 F. Supp. 2d at 718 ("any modification to the prior desegregation orders should promote desegregation . . . while simultaneously *not* placing an inequitable transportation burden on the District's African–American students").

When evaluating sites proposed by school boards under a desegregation order, courts consider whether the site is "a racially neutral location" and whether it is equidistant from Black and white neighborhoods such that the burden is placed equally on Black and white students. *See Davis v. Bd. of Sch. Comm'rs of Mobile Cnty.*, 483 F.2d 1017, 1021-22 (5th Cir. 1973); *Hendry Cnty. Sch. Dist.*, 504 F.2d at 554; *Arvizu v. Waco Indep. Sch. Dist.*, 495 F.2d 499, 504 (5th Cir. 1974) ("it is incumbent upon district courts to insure that the burdens of desegregation are distributed equitably.").

The Valley site selected by the District, and its decision to temporarily consolidate

LaFayette High School Students at Valley High School, squarely places an inequitable and disproportionate burden on the county's Black students, as it requires a significant number of Black students to travel much greater distances than their white peers in order to get to school. Such a burden is unconstitutional; thus, the District's motion should be denied.

### B. The District's Plan Disproportionately Burden Black Students by Forcing LaFayette Feeder Pattern Students to Attend High School in Valley.

As discussed in Section I *supra,* the Valley site is not in compliance with the 1993 Agreed Order. However, even if the Valley site did not violate the 1993 Agreed Order, it should be rejected as disproportionately burdensome for Black students in Chambers County because it places the transportation burden almost exclusively on Black students and violates principles of neutrality and equidistance. *See Anderson*, 232 F.3d at 454; *Davis*, 483 F.2d at 1022; *Cisneros v. Corpus Christi Indep. Sch. Dist.*, 467 F.2d 142, 153 (5th Cir.1972) (finding that length and time of travel for students must be considered in assessing plan).

The Valley feeder pattern is home to nearly 90% of all white students in the district. The District has chosen a site for the new district-wide high school that does not burden these white students as it is located in essentially the same place as the current Valley High School. *See* Doc. 528-3. The District's Bus Transportation Director, Benji Mitchum, testified that his transportation plan for bussing LaFayette students to the Valley Site would not differ from a transportation plan under temporary consolidation because the  distance from the location of the Valley site to the existing school "is not significant" and that any changes in the transportation times for high school students under either scenario would be mainly experienced by LaFayette students. Tr. Vol. 3, 194:18-24; 236:16-22. Mr. Chambley also agreed that if the Valley Site is selected, "white high school students in the district will continue to attend school in Valley and close to their old high school." And that, "the travel burden [from temporary consolidation] only affects those

students from LaFayette High School." Tr. Vol. 2, 14:22-15:6; 56:16-19.

The racial breakdown between the two feeder patterns clarifies the problem the District has created. Either circumstance advocated for by the District means that white students in the Valley feeder pattern are not burdened by a new location; they will attend high school in virtually the same location as they always have. On the other hand, students in the LaFayette feeder pattern, which is 80% Black, will be required to attend a high school that adds 15 miles or a 25-minute drive one way to their current school day. *See* District's 2022 Report to the Court, Doc. 528-3[1]; Trial Ex. 8. The District's plan does not require Valley students to engage in any similar hurdles and does not meet the standards set by other Alabama Courts. *Cf. Lee v. United States*, 914 F. Supp. 489, 492 (N.D. Ala. 1996) (approving a plan where "[t]he [b]oard concluded that with regard to the magnet program, 62% of the burden calculated by distance will be on non-black students, while 64% of the burden calculated by time will be on non-black students.").

The racially disproportionate burden of the District's plan is greater than those that have been struck down as inequitable. For example, *United States v. Mississippi (Choctaw Cnty. Sch. Dist.)* involved a school district's proposed seventh and eighth grade consolidation plan. 941 F. Supp. 2d at 717-18. That district's overall demographics were 35% Black and 63% white. *Id.* at 715-16. The plan called for the relocation of students in a feeder pattern that was 60% Black and 39% white. *Id.* Because the impacted feeder pattern was disproportionately Black, the court rejected the plan: "[a]lthough [the proposal] would help promote desegregation, the Court notes the transportation burdens [that] the majority-African American [feeder pattern] students would incur as a result of the District's proposed consolidation, and finds that the District's proposed

---

[1] These numbers do not include students attending high school virtually through the District's Inspire Virtual Academy program.

consolidation should be modified" to include additional students in the desegregation effort. *Id.* at 718. The District's plan here should similarly be rejected, where the burdened feeder pattern is significantly more Black (80% Black, 17% white) than the District as a whole (48% Black, 45% white).

### C.  The District's Data Highlights the Onerous Burden Placed on Black Students.

Indeed, the data created by the District's own expert, Lee Hwang, makes clear that Black high school students will face the brunt of the transportation burden. Of the potential sites analyzed, the longest average distances are for LaFayette students and Black students traveling to the Valley Site. Trial Ex. 12, pgs. 12, 15; Tr. Vol. 3, 146:1-3; 146:20-22. If the District's plan is accepted, each school day a LaFayette student will have to travel on average 17.8 miles, and collectively over 4,100 miles in one direction to get to the Valley Site. While Valley students will only have to travel on average 3.7 miles, and 2,400 miles in total to get to the same site. Trial Ex. 12, pg. 12.

Mr. Hwang's distinction between the travel distances for LaFayette students and Black students solidifies the pressure the District has created. The District's decision to select the Valley Site forces Black students to travel double the distance of their white counterparts to get to school each day – even taking into consideration the large number of Black students currently enrolled at Valley High School. Trial Ex. 12, pg. 15. Mr. Hwang's analysis indicates that Black students in the county will have to travel on average, 9.2 miles to the Valley Site compared with just 5.6 miles for white students and 4,300 total miles compared to 2,140. Trial Ex. 12, pg. 15; Tr. Vol. 3, 146:1-3; 146:20-22.

Requiring Black students to travel twice the distance of their white counterparts does not fall in line with plans approved by other district courts. *See Anniston City Sch. Sys.*, 737 F.2d at

957 (affirming the district court's order approving defendant's plan, in which the site selected for a new school was "equidistant from black and white neighborhoods, and that the burden was placed equally on black and white students."); *compare with Kelley v. Metro. Cnty. Bd. of Ed. of Nashville & Davidson Cnty., Tenn.*, 492 F. Supp. 167, 191 (M.D. Tenn. 1980) (finding that the defendant's plan "disparately onerate[d] young Black children" because they were bussed out of their neighborhoods while white children were not.)

### D.  The District's Transportation Plan for Bussing Students to Valley Disproportionately Burdens Black Children

The District's plan for bussing LaFayette students to the new Valley site does nothing to alleviate the burden placed on Black students. As Mr. Chambley confirmed, 65% of LaFayette High School students take the bus each day, while only 45% of Valley students do the same. Tr. Vol. 2, 67:16-25. Before and returning from school each day, students in the LaFayette feeder pattern, which is 80% Black, will be required to get off of their individual busses and transfer to one of four shuttle busses that run from a transportation hub, next to LaFayette High School, at Eastside Elementary. Trial Ex. 8. While the creation of two new LaFayette area bus routes to transport students to Valley sounds laudable, in reality, only 18 students would be assigned to those routes. Tr. Vol. 3, 238:8-14; 239:2-5. By creating a plan in which only the LaFayette High School bus riders will be relegated to enduring longer rides, the District continues its racially disparate practices. *See* Trial Ex. 8.

The total transportation time to the Valley Site for LaFayette High School students, by bus, will equal their current bus ride time – which for some students is 85 minutes – plus the 25-minute ride from Eastside to the Valley Site. *See* Trial Exs. 3, 8. This additional 25-minute obligation will only be placed on LaFayette students. Tr. Vol. 3, 236:16-22. And these routes will now range between forty minutes and *one hour and fifty minutes* each way. This leaves only

one current LaFayette area route taking less than an hour to get to the Valley site or high school and many LaFayette students will spend more than three hours roundtrip on the bus each day. *See* Trial Ex. 3. This racially disparate burden is even more egregious under the District's temporary consolidation plan. As Mr. Mitchum conceded, and Demarrion Huguley lamented, under temporary consolidation, a LaFayette student with a class at Inspire Academy would have to take two 25-minute bus rides (Valley to Inspire, Inspire to Valley) during the school day, and then take a bus from Valley to the hub at Inspire Academy in order to get on a bus to go home. Tr. Vol. 2, 143:4-13; Tr. Vol. 3, 223:12-16.

The amount of time that LaFayette students would spend on a bus is concerning even without the comparison to those in Valley. During the public hearing on December 14, 2022, this Court heard concerns about the length, safety, and negative impacts of this long possible commute. The District's own site selection expert, Mr. Richter, also testified that an hour and a half is a long bus ride and that long bus rides have detrimental effects on students. Tr. Vol. 3, 9:2-20. Defendant's transportation plan for bussing students does not fall in line with those deemed permissible by other District Courts. *See Lee v. United States*, 914 F. Supp. at 492; *see also McNeal v. Tate Cnty. Sch. Dist.*, No. 2:70-CV-29-DMB, 2022 WL 17582264, at *3 (N.D. Miss. Dec. 12, 2022); *Thompson v. Sch. Bd. of Newport News*, 465 F.2d 83, 87 (4th Cir. 1972), (the Fourth Circuit en banc upheld a District Court assignment plan where travel time was at maximum one hour).

The extreme ride times for LaFayette students distinguish this case from others where courts have approved more modest transportation burdens in the service of desegregation. For example, in *McNeal*, the court approved a consolidation plan resulting in average bus trip times of 28-29 minutes for white students and 31-33 minutes for Black students. 2022 WL 17582264,

at *3. Because "the increase in average travel time is less than six minutes, regardless of race," the court concluded that the plans did not place an inequitable transportation burden on Black students. *Id.*; s*ee also Horton v. Lawrence Cnty. Bd. of Educ.*, No. 5:66-CV- 00445-RDP, 2022 WL 1217240, (N.D. Ala. Apr. 25, 2022) (approving consolidation where the average bus ride time for a predominately Black feeder pattern increased by 12 minutes but remained in-line with the average bus ride times for the district).

## **CONCLUSION**

Though Private Plaintiffs oppose both temporary consolidation and the site selected by the Board, the reaffirmed commitment by the Board to finally honor its legal obligations to desegregate its school system and finally serve the Black students of LaFayette equally is the type of progress the plaintiff class has sought for decades. Private Plaintiffs simply seek to ensure that the desegregation process is done in a constitutional and fair manner. For the aforementioned reasons, the Private Plaintiffs respectfully urge the court to enforce the 1993 Order and deny the District's motion.

[Signatures Below]

Dated: April 14, 2023

Respectfully submitted,

STANLEY F. GRAY
ASB-8670-A56S
Gray, Langford, Sapp, McGowan,
Gray, Gray & Nathanson
Post Office Box 830239
Tuskegee, AL 36083-0239
Telephone: (334) 727-4830
sgray@glsmgn.com

*/s/ GeDá Jones Herbert*
GeDá Jones Herbert
Victor M. Jones*
Amber M. Koonce*
NAACP Legal Defense &
Educational Fund, Inc.
700 14th Street NW, Suite 600
Washington, DC 20005
Tel: (202) 682-1300
Fax: (202) 682-1312
gherbert@naacpldf.org
vjones@naacpldf.org
akoonce@naacpldf.org

Allison Scharfstein*
Godfre Blackman*
NAACP Legal Defense &
Educational Fund, Inc.
40 Rector Street, 5th Floor
New York, NY 10006
Tel: (212) 965-2200
Fax: (212) 226-7592
ascharfstein@naacpldf.org
gblackman@naacpldf.org
*Admitted *Pro Hac Vice*

*COUNSEL FOR PRIVATE PLAINTIFFS*

26

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the above Plaintiffs' Post-Trial Brief In Opposition To Defendant's Motion For Approval Of Site Selection And Temporary Consolidation has been delivered to all counsel via the Court's electronic filing system on this 14th day of April 2023.

<div style="margin-left: 50%;">

*/s/ GeDá Jones Herbert*
GeDá Jones Herbert
NAACP Legal Defense &
Educational Fund, Inc.
700 14th Street NW, Suite 600
Washington, DC 20005
Tel: (202) 682-1300
Fax: (202) 682-1312
gherbert@naacpldf.org

</div>