IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

| | | |
|---|---|---|
| ANTHONY T. LEE, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| UNITED STATES OF AMERICA, *et al.*, | ) | |
| | ) | |
| Plaintiff-Intervenors, | ) | |
| | ) | |
| v. | ) | CASE NO. 3:70-CV-844-WKW |
| | ) | [WO] |
| CHAMBERS COUNTY BOARD OF EDUCATION, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

## I. INTRODUCTION

In the state of Alabama, along its eastern central border, lies Chambers County. In this largely rural county sits the Chambers County Board of Education. Every year for the past thirty years, the Board has opened the doors of its two high schools, and the hallways and classrooms of LaFayette High School and Valley High School have come alive with students and teachers. This year, the Chambers County Board of Education wants to begin construction of a new high school in the City of Valley. The new school would serve all students in the county district, uniting the public high school student body for the district in a single structure. The construction

of a new high school and consolidation of the students of Lafayette High School and Valley High School have overwhelming support from the Board's communities. The resounding community voice is that a unified high school is long overdue. In contention, however, is the Board's proposal for the location of the new high school—on a seventy-four-acre site donated by the City of Valley—and its decision to close the doors to LaFayette High School and move those students to the campus of Valley High School until the new high school is built.

Because the Chambers County Board of Education is operating under federal court desegregation orders, a federal court must resolve these contested issues. The issues came to the forefront in the Board's pending Motion for Approval of Site for New Consolidated High School, for Approval to Build the New High School, and for Authorization to Temporarily Consolidate High School Students. (Doc. # 500.) Plaintiffs—who are the black students and their guardians in the Chambers County Board of Education's district[1] and the United States—oppose the motion. They argue that the location of the proposed site for the consolidated high school violates

---

[1] There are at least two legal oddities here. First, there is no named, individual black Plaintiff who currently is a student; however, no party has objected to the absence of such a named Plaintiff. The United States stands alone as a known entity with standing. *See Lee v. Macon Cnty. Bd. of Educ.*, 267 F. Supp. 458, 460 (M.D. Ala.) ("In July 1963 the United States was added as a party and as *amicus curiae* in order that the public interest in the administration of justice would be represented."), *aff'd sub nom. Wallace v. United States*, 389 U.S. 215 (1967). Second, it is highly unlikely—and no evidence was presented at the January 2023 trial—that any black student at Valley High School objects to consolidation on racial grounds.

a 1993 consent order and places a disproportionate transportation burden on the District's black students for both temporary and permanent consolidation.

The court has been deep into these issues. In December 2022, the court held a public hearing on the Board's motion and heard the emotional testimony of parents, students, and community organizations and leaders.[2] It also conducted site visits to the high schools and the multiple suggested sites for the new high school. In January 2023, the court held a four-day trial during which it heard from thirteen witnesses and received more than sixty exhibits. There also has been voluminous briefing both before and after the trial.

Counsel for all parties are commended for the thoroughness and quality of their preparation and advocacy on these important issues, for their professionalism, and for their cooperation. Superintendent Casey Chambley and the Board also deserve recognition for their tireless efforts and countless hours devoted to serving the students of the Chambers County.

The remedial powers of a federal court in desegregation cases like this one are narrow. Now that the issues surrounding consolidation of the highs schools and construction of a new high school are contested, the federal courts' oversight role,

---

[2] The court also held a public hearing in June 2022 concerning other school closures (Doc. # 487), and, at that hearing, members of the public also addressed the issue of the consolidation of the high schools (Doc. # 495).

while required, is limited.  A federal court cannot instruct a school board on how to make policy decisions, and it cannot act as a roadblock to a school board's policy decisions, such as those on consolidation and closure of schools and construction of new schools, unless the school board acts in an unconstitutional manner. *See Harris v. Crenshaw Cnty. Bd. of Educ.*, 968 F.2d 1090, 1095 (11th Cir. 1992).

After careful consideration of the arguments of counsel and the evidence, the court entered an order on June 23, 2023, overruling Plaintiffs' objections to the Board's plan to construct a new, consolidated high school in Valley, Alabama, and permitting the Board to proceed immediately with its plans presented to the court at the trial in January 2023.  (Doc. # 578.)  In the same Order, the court sustained Plaintiffs' objections to the Board's plans to merge the student bodies of LaFayette High School and Valley High School on the campus of Valley High School during construction of the new high school because those plans create an undue burden on the black students at LaFayette High School.  LaFayette High School therefore shall remain open during the construction of the new high school.   (Doc. # 578.) Accordingly, the Board's Motion for Approval of Site for New Consolidated High School and for Approval to Build the New High School will be granted, and the Board's Motion for Authorization to Temporarily Consolidate High School Students will be denied.  (Doc. # 500.)  This opinion explains the court's reasons for its rulings.

## II.  SUBJECT MATTER JURISDICTION

Subject matter jurisdiction is proper because the Chambers County Board of Education is operating under federal-court desegregation orders.  *See Lee v. Macon Cnty. Bd. of Educ.*, 584 F.2d 78, 81 (5th Cir. 1978)[3] (explaining that "[f]ederal district courts possess jurisdiction over school desegregation cases only because of unconstitutional action by the state or by a local school board" and that district courts "retain jurisdiction . . . to insure the proper implementation of the desegregation plan and the achievement of the ultimate goal a unitary school system in which the State does not discriminate between public school children on the basis of their race.").

## III.  FINDINGS OF FACT

The Chambers County Board of Education (District) has operated under federal-court desegregation orders for more than half a century.[4]  *Lee v. Macon County Bd. of Educ.*, 267 F. Supp. 458 (M.D. Ala. 1967) (mandating Alabama's school districts, including Chambers County, to disestablish their racially segregated

---

[3] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), the Eleventh Circuit adopted as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

[4] The Chambers County school district covers most of the county, only with the exception of the City of Lanett, which has maintained a separate school district since 1898.  (Doc. # 493 at 2); *see Lee v. Chambers Cnty. Bd. of Educ.*, 849 F. Supp. 1474, 1476 (M.D. Ala. 1994) ("There have been two separate school systems in Chambers County, Alabama since the turn of the century: a Chambers County school system and a Lanett City school system.").  This opinion is not about the City of Lanett school system.

school systems) (three-judge district court), *aff'd sub nom, Wallace v. United States*, 389 U.S. 215 (1967) (three-judge district court).   Federal court supervision is compulsory until the District attains unitary status.   The District has not reached unitary status, either full or partial, and it is not currently seeking unitary status.[5]

Because the District is operating under federal-court desegregation orders and oversight, the District cannot independently close, consolidate, or build schools without obtaining federal-court approval.   Over the last half century, the federal court has overseen school closures and consolidations in the District; some were by agreement, and others were in dispute.   Most recently, in June 2022, after the first public hearing, the court approved the District's decision to close Five Points Elementary School, J.P. Powell Middle School,[6] and LaFayette-Lanier Elementary School.[7]   (Doc. # 493.)

---

[5] To attain unitary status, a district must achieve desegregation with respect to its (1) students, (2) facilities, (3) staff, (4) faculty, (5) extracurricular activities, and (6) transportation. *Green v. Cnty. Sch. Bd. of New Kent Cnty., Va.*, 391 U.S. 430, 435 (1968); *Manning ex rel. Manning v. Sch. Bd. of Hillsborough Cnty.*, 244 F.3d 927, 942 (11th Cir. 2001) ("[F]or a district court to determine whether the vestiges of discrimination have been eliminated to the extent practicable, it must examine . . . the *Green* factors.").   In addition to the *Green* factors, federal courts may examine other ancillary factors, such as the quality of education—including graduation rates and retention—"to determine whether minority students were being disadvantaged in ways that required the formulation of new and further remedies to ensure full compliance with the court's decree."   *Freeman v. Pitts*, 503 U.S. 467, 492 (1992).

[6] The middle school was moved to a different but existing facility in LaFayette and retained the same name, J. P. Powell Middle School.   (Doc. # 570 at 36–37.)

[7] The court also approved the District's creation of a STEAM magnet school at Eastside Elementary School in LaFayette.   (Doc. # 493.)

The District now moves for court approval to build a new high school on the proposed site in Valley and to temporarily consolidate its high school students at Valley High School until the new school's completion.  (Doc. # 500.)  The construction of a district-wide high school is not in contention; however, the principal objections to the construction are that the proposed location of the new, district-wide high school in the City of Valley contravenes a 1993 consent order entered in this case and is unconstitutional because it imposes an unequal transportation burden on the District's black students.  The following are the court's findings of fact as to the District's proposed actions.[8]

## A.    <u>The District's Schools</u>

The District currently operates four elementary schools, two middle schools, and two high schools.  The two high schools are LaFayette High School and Valley High School.  The schools in the attendance zone for LaFayette High School are Eastside Elementary School and J.P. Powell Middle School.  Both are magnet schools focusing on science, technology, engineering, and math (STEM)  (Doc. # 570 at 35.)  The schools in the attendance zone for Valley High School are Bob Harding-Shawmut Elementary School, Fairfax Elementary School, Huguley Elementary School, and W.F. Burns Middle School.  (Doc. # 570 at 34–35.)

---

[8] Many of the facts are stipulated.  Counsel and the parties are commended for their good faith efforts and work in arriving at these stipulations.  (Doc. # 568.)

During the 2022–23 school year, the District enrolled 3,097 students, of whom 49% were black, 45% were white, and 6% were of another race or ethnicity. LaFayette High School enrolled 205 students (86% black, 13% white, and 1% other). Valley High School enrolled 617 students (47% black, 48% white, and 5% other). (Doc. # 568 at ¶ 5.)  Combined in the County system, there were 822 high school students (57% black, 39% white, and 4% other).  (Doc. # 568 at ¶ 6.)  Currently, the District spends approximately $14,000 per student each year at LaFayette High School and approximately $8,000 per student at Valley High School.  (Doc. # 570 at 154; Doc. # 571 at 191.)

There are three more facts of importance:  First, LaFayette and Lanett are directly connected by State Highway 50, approximately eleven miles from city to city.  Second, Lanett and Valley co-exist in the southeast corner of the county on the Georgia state line.  Third, the county school system is split between two time zones, as will be explained.

## B.  The District's Career Technical Education Facility and Offerings

The District offers career technical education in a stand-alone facility, called Inspire Academy.  Inspire Academy, which is in LaFayette across the street from the Chambers County Board of Education facility, offers eleven programs.  Those programs include agri-science, automotive service, culinary, business and finance, cosmetology, and pre-engineering.  (Doc. # 570 at 37–41.)  Inspire Academy also

offers a virtual school.  One of Plaintiffs' experts described Inspire Academy as the "Taj Mahal of career tech education facilities," which he said would be the envy of every school district for whom he has worked.  (Doc. # 569 at 69.)  From all appearances and evidence, the court would be hard-pressed to disagree.

High school students from both schools can elect to take courses at Inspire Academy as part of their curriculum.  For the 2022–23 academic year, 397 students from Valley High School and 187 students from LaFayette High School took one or more courses at Inspire Academy.  Of those students, 193 (48.6 percent) of Valley High's students were black, and 157 (84 percent) of the LaFayette High's students were black.[9]  (Doc. # 565-2 at 1.)  The ride to Inspire Academy for current LaFayette High School students is about five minutes.  The ride for current Valley High School students taking classes at Inspire Academy is about twenty-five minutes.  (Doc. # 568 at ¶ 31.)  Students who elect to enroll in courses at Inspire Academy, whether they attend Valley High School or LaFayette High School, have to schedule two class periods to account for the bus travel.  (Doc. # 571 at 125–26.)

In addition to the career tech education at Inspire Academy, LaFayette High School and Valley High School each offer two career tech courses.  LaFayette High

---

[9] The District's middle school students also are eligible to take certain courses at Inspire Academy.  For the 2022–23 academic year, sixty-two W.F. Burns students (twenty-two of whom are black) and forty-two J.P. Powell students (thirty-nine of whom are black) were enrolled for classes at Inspire Academy.  (Doc. # 565-2.)

offers graphic arts and teacher education, and Valley High offers health science and Junior Reserve Officers' Training Corps (JROTC). (Doc. # 570 at 39.) For the 2022–23 academic year, twenty-six LaFayette High students (twenty of whom are black) traveled to Valley High to take career tech courses, and twenty-eight Valley High students (nineteen of whom are black) traveled to LaFayette High to take career tech courses. (Doc. # 565-2.) Because Inspire Academy will be relocated to the new high school, consolidation of the two high schools will increase student opportunity to participate in these courses, and create efficiencies that do not now exist.

## C.   <u>The 1993 Agreed Order</u>

The idea of consolidation of the District's two high schools has its genesis in a 1993 Order to which the parties agreed (1993 Agreed Order). (Doc. # 564-4; Doc. # 499-1.) In the 1993 Agreed Order, the District agreed to consolidate the two high schools and build a new high school, but its agreement depended upon the federal court's ruling on a then-pending motion filed by the intervenors—the City of Valley and the Valley City Board of Education—to create and operate a separate city school system within Chambers County, Alabama. The 1993 Agreed Order provides:

> If the Court determines that formation of a separate Valley City School District should not be permitted at this time, the district agrees to support the construction and operation of a consolidated, district-wide high school facility at a site readily accessible to Alabama state highway Route No. 50 between Lanett and LaFayette. No later than

10

> one year following issuance of such determination by the Court, the
> Chambers County Board of Education shall request from the County
> Commissioners of Chambers County such additional revenue measures
> as may be necessary to support the issuance of bonds or otherwise to
> finance the construction of such a district-wide high school. The
> district will inform the other signatory parties of the disposition of such
> request[s].

(Doc. # 564-4 at 16.) The federal court denied the City of Valley's request to operate

a separate school system, *see Lee v. Chambers Cnty. Bd. of Educ.*, 849 F. Supp. 1474

(M.D. Ala. 1994), triggering the 1993 Agreed Order's mandate for the District to

build a consolidated high school. (Doc. # 564-2.)

In contention is the 1993 Agreed Order's provision that the consolidated high

school be built "at a site readily accessible to Alabama state highway Route No. 50

between Lanett and LaFayette." Highway 50, named Veterans Memorial Highway,

is an east-west corridor, stretching approximately eleven miles between Lanett and

LaFayette. The proposed site of the new high school is approximately four-and-a-

half to five miles from the eastern access to Highway 50. (Doc. # 569 at 84.)

For various reasons throughout the years, beginning with the voters' solid

rejection in 1994 of a tax referendum, a consolidated high school has not been built.

(Doc. # 570 at 168–69.) From the taxpayers' rejection of funding in 1994 until 2022,

the parties did not pursue the construction of a consolidated high school. But that

does not mean the case became inactive. In May 1995, the District moved to amend

the desegregation order, which if granted, would have superseded the 1993 Agreed

Order and would have let the District build two new high schools, one for the LaFayette attendance zone and one for the Valley attendance zone. (Doc. # 564 at 12–13.) However, the District moved to withdraw the motion to amend prior to a ruling.[10] Three years later, in 1998, the parties jointly moved to amend the desegregation order. That motion—which was granted—addressed grade reconfiguration for middle school students and facility expansion and did not mention the 1993 Agreed Order's requirement to construct a consolidated high school. (Doc. # 564-54.)

In 1999, another joint motion to amend the desegregation orders was filed. As part of that motion, the parties agreed that to relieve overcrowding at Valley High School, two buildings would be demolished, and a new structure would be built to accommodate twenty-one classrooms. In that same joint motion, the parties agreed that the Board could build a 35,735-square-foot gymnasium to replace the old gymnasium at LaFayette High School and a 2000-square-foot science lab at that school. Also, the joint motion asked that the prior Orders regarding building projects be amended, which allowed the District, among other things, to do extensive roofing repairs at LaFayette High School. That motion was granted. (Docs. # 564-54, 564-

---

[10] The court, on motion, deferred Plaintiffs' responses to the petition. (Docs. # 188, 190.) In January 1997, the District moved to withdraw the petition prior to any ruling on it. (Doc. # 564-53.)

55; Doc. # 570 at 176–80.)  There was no mention of constructing a consolidated high school in that motion or order.

In 2015, this court awakened the dormant issues with an Order—the first in seven years—for the Chambers County Board of Education to show cause why this action was not suitable for a motion for declaration of unitary status.  (Doc. # 325.) The case lumbered along for seven more years with little progress.  Fast forward to 2022, after the election of a new superintendent, Dr. Chambley.  The issue of a new, consolidated high school resurfaced, but without mention of the 1993 Agreed Order's provision as to the location of the high school.  In May 2022, the parties jointly moved the court to approve a proposed consent order.  The motion stated that: "The Parties agree that the attached Proposed Consent Order . . . will reasonably ensure that, if fully implemented, the District will eliminate the vestiges of *de jure* segregation . . . and will provide equal educational opportunities to all of the students enrolled in the District."  (Doc. # 480 at 7.)  The agreement submitted by the parties detailed several important changes to be made to the Chambers County school system, including the consolidation of the system's two high schools.  In that motion, the parties agreed that the District would "select the site for a new consolidated high school, not on either the current LaFayette or Valley High School campuses," and that the "[l]ocation must not impose an unequal burden on students on the basis of race, to the extent practicable."  (Doc. # 480-1 at 3.)  However, two weeks later, after

the parties had expended substantial time and resources in negotiating the proposed consent decree, including negotiations in Washington, D.C., the Private Plaintiffs withdrew their consent.  (Doc. # 481 at 2; Doc. # 483 at 2; Doc. # 493 at 4–5; Doc. # 495 at 134.)  In recent filings opposing the District's motion to consolidate the high schools, Plaintiffs, for the first time in a long time, have raised the site location provision in the 1993 Agreed Order as an issue.

It is now thirty years after the entry of the 1993 Agreed Order, and there still is not a consolidated or new school for all the District's high school students.  Hence, the existence of two high schools in the District has not changed.  Other things also have not changed, including some of Chambers County's geographic features, the two time zones, racially identifiable schools in the LaFayette High School attendance zone, fifty-seven percent higher per-student annual costs for LaFayette students, and unequal academic and extracurricular offerings between the high schools.  What has changed for the District are the population, District enrollment, and the superintendent.  The discussion turns to the matters where time has stood still and where time has brought change.

D.  **Chambers County's Geographic Features**

As noted, Chambers County is in east central Alabama along the border of Alabama and Georgia.  Interstate 85 runs through the southeast quadrant of the county at roughly a forty-five-degree angle.  On the southeast side of I-85 lies the

14

City of Valley, Alabama, which has been incorporated since 1980.  It is bordered by the Chattahoochee River on the east, and I-85 and Lanett to the north.  Lanett lies just north and west of Valley with I-85 separating the two cities.  Lanett and Valley are bordered on the east by the Georgia state line; West Point, Georgia; and the Chattahoochee River.  The rest of Chambers County is rural, except for LaFayette.  LaFayette is and has been (since 1835) the county seat and is located approximately in the middle of Chambers County.  (Doc. # 568 ¶ 1.)



(Doc. # 564-14.)

**E.**     <u>Racially Identifiable Schools in the LaFayette Attendance Zone</u>

The three schools in the LaFayette feeder pattern are racially identifiable black schools and have been since the original desegregation order. (Doc. # 568 ¶ 4; Doc. # 441 at 5.) They are racially identifiable because their enrollments deviate from the District-wide racial composition by more than fifteen percentage points.[11] (Doc. # 568 ¶ 4.) For instance, for the 2022–23 academic year, eighty-six percent of LaFayette High School's students were black (Doc. # 568 ¶ 5), and seventy-four percent of J.P. Powell Middle School's students were black (Doc. # 568 ¶ 32).

**F.**     <u>The Academic and Extracurricular Offerings at LaFayette High School</u>

Valley High School offers more course selections and extracurricular activities than LaFayette High School. As Superintendent Chambley testified, the incongruity results from the discrepancy in enrollment at the two schools. (Doc. # 570, at 152–54; *see* Doc. # 568 ¶ 5 (stipulating that, for the 2022–23 academic year, LaFayette High School enrolled 205 students, and Valley High School enrolled 617 students).) When only three or four students qualify for a class, which has

---

[11] Courts have acknowledged that plus or minus fifteen percent is a valid ratio for determining whether schools are racially identifiable. *See, e.g., Belk v. Charlotte-Mecklenburg Bd. of Educ.*, 269 F.3d 305, 319 (4th Cir. 2001) ("[P]lus/minus fifteen percent variance is clearly within accepted standards, and provides a reasonable starting point in the unitary status determination."); *Singleton v. Jackson Mun. Separate Sch. Dist.*, 419 F.2d 1211 (5th Cir. 1969). The fact that schools are "racially identifiable" reflects many factors beyond the control of any party here, including residential demographics, the presence of alternative, private schools, and population growth or shrinkage, migration, and dispersion generally.

occurred at LaFayette High School because of the lower enrollment, the District cannot justify assigning a teacher for such a small class. (Doc. # 570 at 152–54.) Superintendent Chambley also explained that at LaFayette High School, some team sports do not generate enough student interest to form a team. (Doc. # 570 at 153–54.)

To illustrate the discrepancy in extracurricular offerings, in the 2012–13 through 2014–15 school district profiles, Valley High School offered fourteen extracurricular activities that were not available in LaFayette High School, including national honor societies, national service clubs, and sports teams for soccer, tennis and golf, which can provide college scholarship opportunities. (Doc. # 443-8.) This testimony was no surprise, as the District repeatedly has admitted that Valley High School has more academic and extracurricular offerings than LaFayette High School. (*See, e.g.*, Doc. # 328 at 10.) This was historically true, although Valley High School is no longer predominantly white as it was in 1993. (Doc. # 568 ¶ 5); *Lee*, 849 F. Supp. at 1481 ("The curricula at LaFayette High, predominately black, and Valley High, predominately white, were different in several respects.").

## G.   The Operation of Two Time Zones in the District

Chambers County has two time zones. (Doc. # 570 at 30.) The portions of Chambers County encompassing the LaFayette High School attendance zone observe the Central Time Zone, and the portions of Chambers County encompassing

the Valley High School attendance zone observe the Eastern Time Zone.  (Doc. # 570 at 31–32.)  Yet, they are in the same school district.

The use of the Eastern Time Zone is by custom, not law.  In the Standard Time Act of 1918, Congress placed the entire state of Alabama in the Central Time Zone.  Still, some areas on the Alabama side of the Georgia–Alabama border, including the City of Valley, remained in the Eastern Time Zone to accommodate local industry— specifically for Chambers County, to accommodate local textile mills.  Today, the textile mills are gone, but the *de facto* use of Eastern Time has persisted, and it has created significant problems for the communities in Chambers County.  (Doc. # 570 at 32, 44–45.)  For example, hardships exist when parents work in a time zone different from the one in which their children attend school, when two children in a family attend school in different time zones, or when buses must service two time zones on one route.  (*See, e.g.*, Doc. # 571 at 114–16.)

Superintendent Chambley has committed to operate all schools in the District on Central Time after the consolidation of the two high schools.  (Doc # 570 at 53– 54, 146.)  He testified that the District, the City of Valley, and its hospital are the three largest employers in the county and that the city and the hospital, as well as other industries, also have committed to changing their operations to Central Time.  (Doc. # 570 at 148–49.)

**H.      Population Shifts in Chambers County**

According to the U.S. census data, Chambers County's population decreased from 38,876 to 34,772 between 1990 and 2020, a 10.56 percent decrease.  (Doc. # 564-62.)  The City of LaFayette's population also declined between 1990 and 2020.  In 1990, the City of LaFayette's population was 3,205; in 2000, it was 3,234; in 2010, it was 3,003; and in 2020, it was 2,684.  The City of LaFayette's population decreased by 16.3 percent over this 30-year period, with the black population decreasing by 12.3 percent (1,991 to 1,747) and the white population decreasing by 31.1 percent (1,207 to 832).  (Doc. # 564-62.)

During the same 30-year period, the City of Valley's population increased.  In 1990, the City of Valley's population was 8,173; in 2000, it was 9,198; in 2010, it was 9,524; and in 2020, it was 10,513.  (Doc. # 564-62.)  The City of Valley's population increased by 28.6 percent over this 30-year period, with the black population increasing by 180 percent (1,411 to 3,963) and the white population decreasing by 7.4 percent (6,735 to 6,234).

**I.      Decreases in the District's Enrollment**

Over the past thirty years, the District's school enrollment has decreased.  For the 1991–92 academic year, Valley High School projected an enrollment of 856 students, and  LaFayette High School projected an enrollment of 514 students.  (Doc. # 570 at 47–48.)  For the 2022–23 academic year, Valley High School had 617

19

students (a twenty-eight percent decrease), and LaFayette High School had 205 students (a sixty percent decrease).  (Doc. # 568 ¶ 5.)

In addition, overall, Chambers County schools continue to show a decline in enrollment.  For the data provided (the 2015–16 academic year through the 2022–23 academic year), the number of students for all grades decreased from 3,739 to 3,381 (9.57%).  For the same eight-year period, the number of students in high school decreased from 1,080 to 957 (11.39%).  (Doc. # 564-38 at 19; Doc. # 571, at 182–83.)

## J.    Changed Demographics at Valley High School

In 1993, Valley High School was a predominantly white high school.  *See Lee*, 849 F. Supp. at 1481.  Today, it is racially diverse.  For the 2022–23 academic year, Valley High School enrolled 617 students of whom 47 percent were black, 48 percent were white, and 5 percent identified as another race.  (Doc. # 568 ¶ 5.)

## K.    Five Superintendents over the Course of Thirty Years

Since 1993, the District has seen five superintendents at the helm, all of whom were elected.  The current superintendent is Casey Chambley, Ph.D.  (Doc. # 565-1 at 1.)  He began his term in October 2021.  (Doc. # 571 at 90.)

## L.    The District's Preparations for, Approval of, and Plans for a New, Consolidated High School

This brings the factual discussion to the present, with the District's efforts to conceptualize and complete the construction of a single high school to serve all students in the system.

### 1.    *Site Selection*

Site selection for a consolidated high school began in November 2021, when the District hired consultants at Hoar Program Management (HPM), chiefly Tracy Richter, for long-range, master planning for the District that would align with the goal of achieving unitary status.[12]  The long-range plan included a recommendation that the District consolidate the high schools and build a new high school to accommodate 1,000 students.   (Doc. # 564-66 at 3, 5.)   During that period, community meetings were conducted throughout the county dealing with various issues about the schools and master planning.  (Doc. # 564-66 at 3.)

In June 2022, the District worked with Mr. Richter to identify and analyze potential sites for the new combined high school.  HPM hired GIS analyst Lee Hwang to identify potential high school sites over forty acres.  Mr. Hwang analyzed

---

[12] Mr. Richter, who is vice president of planning services for HPM, describes himself as an education facilities planner.  (Doc. # 571 at 172.)

distances between student residences and potential high school sites.  (Doc. # 568 ¶¶ 8–9; *see also* Doc. # 564-66 at 5.)

Mr. Hwang located ten sites.  In July 2022, he met with Superintendent Chambley about the sites he had identified, namely eight sites along or close to Highway 50, one site in Fredonia, and one site in Cusseta.  (Doc. # 568 ¶¶ 8–9.)

In addition to the ten sites identified by Mr. Hwang, the District received two offers for donated land.  First, on June 24, 2022, the City of LaFayette offered to donate land to the school board to construct a consolidated high school.  The City of LaFayette offered up to a combined 164 acres of land it owned or had the option to buy.  (Docs. # 568 ¶ 13; 564-25; 564-29; 564-30.)

Second, on July 20, 2022, the City of Valley offered to donate a seventy-four-acre parcel for a consolidated high school.  (Doc. # 568 ¶ 13.)  The City of Valley's proposal included environmental, geotechnical, and topographical information obtained in 2016, for which the Chambers County Development Authority helped pay.  (Doc. # 568 ¶ 14.)  This proposal, according to the terms of the city's offer, would expire within three years of its date.  (Doc. # 564-59; Doc. # 570 at 76.)  The proposed site in Valley is approximately two miles from Valley High School and four-and-a-half to five miles from a junction with Highway 50.  (Doc. # 572 at 236; Doc. # 564 at 84.)

After the cities of Valley and LaFayette offered to donate property, Mr. Richter recommended that the District narrow its site selection to the two donated properties.  (Doc. # 568 ¶ 15; Doc. # 571 at 276.)

### 2.    *Community Meetings*

On September 12 and 13, 2022, the District held community meetings to present site selection research conducted by HPM. The presentation provided a comparison of the two donated properties.  The District's site selection comparison was not completed at the time of the presentation.  Attorneys for the Plaintiff Parties attended both presentations.  (Doc. # 568 ¶ 17.)

After the LaFayette meeting, the District, for the first time, requested additional information about the donated property in LaFayette.  The City of LaFayette responded to the District's request on September 20, 2022.  (Doc. # 568 ¶¶ 14, 18.)

### 3.    *The Superintendent's Recommendation and the Board's Vote*

On or about the week of October 17, 2022, Mr. Richter recommended that the District build the new, consolidated high school on the site donated by the City of Valley.  (Doc. # 568 ¶ 19.)  He thus recommended the Valley site over the LaFayette site.

Mr. Richter's recommendation was based on several factors, including infrastructure, access to utilities, access to athletic and competition fields, and size.

23

(Doc. # 571 at 242–51; Doc. # 564-66 at 8.)  However, in his final analysis, it came

down to proximity of students and mileage to the site.[13]  (Doc. # 564-64 at 11.)  Both

the mean and median centers were closer to the Valley site for high school students,

as indicated in the chart showing the mean and median centers for the two existing

high schools:

| MEAN CENTER<br>Identifies the geographic center (or center of concentration) of all students<br>Chambers County 9-12 Students | | | | |
|---|---|---|---|---|
|  | Shortest Distance to Mean Center | Longest Distance to Mean Center | Average Distance to Mean Center | Total Mileage to Mean Center |
| County Wide | 0 | 27.5 | 8.4 | 7,437.9 |
| Lafayette High School | 4.5 | 27.5 | 13.9 | 3,273.3 |
| Valley High School | 0 | 12.9 | 6.5 | 4,139.4 |

| MEDIAN CENTER<br>Identifies the location that minimizes overal Euclidean distance to all 9-12 students<br>Chambers County 9-12 Students | | | | |
|---|---|---|---|---|
|  | Shortest Distance to Median Center | Longest Distance to Median Center | Average Distance to Median Center | Total Mileage to Median Center |
| County Wide | 0.3 | 30.6 | 7.3 | 6,473.8 |
| Lafayette High School | 7.6 | 30.6 | 16.4 | 3,832.4 |
| Valley High School | 0.3 | 13.1 | 4.3 | 2,585.0 |

(Doc. # 564-66 at 8–9.)

---

[13] Another factor that impacted the decision was cost.  The donated sites freed the Board from having to spend public money to purchase a site and, with regard to the Valley site, to build extensive athletic facilities.  (Doc. # 571 at 217–18.)  In LaFayette, the football stadium option was much less attractive.  The athletic facilities already existing in the Valley area included a football stadium with amenities and practice fields.  (Doc. # 564-66 at 11; Doc. # 571 at 242.) Also, the population growth is in the Valley area, and adequate infrastructure, such as a hospital, is available.  (Doc. # 570 at 185–86.)

Mr. Richter also considered how his choice would affect transportation for minority students.  Based on mileage, by road networks, the LaFayette site overall would require black high school students to travel farther than they would to the Valley site.  The total mileage black students would have to travel to the donated LaFayette site is 4,921 miles, and the total mileage black students would have to travel to the donated Valley site is 4,280.9 miles.  (Doc. # 564-66 at 9.)  Also, proximity by roads for all high school students in the District is less mileage overall to the Valley site than to the LaFayette site (6,628.8 miles for the Valley site versus 10,867.4 miles for the LaFayette site).  (Doc. # 564-66 at 9, 12; Doc. # 571 at 236–37.)  Mr. Richter also considered how the transportation would affect those students living farthest from the school and felt, based on his experience, that the District could make accommodations to reduce the impact of a bus ride, such as providing air conditioning, WIFI, and personal electronic devices.  (Doc. # 541 at 242–51.)

Superintendent Chambley followed the recommendation of Mr. Richter.  On October 26, 2022, Superintendent Chambley recommended that the Board approve the donated Valley property as the site for the new consolidated high school, subject to the approval of this court.  (Doc. # 568 ¶ 21; Doc. # 511-4 at 5.)  The Board approved the recommendation of the Valley site, with four in favor and two opposed.  (Doc. # 568 ¶ 22; Doc. # 511-4 at 3.)  The Board did not vote on temporarily

consolidating high school students at the existing Valley High School.  (Doc. # 568 ¶ 23.)

Two Board members testified at the January 2023 trial.  Board President Jeffrey Finch voted in favor of the consolidation of the high schools and construction of the new site in Valley.  (Doc. # 573 at 267, 275.)  He cast his vote "for the betterment of the kids and administration of Chambers County School Board." (Doc. # 273 at 272.)

Board member, Lashae Herring, voted against the consolidation of the high schools at the Valley site.  (Doc. # 569 at 203.)  Although she favors a consolidated high school, she voted against the recommendation for two reasons.  First, she wants the school to "be in a neutral territory," and not in the cities of Valley or LaFayette. (Doc. # 569 at 203–04.)  Second, she is concerned about the travel distance for some students who live in rural areas, live with grandparents, and rely on bus transportation for school.  (Doc. # 569 at 204.)  However, she was candid when the court asked if any solution would satisfy most of the county.  She responded:  "I doubt it."  (Doc. # 569 at 211.)  There is no evidence disputing her conclusion.

### 4.   *Desegregation Advisory Committee*

Some members of an advisory group—the Desegregation Advisory Group (DAC)—also weighed in on both temporary and permanent consolidation of the high

schools.[14]  Prior to the Board vote, the DAC raised several concerns about the site selection process and the selections of the Valley site for recommendation to the Board.  The DAC requested to be put on the Board agenda but was told no one could speak because the discussion would be in executive session.  The DAC then put its concerns in writing, including a request for the Board to postpone voting.  That writing was provided to the Board prior to its vote.  (Doc. # 568 at 5.)

At the trial, four members of the DAC testified that they opposed temporary consolidation and that they supported permanent consolidation, but that they wanted the new school built in a central location.  (Doc. # 571 at 95–148.)  Three of the DAC members who testified were students at LaFayette High School, and the fourth DAC member was a child nutrition professional who worked at Fairfax Elementary School.  (Doc. # 571 at 95, 118, 128, 139.)  The three student members from Valley High School did not testify, nor did they attend any of the DAC meetings.  (Doc. # 571 at 108.)

---

[14] The DAC, which was established pursuant to this court's July 5, 2022 Order, is an advisory group with student and parent representatives from both the Valley and LaFayette attendance zones.  The Order directed that the DAC, whose membership must be at least twelve, should have regular access to the superintendent and the board of education to address desegregation issues and the progress of the changes to the District.  The Order also directed the DAC to meet at least twice annually until the closure of the case against the Chambers County Board of Education.  (Doc. # 493.)  Up until the time of the January 2023 trial, the DAC met twice a month.  (Doc. # 571 at 98.)

5.     *The Other Sites*

Prior to the Board's vote, the District did not ascertain the availability of the non-donated sites.  The District did not know the cost to acquire any of these sites.  The District did not know if any of these sites would be donated or discounted.  (Doc. # 56 ¶ 11.)  District representatives also did not officially visit any of the non-donated sites to evaluate them as potential sites for the new, consolidated high school prior to the vote.  The District also did not know the transportation impact for any of these sites or how much it would cost to build on one of these sites compared to building on one of the donated sites.  (Doc. # 568 ¶ 12.)  Additionally, the District did not obtain information regarding the accessibility, installation, or upgrade of utilities to any of the non-donated sites.  (Doc. # 568 ¶ 24.)

After the Board's vote, at the District's request, Chris Busby, the deputy director for the Chambers County Development Authority, conducted utilities research on the non-donated sites during November 2022.  Mr. Busby completed and submitted his analysis in the same month.  (Doc. # 568 ¶ 24; Doc. # 569 at 5.)  He reported that most sites were not feasible.  Either the landowners did not want to sell the properties or the estimated costs to complete engineering and geotechnical analysis on each site each of the sites could run as high as $300,000 per site or $3 million if all ten sites were to be evaluated effectively.  Several sites did not have sewer access or other important infrastructure.  Some sites were privately owned,

and the owners expressed that they did not wish to sell or donate their sites to the district for the purpose of the school.  (Doc. # 569 at 12–34.)

### 6. *Temporary Consolidation*

The District also plans to consolidate the two high schools temporarily at the existing Valley High School campus, beginning for the school year 2023–24.  (Doc. # 568 ¶ 29.)  This consolidation also would include a change in the name of the existing Valley High School, its colors, and its mascot to create a unified, neutral high school.  (Doc. # 574 at 181–82.)  During temporary consolidation, the District also would continue to offer career tech classes at Inspire Academy in LaFayette and transport high school students to and from Inspire Academy during the school day.  (Doc. # 568 ¶ 31.)  During temporary consolidation, there would be no students at the current LaFayette High School campus.  The District proposes to renovate the current LaFayette High School building for the K-8 STEAM program at Eastside Elementary School.  But the District does not have a formal plan for the renovations.  It does not know if it has the financial ability to build a new high school and renovate the current LaFayette High School for the STEAM program simultaneously.  (Doc. # 568 ¶ 30; Doc. # 571 at 13.)

The Board did not vote on temporary consolidation of all the District's high school students at Valley High School; that issue was not before the Board.  But had that issue been brought up for a vote, board member Ms. Herring testified that she

would have opposed temporary consolidation at the Valley High School. Ms. Herring testified that she does not want the LaFayette High School students to have to move twice. (Doc. # 569 at 204–05.)

**7.**  ***Funding for the New Consolidated High School and Additional Site Selection Evidence***

A new high school would require at least 170,000 square feet to accommodate 1,000 students, and the current plan is for 183,000 square feet. (Doc. # 564-66 at 5; Doc. # 571 at 258.) The District expects the new, consolidated high school to cost $65 to $70 million, but it has not finalized the specifications for the new school. The District expects that construction will take at least two years. (Doc. # 568 ¶ 7.)

To pay for construction, the District is projected to receive $1.8 million more in local revenues in 2023 than in 2022. (Doc. # 570 at 103–04; Doc. # 564-23.) The District also has funding from federal COVID-19 relief legislation (Elementary and Secondary School Emergency Relief Fund), but that money will revert back to the federal government if it is not allocated and spent by 2024. (Doc. # 570 at 105–07.) The District also has been working with underwriters and bond agents. "[A]s long as the interest rates stay in a range where debt service remains around $5 million," Superintendent Chambley confidently believes that the District can build the new school without a tax increase. (Doc. # 570 at 108–09.) Based on the absence of evidence of secured financing and architectural renderings for the new high school,

the court is unable to opine on these matters.  At the same time, the court is mindful that "[f]unding decisions are within the competence of the Board, whose powers, as the Supreme Court has noted, are 'plenary,' in the absence of a constitutional violation."  *Lee v. Macon Cnty. Bd. of Educ.*, 584 F.2d 78, 82 (5th Cir. 1978).

At the trial, there was testimony about the median and mean centers of population among black and non-black students.  Both the mean and median centers of high school population are in the Valley attendance boundary.  (Doc. # 564-68.) Additionally, seventy-two percent of high school students live in the Valley High School boundary, while twenty-five percent of high school students live in LaFayette High School boundary.  (Doc. # 572 at 105.)

There was testimony that the median center does not account for "outlier" high school students, that is, those high school students who live the farthest away from their school.  (Doc. # 572 at 13, 86–87, 90; Doc # 569 at 135; Doc. # 533-1 at 3.)  No testimony defined precisely how far away a student must live to be an "outlier" (Doc. # 572 at 90); however, on the court's inquiry, the District provided a chart, prepared by one of its experts (Hwang), that listed the number of high school students, by race, who lived outside a twenty-mile radius of the proposed site in Valley for the new consolidated high school.  (Doc. # 564-69.)  For the 2022–23 academic year, that number was forty-nine black high school students and nineteen non-black high school students.  This means that roughly ten percent of all black

31

high school students live outside the twenty-mile radius, while ninety percent of all black high school students live within the twenty-mile radius.  (Doc # 564-69.)

**8.** ***Current Bus Routes and Bus Routes for Temporary and Permanent Consolidation of the District's High Schools***

        **(a)**    **Current Bus Routes**

For the 2022–23 academic year, there were forty-one bus routes that picked up and dropped off students at the beginning and end of each school day.  Fifteen routes serviced the LaFayette attendance zone, and twenty-six routes serviced the Valley attendance zone.  (Doc. # 572 at 152; Joint Tr. Ex. 3.)  There were an additional twenty-seven bus routes that ran mid-day, the majority of which transported students to and from Inspire Academy and/or the high schools for career tech courses.  (Doc. # 572 at 153.)  The average number of students who rode the bus varied from month to month; however, in November of the 2022–23 year, 103 LaFayette High School students and 219 Valley High School students rode the bus.  (Doc. # 572 at 155–56.)  To and from school, about half of the LaFayette High School students ride the bus, and slightly more than one-third of Valley High School students ride the bus.  (Doc. # 572 at 237.)

The ruralness of certain areas in the county increases bus travel for some students of all races.  For the 2022–23 academic year, there were eight bus routes for LaFayette High School students, ranging from sixty to eighty-five minutes one

way.[15]  (Doc. # 564-15 (Jt. Trial Ex. 3); Doc. # 572 at 244.)  The longest bus route, one way, was eighty-five minutes, and on this route, there were four black high-school students and no non-black high-school students.  The travel time for the four high school students on this route, however, was not eighty-five minutes, but sixty-five to seventy minutes.[16]  (Doc. # 672 at 264.)  Two of the bus routes were seventy-five minutes, one way.  On one route, there were no black high-school students and seven white high-school students, and on the other seventy-five-minute route, there were seventeen black high-school students, no white students, and five Hispanic students.  (Doc. # 564-15.)  For the 2022–23 academic year, there were nine bus routes for Valley High Schools students, ranging from sixty to seventy-five minutes.[17]  On the longest, seventy-five-minute bus route, there were two black high-school students and six non-black students.  (Doc. # 564-15.)  On the second longest bus route of sixty-seven minutes, there were five black high-school students, and

---

[15] The joint exhibit is a chart detailing bus routes, the number of students who rode the bus for the beginning of the 2022–23 academic year to the time of trial, and the demographics of the bus riders.  The duration of bus travel reflects the *longest time* that the last student could be on a bus route.  Of course, not all students ride the whole route; students are picked up and dropped off along the way.  (Doc. # 564-15; Doc. # 572 at 165–66, 245.)  And most routes include students in elementary and middle school grades.  Using the longest ride per route, which the parties argued, does not reflect the *average* ride of a high school student per route.

[16] For the 2022–23 academic year, one student rode the bus for 85 minutes on the afternoon route; that student was in elementary school.  (Doc. # 572 at 246–48.)

[17] Eight of these nine routes transport high school students.  (Doc. # 564-15.)

eight white high school students.  On the third longest bus route of sixty-five minutes, there were ten black high-school students, and five white high-school students.  (Doc. # 564-15.)  For the 2022–23 year, the average ride time in the county for the thirty-five daily bus routes transporting at least one high school student was fifty-three minutes.  (Doc. # 564-15.)

> **(b)    Bus Routes for Permanent Consolidation at a New High School at the Valley Site**

After November 2022 (which was after the District moved this court to approve the Valley site), the District created a plan for transporting current LaFayette High School students to the new consolidated high school at the proposed site in Valley.[18]  (Doc. # 572 at 173–77; Doc. # 564-19.)  The transportation plan proposes using the existing 2022–23 routes to transport LaFayette-zoned elementary, middle, and high school students to Eastside Elementary School.  From Eastside Elementary School, high school students would travel to a hub at the present location of Inspire Academy, which currently houses the District's career tech program.[19]  These high school students would then take one of four shuttle buses to the consolidated high school in Valley.  (Doc. # 568 ¶ 27; Doc. # 572 at 206.)  This

---

[18] The District did not create a transportation plan for any other site, including the donated LaFayette site or the non-donated sites along Highway 50, in Fredonia, and in Cusseta.  (Doc. # 568 ¶ 26.)

[19] Future use of the current Inspire Academy location and facilities is not at issue.

plan adds approximately twenty-five minutes to these students' bus routes (one way), (Doc. # 564-22' Doc. # 568 ¶ 27), which is the same amount of time current Valley High School students travel one-way to Inspire Academy for career tech courses.  (Doc. # 568 ¶ 31.)  Students also could drive to Inspire Academy and then take the bus from the academy to Valley High School.  (Doc. # 572 at 202.)

The transportation plan also includes the creation of two additional routes. These routes would take high school students, formerly zoned for LaFayette High School, who live along the eastern and southern borders of Chambers County, directly to the consolidated high school in Valley.  (Doc. # 568 ¶ 28; Doc. # 572 at 173–77; Doc. # 564-22.)  The new bus route for students from the eastern border of the county would transport eight students (four of whom are black and four of whom are white) and take approximately fifty minutes.  The new bus route for students from the southern border of the county would transport ten high-school students (eight of whom are black and two of whom are white) and take approximately fifty-five minutes.  (Doc. # 572 at 173–176; Doc. # 564-22.)  Because all career tech courses would be onsite at the consolidated high school, the bus routes between the two high schools and to and from Inspire Academy would no longer be necessary.  (Doc. # 568 ¶ 33; Doc. # 570 at 156.)

The District also has ordered six buses with air conditioning.  Those buses will be used for the district's six longest routes.  (Doc. # 572 at 176–77.)

### (c)    Bus Routes for Temporary Consolidation of the Two High Schools at the Existing Valley High School

The District proposes using the same bus plan to transport current LaFayette High School students to the existing Valley High School during temporary consolidation.  (Doc. # 572 at 194, 235.)  As confirmed by the District's director of transportation, the plan is the same because the proposed Valley site to construct the new combined high school is not far from the existing Valley site.  (Doc. # 572 at 148–49, 235.)

The District also plans to continue offering career tech classes at Inspire Academy during temporary consolidation of the two high schools at Valley High School.  (Doc. # 568 ¶ 31.)  It would continue to bus students from the existing Valley High School throughout the day to Inspire Academy, which is in LaFayette.  (Doc. # 572 at 194–95.)  For a high school student formerly zoned for LaFayette High School and living in the LaFayette area, he or she likely would have four extended bus trips per day if that student elects to take career tech courses at Inspire Academy.  The student would (1) travel by bus from the LaFayette area to Valley High School, (2) travel back to Inspire Academy in LaFayette for career tech courses, (3) travel back to Valley High School, and (4) finally travel home to the LaFayette area at the end of the school day.  (Doc. # 572 at 195–197; 221–26.)  These students potentially would endure these long bus rides for two years, which is the

estimated timeframe for completion of the new high school.  (Doc. # 572 at 227; Doc. # 572 at 249.)

## N.   **Plaintiffs' Evidence About the District's Selection of the Valley Site**

Plaintiffs presented two experts at trial.  The experts disagreed with the District's selection of the Valley site.

Robert Murray, with King Consulting from California, was offered as an expert in school facilities and transportation planning.  Mr. Murray testified that the District's community presentations were biased in favor of the Valley site.  He also testified that the District's transportation cost analysis was overinflated.  (Doc. # 564-28.)   The District admitted the error concerning the calculation of the transportation cost analysis.  (Doc. # 564-40; Doc. # 572 at 14–17; Doc. # 569 at 198–99.)  The court has not relied upon the erroneous calculations.

Mr. Matthew Cropper was offered as an expert in K-12 school planning, with a "specialty [in] facilitating comprehensive school redistricting studies as well as demographic analysis and facility planning."  (Doc. # 564-38 at 2; *see also* Doc. # 569 at 114.)  By the time of trial, he had been studying the District's school system for over two years.  He opined that the District did not conduct adequate research to make an informed decision to reject the sites along Highway 50 and that reliance on the median population center as a basis for selecting a site is not ideal because it fails to account for "outliers."  (Doc. # 569 at 125–33; Doc. # 564-38 at 2.)  He also

testified that the District should have selected a property in a central location, and not in Valley, to reduce the overall transportation burden for all students.  (Doc. # 564-38.)

Mr. Cropper's testimony contradicts his earlier opinion in this case.  In a twenty-six-page report issued in March 2022, Mr. Cropper presented three options for the District to "consider to help provide more demographically diverse schools within the county." (Doc. # 564-58.)  The second and third options consolidated the two high schools at Valley High School, and Mr. Cropper recommended the District implement the third option.  (Doc. # 564-58 at 7, 9.)  He presented these options based on "best practices when redistricting," on the racial composition of the proposed schools, on "school utilization," on the students' "distance to school," on the number of students affected, and "how students matriculate from elementary to middle to high school (*i.e.*, feeder patterns)."  (Doc. # 564-58 at 4.)

At trial, Mr. Cropper testified that he made the recommendation in March 2022 to merge the two high schools at the existing Valley High School before he knew that the LaFayette attendance zone was predominantly black.  (Doc. # 569 at 147–48.)  This testimony contradicts the information he provided in his March 2022 report.  That report indicates that the impact on the race of the schools factored into his decision (Doc. # 564-58 at 4), and it includes charts that identify each school's enrollment by race.  These charts reflect that the schools in the LaFayette

attendance zone (LaFayette High School, J.P. Powell Middle School, and Eastside Elementary School) have predominantly black enrollment.  (Doc. # 570 at 35.)  Mr. Cropper's about-face on the location of the merged high schools is not credible.

## IV.  DISCUSSION

The District proposes to close a racially identifiable high school (LaFayette High School), to consolidate temporarily the student bodies of the District's two high schools at Valley High School, and to build a district-wide high school at a new site in Valley.  The discussion addresses, first, whether modifying the 1993 Agreed Order to permit constructing the new high school in Valley is warranted; second, whether permanent consolidation of the District's high school students at a new, consolidated school is constitutional; and third, whether temporary consolidation of the District's high school students at the existing Valley High School is constitutional.  For the reasons to follow, modification of the 1993 Agreed Order's location provision is warranted; permanent consolidation at the proposed Valley site passes constitutional review; but temporary consolidation at the existing Valley High School does not.

## A.    Modification of the 1993 Agreed Order's provision as to the location of the new, consolidated high school is warranted.

Plaintiffs support the District's plan for the consolidation of the high schools at a new, single facility—their dispute lies in the District's proposal for the high

school's proposed location. Plaintiffs argue that the 1993 Agreed Order requires construction of the consolidated high school "at a site readily accessible to Alabama state highway Route No. 50 between Lanett and LaFayette" and that the proposed site in Valley violates this term. (Doc. # 577 at 7 (quoting Doc. # 564-4 at 16).) That ends the issue for Plaintiffs: They argue that the District cannot build a consolidated, district-wide high school at the proposed Valley site because the location violates the thirty-year-old 1993 Agreed Order. Alternatively, Plaintiffs argue that the District has not shown that a modification of the 1993 Agreed Order is warranted. They contend that the location for the consolidated high school was central to the purpose of the 1993 Agreed Order and that the District has not demonstrated changed circumstances to warrant a modification to that order. Moreover, Plaintiffs argue that, even if those arguments fail, the proposed location is unconstitutional because it disproportionately burdens the District's black students. Plaintiffs also contend that the District should not be allowed to argue for a modification when it has not formally done so in thirty years. (Doc # 577 at 9–13; Doc. # 576 at 2-7.)

Taking a different position, the District points to the parties' conduct over the last three decades to argue for a modification of the 1993 Agreed Order. Alternatively, the District contends that laches prevents Plaintiffs from seeking to enforce the location provision in the 1993 Agreed Order. The District argues that,

after the 1994 failed tax referendum for financing a new high school, the parties—in their negotiations and petitions filed throughout the years—have ignored the 1993 Agreed Order's provision to construct a consolidated high school.  For example, in the 1990s, the parties jointly requested major construction projects for facilities improvements at *both* high schools.  (Doc. # 575 at 5–7.)  The District also emphasizes that the parties' negotiations in 2022 resulted in a proposed consent order, that although later withdrawn, did not mention a Highway 50 location for the new high school, but instead focused on a neutral site selection that would not "impose an unequal burden on students on the basis of race, to the extent practical." (Doc. # 575 at 4–5.)  The District contends that Plaintiffs' insistence on strict adherence to the 1993 Agreed Order's location provision is disingenuous and contrary to the parties' conduct.  The District further contends that constructing the district-wide site at the proposed Valley site passes constitutional muster. (Doc. # 575 at 12–29.)

In the 1993 Agreed Order, the District "agree[d] to support the construction and operation of a consolidated, district-wide high school facility at a site readily accessible to Alabama state highway Route No. 50 between Lanett and LaFayette." (Doc. # 564-4 at 16.)  The proposed Valley site is, by roadway, four-and-a-half to five miles from Highway 50.  (Doc. # 564 at 84.)  The District has not argued that the proposed Valley site is "readily accessible" to Highway 50, but rather has argued

for elimination of this provision in the 1993 Agreed Order. (*See* Doc. # 575 at 9–12.) The court finds that modification of the 1993 Agreed Order is warranted.[20]

A consent decree embodies the voluntary agreement of the parties backed by the enforcement power of the court. *See R.C. ex rel. Ala. Disabilities Advoc. Program v. Walley*, 390 F. Supp. 2d 1030, 1043 (M.D. Ala. 2005) (citing *Vanguards of Cleveland v. City of Cleveland*, 23 F.3d 1013, 1017 (6th Cir. 1994)). A district court has inherent power to modify a consent decree. *Jacksonville Branch, N.A.A.C.P. v. Duval Cnty. Sch. Bd.*, 978 F.2d 1574, 1582 (11th Cir. 1992) (citations omitted). A flexible standard applies to modifications of a consent decree for institutional reform. Flexibility in modifying such decrees is important "where efforts to implement the decree have been bogged down for years" and because these decrees "reach beyond the parties involved directly in the suit and impact on the public's right to the sound and efficient operation of its institutions.'" *Reynolds v. McInnes*, 338 F.3d 1221, 1226 (11th Cir. 2003) (quoting *Rufo v. Inmates of Suffolk Cnty. Jail*, 502 U.S. 367, 381 (1992)).

"[A] court faced with a motion to modify a consent decree in institutional reform litigation must begin by determining the 'basic purpose' of the decree." *United States v. City of Miami,* 2 F.3d 1497, 1504 (11th Cir. 1993). If the provision

---

[20] It is thus unnecessary to address the alternative laches argument.

to be modified "is central to the decree, or . . . 'the most important element' of the decree, then the modification is likely to violate the basic purpose of the decree and, therefore, will be forbidden." *Reynolds*, 338 F.3d at 1226 (quoting *City of Miami*, 2 F.3d at 1504–05).  But, if the provision "merely sets out one of several means of accomplishing the purpose of the decree or one of several means of measuring compliance with the decree's objective, then the requested modification is not necessarily prohibited." *Id.* (quoting *City of Miami*, 2 F.3d at 1505).

If the proposed modification to a consent decree does not displace the decree's central purpose, the Supreme Court has established a two-pronged framework for assessing whether a modification is warranted.  First, the movant must show "a significant change in circumstances" in either the law or the facts.  *Rufo*, 502 U.S. at 383.  Second, if the movant meets its burden, the modification must be "suitably tailored to the changed circumstance."  *Id.*

In *Reynolds*, drawing from Supreme Court and Eleventh Circuit precedent, the Eleventh Circuit explained that modification of a consent decree based on a factual change may be appropriate in these five situations:  (1) where "changed factual conditions [have made] compliance with the decree substantially more onerous"; (2) "when a decree proves to be unworkable because of unforeseen obstacles"; (3) "when enforcement of the decree without modification would be detrimental to the public interest"; (4) when "significant time has passed and the

objectives of the original agreement have not been met despite the defendants' efforts"; or (5) "when a continuation of the decree would be inequitable."  338 F.3d at 1226–27 (quotation marks and citations omitted).

With these principles in mind, the court turns to the parties' contentions, and finds that modifying the 1993 Agreed Order's location provision is justified.

## 1.    *The location provision for constructing a district-wide high school is not a basic purpose of the 1993 Agreed Order.*

Plaintiffs argue that modifying the location provision is impermissible because that provision is one of the 1993 Agreed Decree's basic purposes.  (Doc. # 577 at 9–10.)  It is not.

The basic purposes of the 1993 Agreed Order are set out in the order itself. Those purposes were twofold:  to resolve the parties' disputes about (1) the relief needed "to eliminate continuing vestiges of past discrimination and segregation in the schools of Chambers County" and (2) the District's proposed plan for multiple school closures and consolidation, for grade reconfigurations, and for attendance zone modifications.  (Doc. # 564-4 at 3.)  The eighteen-page 1993 Agreed Order accomplishes these purposes through a detailed listing of required objectives for school closures and consolidations, for student reassignments, and for implementation of a comprehensive desegregation plan.  One objective—the construction of a district-wide high school that offers the same opportunities for all

the District's high school students, including courses, instruction, and extracurricular activities—furthers the goal of eliminating segregated, racially identifiable schools and the vestiges of discrimination.[21]   For 30 years, this objection—reflecting an education system that is unconstitutional—has existed. The location of the new, consolidated high school was but one part of the required objective for constructing a consolidated, district-wide high school and of an overall plan for desegregation.  (Doc. # 564-4.)  It violates reason and the facts to argue that a later change in the location of the district-wide high school singlehandedly would destroy the wholistic purposes of the 1993 Agreed Order and the efforts for a unified, single high school for the District.  *Cf. Rufo*, 502 U.S. at 387 ("If modification of one term of a consent decree defeats the purpose of the decree, obviously modification would be all but impossible.").

The court finds that the 1993 location provision for the consolidated high school is not "'the most important element of the decree,' and modification of it is not 'likely to violate the basic purpose of the decree.'"  *Reynolds*, 338 F.3d at 1228 (quoting *City of Miami*, 2 F.3d at 1504).

---

[21] The United States agrees that "[c]onsolidating all high school students at one school, using the current high school enrollment, would result in a combined enrollment (56% Black, 39% White and 5% other) that better reflects the District's overall racial composition."  (Doc. # 558 at 5.)

**2.      *The District has shown a significant change in factual circumstances.***

Plaintiffs next argue that, even if modification of the location provision is not prohibited outright, the District has not shown that changed circumstances warrant a modification of the 1993 Agreed Order. The District takes the opposite position.

Consideration of the third, fourth, and fifth situations articulated in *Reynolds* support modification of the 1993 Agreed Order's location provisions. Significant time has passed without the construction of a district-wide high school, notwithstanding the District's efforts, and factual circumstances have changed over the three decades that make it inequitable and detrimental to the public interest to require the parties to adhere to the 1993 Agreed Order's location provision for the new district-wide high school.[22] *See Reynolds*, 338 F.3d at 1226–27.

First, it cannot be disputed that "significant time has passed" and that the 1993 Agreed Order's objective of a new consolidated high school has not been met. Every year for the past thirty years, the District has opened the doors of its two high schools. The unfortunate reality is that a Chambers County student who graduated in 1993 from either Valley High School or LaFayette High School is now nearly fifty years old and potentially a parent of a child who graduated in the same system.

---

[22] The District argues that "changed factual conditions [have made] compliance with the decree substantially more onerous" and (2) that the 1993 Agreed Order has proven "unworkable because of unforeseen obstacles." *Reynolds*, 338 F.3d at 1226–27. The court has considered these changed factual conditions in its analysis.

The 1993 graduating classes of Valley High School and LaFayette High School have watched future generations of the District's students graduate, not from the promised consolidated high school, but from either LaFayette High School or Valley High School.  Time has not stood still, and here time is measured in decades.  Three decades have passed, and there still is not a consolidated high school in the District.

The District's good-faith efforts to comply with the 1993 Agreed Order to build a consolidated high school faced immediate defeat.  The financing fell through in 1994 when the voters rejected the tax referendum designed to fund the construction of the consolidated school.  With that defeat, the good-faith focus of all parties—both Plaintiffs and the District—shifted.  (Doc. # 570 at 168–69).

Since 1994, all parties have proceeded in the public filings of this litigation as if a new, district-wide high school was not on the horizon, was not near Highway 50, and indeed was not anywhere.  As Superintendent Chambley, a life-long resident of the area, summed it up:

> I can remember growing up in the community and hearing . . . about a consolidated high school for a long time and the public has been talking about it for a long time . . . .  However, other things have happened that made the community and made us feel like that maybe it was not going to happen.  For example, renovations at certain buildings, the building of a new football stadium, or the building of a new basketball facility, or the building of two new band rooms, one at Valley and one at LaFayette, that made it look like there would not be a consolidation.

(Doc. # 570 at 167.)

For many years, the issue of a new, consolidated high school lay dormant. (*See, e.g.*, Doc. # 570 at 167 ("I also early on was not quite sure about the 1993 order because things had sat for so long.  In 2015 when it was brought back up, from '93 to 2015 nothing really happened." (Chambley)).)  Since 2015, the parties have represented that they have been working together in good faith to resolve this litigation.  (*See* Doc. # 358 (Joint Status Report, reporting that "[a]ll Parties will work in good faith to remedy any areas of concern and work towards an agreement."); Doc. # 368 at 4 ("The Parties will continue to work in good faith to address the desegregation obligations of Chambers County."); Doc. # 372 (Order noting that the parties' filings indicate that they are working together in good faith); Doc. # 395 at 3 (Joint Status Report, reporting that "[t]he Parties intend to continue their negotiations in good faith . . ."); Doc. # 400 at 3 ("The Parties intend to continue their negotiations in good faith regarding all areas of concern identified by" Plaintiffs.); Doc. # 478 at 1 ("The parties have been negotiating in good faith and have made substantial progress toward resolving this matter.  Several minor issues remain but the parties are extremely hopeful that those issues can be resolved, and a Proposed Consent Decree submitted for the Court's consideration on or before May 13, 2022."); Doc. # 479 at 3 ("The parties have continued to negotiate in good faith and have reached an agreement in principle.").)  Plaintiffs continually have joined Defendant in representing the parties' good faith efforts to resolve this litigation.

Even as recent as a year ago in the parties' negotiations (although those negotiations ultimately were unfruitful), Plaintiffs did not insist on a site for the new high school that was readily accessible to Highway 50, but on a site that was "not on either the current LaFayette or Valley High School campuses." (Doc. # 480-1 at 3.) Hence, while Plaintiffs fault the District for not giving its best effort and for not requesting a modification of the location provision earlier, the fault, if there is fault to be had, lies on both sides of the litigation.

The 1993 Agreed Order, after thirty years, has not achieved its objective to provide a single, district-wide high school for its students. "[T]he time has come" to modify the 1993 Agreed Order to prescribe another means to achieve this long awaited and sought-after goal. *See United States v. United Shoe Machinery Corp.*, 391 U.S. 244, 251–52 (1968) (modification of consent decree warranted where it had not achieved its objectives after ten years of operation).

The court further finds that it would be inequitable to require the District to adhere to the thirty-year-old provision for the location of the district-wide high school. The location of a district-wide high school must be viewed in the context of the time period of the agreement. In the 1992–93 academic year, there were more black students enrolled at LaFayette High School than at Valley High School: 361 black students attended Valley High School, and 439 black students attended LaFayette High School. Today, significantly more black students attend Valley

High School than attend LaFayette High School.  For the 2022–23 academic year, 289 black students attended Valley High School, and 173 black students attended LaFayette High School.  Today, 63 percent of the District's black high school students attend Valley High School.

Additionally, over the thirty-year period since the entry of the 1993 Agreed Order, the overall attendance at LaFayette High School has decreased drastically.  For the 1991–92 academic year, the projected enrollment for LaFayette High School was 514 students.  (Doc. # 570 at 47–48.)  Contrast that to today, where for the 2022–23 academic year, LaFayette High School enrolled 205 students, a decrease of 61 percent over the thirty-year period.  (Doc. # 568 ¶ 5; Doc # 570 at 167.)  Today, Valley High School, with 617 students enrolled during the 2022–23 academic year, has three times as many students as LaFayette High School:  Seventy-five percent of the District's high school students attend Valley High School, while twenty-five percent attend LaFayette High School.  (Doc. # 568 ¶ 5.)

These enrollment numbers align with the population trends of Chambers County.  Between 1990 and 2020, according to the U.S. Census data, the City of LaFayette's population decreased by 16.3 percent.  (Doc. # 564-62.)  Over the same thirty-year period, the City of Valley's population has increased by 28.6 percent.  (Doc. # 564-62.)  Generally, the population is much larger in the Valley area than in other areas of the county.

The three-decade shift in enrollment demographics and population growth cannot be ignored when examining the continued propriety of the 1993 Agreed Order's location provision for the new, consolidated high school.  In 1993, more of the District's black high school students attended LaFayette High School than Valley High School, and the total number of high school students was more evenly distributed between the two high schools.  A new, consolidated high school at a location readily accessible to Highway 50—the east-west corridor for travel between LaFayette and Valley—made sense.  Today though a modification of the location provision makes sense when seventy-five percent of the District's high school students and sixty-three percent of the District's black high school students attend Valley High School, and the Valley area is growing in population.

Also, in 1993 as today, Lafayette High School operates on the Central Time zone, and Valley High School operates on the Eastern Time zone.  A more geographically centered high school—to the extent a geographical center was what was contemplated by the 1993 Agreed Order—would have helped minimize the disruption that some of the students would have endured by attending school in a time zone different from the one in which they lived.  Today, Superintendent Chambley is committed to operating the new district-wide high school on the Central Time zone, and he has received support from governmental and private businesses to also operate on the Central Time zone.  (Doc. # 570 at 53–54, 146–49.)  The use

of a single time zone will eliminate disruption and inconvenience for the District's students and their families.

These changed factual conditions make compliance with the Agreed Order's location provision for the new district-wide high school inequitable and detrimental to the public interest. The citizens of Chambers County have entrusted their public school officials with running the school system, and the public has a substantial interest in public officials making large-scale decisions, such as where to build the District's sole high school, based on present facts. Requiring the District to adhere to the location provision in the 1993 Agreed Order would be inequitable based on changed factual conditions.

### 3. *The proposed location of the Valley site is suitably tailored to the changed circumstances.*

Because the District has shown factual changes warranting a modification to the 1993 Agreed Order's provision for the location of the new, consolidated high school, the court "should determine whether the proposed modification is suitably tailored to the changed circumstance." *Rufo*, 502 U.S. at 391. Here, the proposal is a new, district-wide high school at the Valley site.

To determine whether the proposed modification is suitably tailored to the changed circumstance, it cannot "create or perpetuate a constitutional violation." *Id.* at 392. So long as there is no constitutional violation, the public interest and

"[c]onsiderations based on the allocation of powers within our federal system, require that the district court defer to local government administrators, who have the 'primary responsibility for elucidating, assessing, and solving' the problems of institutional reform, to resolve the intricacies of implementing a decree modification."  *Rufo*, 502 U.S. at 392 (cleaned up) (quoting *Brown v. Bd. of Educ.*, 349 U.S. 294, 299 (1955)).  This means that the choice need not have been the court's choice.

The issue of whether the proposed location of the Valley site is suitably tailored to the changed circumstances turns on whether consolidation of the two high schools at the proposed Valley site is constitutional.  The court concludes for the reasons in the next section that permanent consolidation is constitutional.

## B.   The Constitutionality of Valley as the Proposed Permanent Location for the Consolidated High School

The District proposes to close a predominantly black high school and to build a school on a new site in Valley for all its high school students.  The following considerations guide the analysis of whether the District's decision is constitutionally permissible.

First, the court must examine whether the District "include[d] the objective of desegregation in decisions regarding the construction and abandonment of school facilities."  *Harris v. Crenshaw Cnty. Bd. of Educ.*, 968 F.2d 1090, 1094–95 (11th

Cir. 1992) (citation omitted).  Relevant to this inquiry is whether the District "ha[s] complied in good faith with the desegregation decree since it was entered, and whether the vestiges of past discrimination ha[ve] been eliminated to the extent practicable." *Freeman v. Pitts*, 503 U.S. 467, 492 (1992).

Second, because the District "proposes to close a school facility with a predominately minority student body, there must be sufficient evidence to support the conclusion that [its] actions were not in fact motivated by racial reasons." *Harris*, 968 F.2d at 1095. (citation omitted); *see also Lee v. Macon Cnty. Bd. of Educ.*, 448 F.2d 746, 753 (5th Cir. 1971) ("[I]t would be impermissible for the school board to close formerly black schools for racial reasons.").

Third, if closing LaFayette High School and consolidating the students (both temporarily at Valley High School and permanently at the new school), "the burden of desegregation must be distributed equitably; the burden may not be placed on one racial group." *Harris*, 968 F.2d at 1097.

The first consideration is not seriously in contention.  Consolidating the District's two high schools in a single facility "accomplishes the objective of greater desegregation," *Harris*, 968 F.2d at 1093, and advances desegregation with respect to the *Green* factors addressing student assignment, faculty, staff, resource allocation, extracurricular activities, and facilities (more on transportation later), *see*

*Green*, 391 U.S. at 435, and the non-*Green* factor concerning the quality of education, *see Freeman*, 503 U.S. at 492. *See also supra* note 5.

First, a single high school for all the system's ninth through twelfth graders eliminates a racially identifiable school (LaFayette High School), increases diversity by unifying the District's entire high school body, and disestablishes any dual high-school system and its effects. Consolidation also effectively prevents "the recurrence of the dual school structure." *Harris*, 968 F.2d at 1096.

Second, for the faculty and staff, Superintendent Chambley testified that no teacher and no staff member will lose his or her job. All will join the District's ninth through twelfth grade students at the single high school.

Third, consolidation of the District's two high schools will allow a more efficient use of resources and will equalize course offerings and extracurricular activities. Students previously zoned for LaFayette High School will have the broader selection of courses and extracurricular activities that have been available to students at Valley High School. (Doc. # 570, at 152–54 (discussing the discrepancy in course offerings available at each high school); Doc. # 443-8 (noting that Valley High School offered fourteen extracurricular activities that were not available in LaFayette High School, including national honor societies, national service clubs, and sports teams for soccer, tennis and golf).) Additionally, the District's high school students will benefit from the consolidation of career tech courses at the new

high school.  Students who elect to take career tech courses no longer will have to allot two class periods for one course to account for the travel and can add an additional course in their schedules.

Fourth, the new high school will give the District's students a modern facility that is neither on the LaFayette High School campus nor on the Valley High School campus.

Consolidating Valley High School and LaFayette High School will have a significant positive effect on desegregation.  As even Plaintiffs' expert agrees, the consolidation of the high schools "clearly helps to provide more diverse environments for as many students as possible," even if "it is not perfect." (Doc. # 569 at 156.)

The court further finds that there is no evidence that the District acted with a racial motivation in its decisions.  No evidence was presented at the January 2023 trial that any black student at Valley High School objects to consolidation on racial grounds or to the location of the school.  The location of a consolidated high school in Valley was once even championed by Plaintiffs' expert.  (*See* Doc. # 564-58 at 8, 10.)  Plaintiffs suggest that the District has not met its burden to show that the closure is not racially motivated.  They argue that the District did not act in good faith in selecting the Valley site.  But the record yields a contrary conclusion.

Since 2015, the District has proactively engaged in efforts to achieve unitary status for its school system. Those efforts included erecting the long-awaited new high school for all the District's high school students, and those efforts began in earnest when, in November 2021, the District hired consultants at HPM for long-range, master planning for the District, a plan that included consolidation of the high schools and construction of a new high school to serve 1,000 students. (Doc. # 564-66 at 3, 5.) Community meetings were conducted throughout the county dealing with various issues concerning the schools and master planning. (Doc. # 564-66 at 3.)

In sum, the first two considerations—whether the District considered the objective of desegregation in its decision to build a consolidated high school in Valley and whether the District's decision was motivated by racial reasons—land in the District's favor.

Plaintiffs' central criticism is with the site selection. Plaintiffs argue that the District's proposed site is unconstitutional because it imposes a disproportionate transportation burden on the District's black students at LaFayette High School. (Doc. # 577 at 15; Doc. # 559 at 20–22.) Closing LaFayette High School and consolidating those students at a new, consolidated high school in Valley does affect LaFayette-zoned black students more than white students because eighty-six percent of LaFayette High School's student body is black. (Doc. # 568 ¶ 5.) However, the

proposed plan—when viewed in context of a desegregation plan—does not impose an unconstitutional transportation burden overall on the District's black students.

First, sixty-two percent of the District's black high school students (289 students) attend Valley High School, and they will experience no significant impact in their transportation to the new high school, which will be close to their current school. Thirty-eight percent (176 students) of the District's black high school students attend LaFayette High School. For most of the high school students in the LaFayette attendance zone who ride the bus (which is one half of the student body), their travel time to the new high school in Valley will increase by approximately twenty-five minutes. (Doc. # 568 ¶ 27.) The twenty-five minutes is based on the travel time from the bus hub in LaFayette to the consolidated high school in Valley. To ease the burden of transportation on some of the LaFayette High School's black students, two direct routes from the farthest reaches of the county will be implemented. (Doc. # 572 at 238–239.) The District's two new, non-stop bus routes will eliminate the increased bus times for twelve black students who live in the eastern and southern areas of the county. (Doc. # 572 at 173–176; Doc. # 564-22.)

Second, consolidating the career tech courses at the new high school benefits all students, regardless of race or ethnicity. No student must board a bus, travel offsite to Inspire Academy, and expend one class period for transportation. For the 197 black high school students at Valley High School who took career tech courses

in 2022–23, they will experience a fifty-minute *decrease* in their bus travels for each day they previously had to travel to Inspire Academy. (Doc. # 565-2 at 1.) For the 187 LaFayette High School students, their gain is less—they will save ten minutes in bus travel (Doc. # 565-2 at 1)—but they will gain a class period for their schedules.

Third, both the mean and median centers of the District's high school population are in the Valley attendance zone. The area surrounding Valley is more densely populated than that surrounding LaFayette. As the Eleventh Circuit has recognized, a plan for schools near population growth areas "is in keeping with the general rule that students should be transported from areas of lesser population density to areas of greater population density." *Harris*, 968 F.2d at 1093. The District has configured a reasonable plan for transporting students in the LaFayette attendance zone to the new high school.

Fourth, ninety percent of all black high school students live within a twenty-mile radius of the proposed Valley site. (Doc # 564-69.) While it is true that most LaFayette High School students have increased bus rides, the Board has devised reasonable solutions to otherwise insolvable circumstances: geographic dispersion of students. *See, e.g.*, *Harris*, 968 F.2d at 1097 (holding that "[t]ransporting these children to Brantley rather than to Dozier, which will add, at most, ten miles to their

bus ride, is not unreasonable" and that there was "no reasonable alternative to transporting Dozier's students to Brantley").

Also, Plaintiffs want the high school more centrally located on Highway 50. It is a laudable goal. As Superintendent Chambley admitted, "[t]here's not a perfect scenario or a perfect situation. In a perfect situation, a middle scenario would probably be better if we could afford that location, if we could afford that and do everything that we needed to do." (Doc. # 570 at 131.)  The evidence establishes that sites on Highway 50 identified by the District's expert were not viable.  Either the landowners did not want to sell the land or serious expense would have been required for sewage and water.  (Doc. # 568 ¶ 24; Doc. # 569 at 5, 12–34.)  Instead, the donated properties in Valley and LaFayette gave significant advantages.  But the District concluded that transporting Valley High School students—who comprise seventy-five percent of the District's high school population (Doc. # 568 ¶ 5)—to the proposed LaFayette High School was not a viable alternative.  It is true, as Plaintiffs lament, that most of the District's white students attend Valley High School and thus will not experience increased travel times.  However, the majority of the District's black high school students live in the Valley attendance zone, and the overwhelming majority of all the District's high school students live in the Valley attending zone. The District concluded that transporting seventy-five percent of the District's high schools students to an attendance zone where only twenty-five

percent of the District's high school students live would not equitably distribute the transportation burden. The court will not disturb that local, multi-faceted policy decision.

It is true that, because of this plan, an indeterminate few black and white high school students will suffer an increased travel burden. But the burdens of the outliers who form a small percentage of the overall student population cannot dictate the overall plan and its benefits for all high school students in the county system.

 **B.**   **The Constitutionality of Valley High School as the Temporary Location for all the District's High School Students**

The District's temporary consolidation plan yields a different result. The District's plan to close LaFayette High School and temporarily consolidate all high school students at Valley High School in Fall 2023 before the new high school is constructed would disproportionately burden the black students at LaFayette High School. Several considerations support this conclusion.

First, LaFayette High School's black students will have to integrate into the facility of their rival high school, while more than ninety percent of the white students will be on their home turf at Valley High School. While Valley High School's name, mascot, and colors will change (Doc. # 574 at 181–82), memories of Valley High School are not likely to fade. (*See* Doc. # 571 at 149, 155–56 (testimony from LaFayette High School's counselor about "the homefield

advantage" for Valley High School students during temporary consolidation and about anxiety and fear expressed by LaFayette High School students on having to temporarily consolidate at Valley High School).)  Relatedly, citizens also expressed concerns at the public hearings held in June 2022 and December 2022 that the temporary consolidation would turn into permanent consolidation at the existing Valley High School.  (Doc. # 495 at 12.)  Until plans are finalized, financing is secured, and groundbreaking has occurred, those concerns cannot be dismissed. They are legitimate and weighty.

Second, Dr. Chambley testified that the District feels that, while the temporary solution is "not perfect," it is "reasonable."  (Doc. # 574 at 182; *see also* Doc. # 571 at 55.)  However, the Board did not put the issue of temporary consolidation up for a vote.  (Doc. # 568 ¶ 23.)  It voted only on permanent consolidation at a new high school at the Valley site.  There is no official stamp of approval by the Board for temporary consolidation.

Third, LaFayette High School students, but not Valley High School students, will be forced to change schools twice—first to the Valley High School campus, and then to the new, district-wide high school.  Ms. Herring echoed this concern, testifying that she does not want the LaFayette High School students to have to move twice.  (Doc. # 569 at 204–05.)  At the December 2022 public hearing, the court heard serious concerns from residents about temporary consolidation.  (Doc. # 529.)

Fourth, the District's position is to use temporary consolidation to integrate the high school student body immediately and allow for the renovation of the existing LaFayette High School for a new STEAM academy. (Doc. # 570 at 151–55.) However, the District did not present evidence of a timeline for the renovations or a financial plan, and it has not yet hired an architect. (Doc. # 571 at 11–12.) Superintendent Chambley also admitted that he does not know whether the District has the financial capacity both to build a new high school and to renovate the current LaFayette High School. (Doc. # 571 at 12.)

Fifth, temporary consolidation at the current Valley High School does not equally distribute the burdens of desegregation among the black and non-black students who take courses at Inspire Academy. *See United States v. Hendry Cnty. Sch. Dist.*, 504 F.2d 550, 554 (5th Cir. 1974) (On the issue of "whether the proposed location of the new school is a proper one under all the circumstances," the court must "ensure that the burdens of desegregation are distributed equally among all classes of citizens."). As Mr. Mitchum conceded, under temporary consolidation, a LaFayette student with a class at Inspire Academy might have to ride a bus to Valley, then take two twenty-five-minute bus rides during the school day (Valley to Inspire Academy, Inspire Academy back to Valley), and then take a bus from Valley to the hub at Inspire Academy to get on a bus to go home. (Doc. # 571 at 143; Doc. # 572 at 223.) Requiring only the students of the predominantly black high school

to endure extended bus rides to take career tech courses is onerous.  Superintendent Chambley agreed that "the travel burden [from temporary consolidation] only affects those students from LaFayette High School . . . ."  (Doc. # 571 at 56.)  Temporary consolidation of the District's high school students at Valley High School would violate the Constitution.

## V.  CONCLUSION

The Chambers County Board of Education had a difficult decision to make to move its system forward for its high school students.  As one Board member testified, whatever decision the Board makes about consolidating its high school students under a single new roof, and the court approves, it will not please all Chambers County citizens.  (Doc. # 569 at 211.)  It is not even close.

The Chambers County Board of Education's decision to consolidate the two high schools and build a new high school on the proposed site in the City of Valley is a warranted modification of the 1993 Agreed Order and meets constitutional standards.  Any shortcomings in that decision are not matters of constitutional significance, but rather fall within the Board's primary responsibility for solving the peculiar problems of its local school system.  *See Rufo*, 502 U.S. at 392.  However, the temporary consolidation of the high school students at the existing campus of Valley High School would cause the students at LaFayette High School, a

predominantly black school, to bear a disproportionate transportation burden under the plan, and thus would be unconstitutional.

Accordingly, it is ORDERED that the Board's Motion for Approval of Site for New Consolidated High School and for Approval to Build the New High School is GRANTED, and that the Board's Motion for Authorization to Temporarily Consolidate High School Students is DENIED.  (Doc. # 500.)

It is further ORDERED that the Chambers County Board of Education shall file progress reports, commencing **October 31, 2023**, with the court on the planning and construction for the new high school every ninety days.

DONE this 22nd day of September, 2023.

_____/s/ W. Keith Watkins_____
UNITED STATES DISTRICT JUDGE