IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF ALABAMA

EASTERN DIVISION


ANTHONY T. LEE, et al.,

     Plaintiffs,

UNITED STATES OF AMERICA,

     Plaintiff-Intervenor
     And Amicus Curiae,


and NATIONAL EDUCATION
ASSOCIATION, INC.,

    Plaintiff-Intervenor,


    vs.              CASE NO.:  3:70-cv-844-WKW

CHAMBERS COUNTY BOARD
OF EDUCATION, et al.,

    Defendants.

\* \* \* \* \* \* \* \* \* \* \* \* \* \*

STATUS CONFERENCE

\* \* \* \* \* \* \* \* \* \* \* \* \* \*

BEFORE THE HONORABLE W. KEITH WATKINS, UNITED STATES DISTRICT JUDGE, at Opelika, Alabama, on Tuesday, January 28, 2025, commencing at 9:28 a.m.

KATIE SILAS, RPR, OFFICIAL COURT REPORTER
U.S. District Court, Middle District of Alabama
One Church Street, Montgomery, Alabama 36104  (334)315-0363

**APPEARANCES**

FOR THE PLAINTIFFS:        Mr. Stanley F. Gray
                           GRAY, LANGFORD, SAPP,
                           MCGOWAN, GRAY & NATHANSON
                           P.O. Box 830239
                           Tuskegee, Alabama 36083-0239

                           Ms. Amia L. Trigg
                           NCAAP LEGAL DEFENSE &
                           EDUCATIONAL FUND, INC.
                           700 14th Street NW, Suite 600
                           Washington, D.C. 20005

                           Ms. Allison Scharfstein
                           NCAAP LEGAL DEFENSE &
                           EDUCATIONAL FUND, INC.
                           40 Rector Street, Suite 5th Floor
                           New York, New York 10006


FOR THE GOVERNMENT:        Ms. Toni M. Coleman
                           DEPARTMENT OF JUSTICE
                           Criminal Rights Division
                           Educational Opportunities Section
                           150 M. Street NE
                           Washington, D.C. 20530

                           Ms. Amelia K. Huckins
                           DEPARTMENT OF JUSTICE
                           Criminal Rights Division
                           Educational Opportunities Section
                           950 Pennsylvania Avenue, NW
                           Washington, D.C. 20530


FOR THE DEFENDANTS:        Mr. Robert T. Meadows III
                           CAPELL HOWARD, PC
                           P.O. Box 1857
                           Opelika, Alabama 36803


            Proceedings reported stenographically;

              transcript produced by computer.

(The following proceedings were heard before the Honorable W. Keith Watkins, United States District Judge, at Opelika, Alabama, on Tuesday, January 28, 2025, commencing at 9:28 a.m.)

(Call to order of the Court.)

THE COURT:  I've checked the filings this morning.  I see there are no filings that are new.  Am I missing anything from anyone?

(No response.)

THE COURT:  Mr. Meadows, can you hear me okay?

MR. MEADOWS:  Yes, sir.

THE COURT:  All right.  I also note that there does not appear to be any change in counsel since our last hearing, at least not those who are in the room.

MR. MEADOWS:  No, sir, not from the Board's standpoint.

THE COURT:  Any on the plaintiffs' side, the Government's side?  Anyone knew?

MS. COLEMAN:  No, Your Honor.

THE COURT:  All right.

MR. GRAY:  No, Your Honor.

THE COURT:  Thank you.

All right.  Let's take appearances for the plaintiffs. Mr. Gray, do you want to start?

MR. GRAY:  Stanley Gray for the private plaintiffs.

THE COURT:  Good morning.

MR. GRAY:  Good morning, sir.

MS. TRIGG:  Good morning, Your Honor.  Amia Trigg from the Legal Defense Fund on behalf of the private plaintiffs.

THE COURT:  Good morning.

MS. TRIGG:  Good morning.

MS. SCHARFSTEIN:  Good morning.  Allison Scharfstein on behalf of the private plaintiffs, Legal Defense Fund.

THE COURT:  Good morning.

All right.  And then the Government.

MS. COLEMAN:  Good morning, Your Honor.  Toni Coleman for the United States.

THE COURT:  Good to see you.

And you.

MS. HUCKINS:  Good morning, Your Honor.  Amelia Huckins also for the United States.

THE COURT:  Good to see you again, too.

MR. MEADOWS:  Good morning, Your Honor.  Bob Meadows for the defendants.

THE COURT:  Okay, Mr. Meadows.

And, Ms. Weldon, we haven't met -- Dr. Weldon.  Welcome.

DR. WELDON:  Thank you, sir.

THE COURT:  And I believe the board members are here except for Mr. Siggers; is that right?

MR. MEADOWS:  Your Honor, Mr. Siggers is not here due to health concerns for his father.

THE COURT:  Right.  I heard that he's maybe at the emergency room.

All right.  So we have a new board member, Mr. Newton.

MR. FREDERICK NEWTON:  Yes, sir.  Frederick Newton, sir.

THE COURT:  Good morning.

MR. FREDERICK NEWTON:  Good morning, sir.

THE COURT:  Glad to have you.

MR. FREDERICK NEWTON:  Yes, sir.

THE COURT:  Ms. Herring.

Good morning.

MS. LASHAE HERRING:  Good morning.

THE COURT:  Ms. Lyons.

MS. CANDACE LYONS:  Good morning.

THE COURT:  Hi.  Good morning.

Ms. Hunt.

MS. JENNIFER HUNT:  Good morning.

THE COURT:  Good morning.

And the Board President, Ms. Leak.

MS. VICKI LEAK:  Good morning, Your Honor.

THE COURT:  I'm sorry that you had to get in a jury box.  I would have let you stayed surrounded by big wheels, but --

MS. VICKI LEAK:  These are big wheels.

THE COURT:  Yeah.

Is there any public officials local to the county or the cities involved here in the courtroom?  Is the mayor of Lafayette or Valley in the room?

MAYOR LEONARD RILEY:  Mayor Leonard Riley, City of Valley.

THE COURT:  Good morning, Mayor.

MAYOR LEONARD RILEY:  Thank you.

THE COURT:  Anyone else?  Any representatives?  Senators?

MR. LOUIS DAVIDSON:  Louis Davidson.  I'm the city clerk for the City of LaFayette.

THE COURT:  City of LaFayette, good morning.

MR. MEADOWS:  Your Honor --

MS. DEBRA RILEY:  Debra Riley, Chambers County Commissioner.

THE COURT:  Oh, good.  Thank you.

MR. DOUGLAS JONES:  Douglas Jones, Chambers County Commissioner.

THE COURT:  Thank you for the two commissioners being here.

So we've got mayor and two commission- -- two county commissioners and the mayor of Valley and the city manager or city representative from Lafayette.

Am I saying LaFayette right?

(Collective "Yes.")

THE COURT:  I wanted to have this hearing specifically today because we're doing a dance between politics and law, and I intentionally did not rule on your motion because of the up-in-the-air status of the political situation in the county.

Deanna, would you fold that screen down so I can see better.

COURTROOM DEPUTY HARRIS:  Is that good?

THE COURT:  That's better, yeah.  Thank you.

So I, first, want to start with the plaintiffs.  I believe I know everybody's position based on your filings; but, Mr. Gray, let's start with you.

Has there been any change in your position during this political hiatus?

MR. GRAY:  No, sir.  There has not been any change since -- in our position.

THE COURT:  All right.

MR. GRAY:  It remains the same.

THE COURT:  Okay.  The United States, has there been any change in your position?

MS. COLEMAN:  No we have no indication that our position has changed.

THE COURT:  Okay.  I noticed how you put that.

All right.  Mr. Meadows, you filed an extensive answer

to my questions.  I appreciate that.  Any change in your position?

MR. MEADOWS:  Yes, sir, Your Honor.  May I stand at the podium?

THE COURT:  Sorry about the monitor, but I'd rather see you.

MR. MEADOWS:  Since Dr. Weldon took over with -- January 1, she has pursued vigorously determinate information related to the school board desegregation case and specifically with the issues in the motion that we filed for pause.  She has dealt with a number of individuals -- reached out to a number of individuals to deal with those issues, which I can let her explain to you.

But for purposes of the hearing today, Your Honor, the Board has met twice since she took over in the last three weeks.  One week they couldn't meet because of the ice storm, but they met again last night, an executive session, and voted five to nothing.  I think Ms. Lyons was not at the meeting, but the other five board members voted unanimously to approve the superintendent's -- that is Dr. Weldon's -- recommendation to -- and I'm not sure what the legal vehicle is -- to withdraw the pause and to move forward with the same understanding, with the construction, the location, et cetera, that was sold last year.

So that motion we -- and again, I don't know exactly

what the legal vehicle is, but I wanted to let you know that the Board voted unanimously to withdraw that, forego it -- whatever, and move forward.  So that is where we stand as of this morning.

THE COURT:  All right.  Are you making -- are you moving -- you're making a move to withdraw your --

MR. MEADOWS:  Yes, sir.  Whatever -- whatever -- I'm not sure what the term is; but, yes, sir, we are.

THE COURT:  All right.  You move to withdraw it, and your motion is granted.

MR. MEADOWS:  All right.  Thank you, Your Honor.  So that's where we stand as of this morning.

THE COURT:  Okay.  Good.

Board, thank you for that, and I think we're getting off on the right foot here.

I don't have any intention to run your business -- Superintendent, we haven't met, but I don't have any intention to run your business, but I do have an intent to see my orders are complied with.  That's all.  What we're doing here is something the County has not been able to do in -- since 1970 and certainly since 1993, and I would like to see this over with.

So, Dr. Weldon, I would like to address some questions to you.  Would you feel comfortable coming up to the witness stand, or do you want to stay -- or do you want to stand where

you are?  You can stand there with Mr. Meadows, if you'd like.

DR. SHARON WELDON:  Either way.

THE COURT:  Okay.

DR. SHARON WELDON:  I'm good either way.

THE COURT:  All right.

DR. SHARON WELDON:  Do I need to stand up?

THE COURT:  Yeah.  Why don't you just come up so we can hear you better.

Mr. Meadows, you can move your chair wherever you need to.

You can go ahead and be seated.

DR. SHARON WELDON:  Thank you.

THE COURT:  I'm not going to swear you in.

Welcome to the club, and I don't mean a stick.  That's an old Far Side cartoon.

Dr. Weldon, tell me -- I've read Mr. Meadows's report and just heard what he said.  Tell me what your approach is going to be to this entire project.  And when I say the "project," I'm primarily addressing the consolidation of the two high schools in your district.

DR. SHARON WELDON:  Right.  Well, I have for the -- what I've been spending a lot of time doing is just getting to know exactly where we are in the process.  My plan is -- is to continue.  I -- you know, do I want to back up?  I can't back up, and there's -- I don't have the authority to go back and

change minds or anything.  I'm taking where we are and what we've started with.

It was paused.  In pausing it, we have some relationships we have to restore with our project management organization or company.  I've been working to -- reaching out to HPM, who's our project management.

THE COURT:  And will be?

DR. SHARON WELDON:  Yes, sir.  Yes, sir, and will be, you know.  Because one of the things that I did in -- in one of our conversations with the Board, they talked a lot about, like, Let's look at what our taxpayers have already invested, and I think that's a really important thing that we take a look at, is what our taxpayers have invested, because just like they are those taxpayers we're talking about, so am I.

And so I'm looking at just where we are and what we -- what we're picking up.  You know, there's been decisions that were already made that -- decisions that were made in the courtroom, decisions that were made with our Board meeting, and I have a great respect for that.

My plan is to move forward, to restore some of these relationships, to get back in touch with the architect, and start looking -- moving forward.  I'm already talking with Mr. Joe Jolly and -- to work on the bonding issue because I -- I'm just an old-fashioned kind of person that I think before I totally pick out my house, I need to know how much I can spend

on it.

THE COURT:  Yeah.

DR. SHARON WELDON:  And I want to make sure that we're making plans and moving forward, taking some of the things that I know may end up being issues, that I can go back and we can correct.  You know, we're going to be transporting students to and from.  And right now looking at what is in the consolidated plan, I need to make sure that there is a way that not only is instruction going to happen at that new high school, but Career Tech, because Career Tech is huge.  That's a huge thing for so many of our students, and I don't want it to be -- Career Tech needs to be in my phase one because that's going to decrease a lot of that traffic up and down Highway 50.

THE COURT:  All right.  Let's go back a bit.

What is your education and experience, and what's your Ph.D. in?  Or do you have a Ph- -- do you have a Ph.D.?

DR. SHARON WELDON:  I have a Ph.D. and got the student loan to prove it.  My Ph.D. is from Auburn University -- war eagle -- and it is in educational leadership.

THE COURT:  Okay.  And what's your experience?

DR. SHARON WELDON:  My experience overall in education?

THE COURT:  Uh-huh.

DR. SHARON WELDON:  In education, I've been with Chambers County schools for over 25 years.  I was hired by

Mr. Leonard Riley, when he was the superintendent of education, two years before I graduated, and I taught in the classroom. My bachelor's degree is secondary math education.

THE COURT:  Which school did you teach in the classroom?

DR. SHARON WELDON:  I was actually at W. F. Burns the majority of the time.  I did teach at Valley High School a year.  But middle school, as strange as it seems, was just my absolute calling, and I enjoy teaching middle school grades.

So I taught at W. F. Burns, a year at Valley High School.  I got my master's degree from Troy University, and my first leadership position was as an assistant principal at Valley High School.  I was there for about two and a half years, and I had the opportunity then to go to Bob Harding-Shawmut Elementary.  It was K5 -- or pre-K 5 at the time, and I was a principal there for a year.

THE COURT:  Shawmut?

DR. SHARON WELDON:  Shawmut, yes.

And after I left there, I was hired -- numbers has been my thing -- and I was hired as a school improvement specialist for our system.  I worked as a school improvement specialist and then a secondary director for approximately ten years, and then in the '21/'22 school year, I went back into the classroom for two and a half years.  And I -- I taught math again, and it just so happened I returned back to Burns.  They

had a math opening. And I had the opportunity to go there, and that's where I've been until January.

THE COURT: Okay. Thank you. How would you describe the overall financial condition of the Chambers County School Board when you took over?

DR. SHARON WELDON: Well, in -- I've been there a month. We're still learning.

THE COURT: Well, it --

DR. SHARON WELDON: You know --

THE COURT: But it is public.

DR. SHARON WELDON: Yes, it is public. And we are -- when you look at it, I think we're looking solid. But my concern is looking at the things that we were funding through ESSER funds, and some of those things that need to be sustainable that maybe -- right now we've got to find other pots of money to make that sustainable.

THE COURT: What is ESSER funds?

DR. SHARON WELDON: ESSER funds are -- well, that's the COVID money. That's the money that we had for recovery to help close up --

THE COURT: Well, that would --

DR. SHARON WELDON: -- the gap.

THE COURT: -- be temporary money, then.

DR. SHARON WELDON: Absolutely. Absolutely. And it is now -- it's gone. We've done a lot of improvements. We

also had some other things that were -- we were able to do with that, but now we have to look for how are we going to compensate for those things that -- you know, because some of the things that were provided were some interventionists. There were people who could help come in and work to close the gap, and that's something that -- you know, the money went away, but the gaps are still there, and we want to continue making progress.

THE COURT:  Superintendent Chambley represented to the Court more than a year ago that he anticipated an increase in revenues -- I think in tax revenues --

DR. SHARON WELDON:  Yes, sir.

THE COURT:  -- of about 1.6 million either from '22 to '23 or from '23 to '24.  Did that happen?  Do you know?

DR. SHARON WELDON:  Now, I'm going to be honest and say I don't know the exact value.  I know that there was an increase, but I don't know the value --

THE COURT:  All right.

DR. SHARON WELDON:  -- the amount.

THE COURT:  And from your initial projections, what kind of debt service would you anticipate the Board can sustain now over the long term, say, of 20-, 25-, or 30-year issue?

It's been represented earlier that the Board could possibly sustain 5.5 million a year.

DR. SHARON WELDON:  I think possibly 5 million.

Because I -- I think one thing in -- my concern and some things that I don't know are some other issues that I feel like we've got to figure out how to address, and -- you know, we -- we closed schools, but we've got some overcrowding now.  And I think we -- you know, 5 million, yes.

THE COURT:  Okay.  What's your next step in the construction process?

DR. SHARON WELDON:  My next step in the construction process is I have meetings scheduled with -- I'm waiting on the call back of when a meeting will be with HPM.

THE COURT:  They're going to make money, so they should call you back.

DR. SHARON WELDON:  Absolutely they are.  Well, and I got the email from them last night saying, Hey, this is what we're doing, and we want to set up a meeting in the next two weeks.  So I'm still waiting on that, but he still had some other people to talk to.

I'm meeting with Mr. Joe Jolly either this week or the beginning of next week.  And we were just waiting to hear from HPM to see if they're going to be able to be at the table with us when we have that conversation.  And I will be talking with him because, like I said, I think my next -- I want to know financially where we are and what we can do.

THE COURT:  Do any of your plans require the cooperation of the County Commission or the voters?

DR. SHARON WELDON:  I think that all of my plans will require the cooperation.  I think we all have to work together. I --

THE COURT:  Well, I mean, for a tax increase or for a bond issue.  I assume certain resolutions have to be passed.

DR. SHARON WELDON:  They will.  And --

THE COURT:  Is there any dispute between the Board of Education and the County Commission --

DR. SHARON WELDON:  No.

THE COURT:  -- that you're aware of?

DR. SHARON WELDON:  No dispute.  I have been -- I've spoke with several of them, and we're all working together. And I think we will have those open communications of what needs to take place.  We're -- we're a team.

THE COURT:  Okay.  Let me hit a couple of individual matters.  First of all, the City of Valley.  And the mayor's here, and I read the mayor's comments in the newspaper from a year or two ago.  He was very strongly in support of the site. But the resolution approving this for three years appears to be expiring this year.

DR. SHARON WELDON:  Yes, sir.

THE COURT:  Has that been renewed?  Have you talked to the mayor about renewing it?

DR. SHARON WELDON:  The mayor and I have -- we've spoken.  And formally do we have that written down agreement?

No.  But we've spoken, and I think we're on --

THE COURT:  Well, I would urge that you-all update and extend that for at least three more years, if not four.

DR. SHARON WELDON:  Yes, sir.

THE COURT:  Just my suggestion.

DR. SHARON WELDON:  Thank you.

THE COURT:  Now, Superintendent Chambley agreed to operate the county schools in one time zone, and I need to know your position on that.

DR. SHARON WELDON:  Well, because I have been in the system juggling time zones back and forth --

THE COURT:  You live in Huguley, don't you?

DR. SHARON WELDON:  I do live in Huguley.

THE COURT:  And what time zone is Huguley in?  Do you know?

DR. SHARON WELDON:  Well, it's according to what part of my house I'm standing in actually.

THE COURT:  That's what I thought.

DR. SHARON WELDON:  Because if I'm in one end of the house, my phone tells me what time it is on Eastern time.  If I'm in the other end of the house -- and I don't have a big house, sir.  I just want you to know that -- then it tells me what time it is on Central time.

THE COURT:  Well, I want to know -- state troopers have the same problem.  They can't testify as to when they

stopped someone because they don't know where they were when it's close to the line.

DR. SHARON WELDON:  I understand, yes.  And --

THE COURT:  So what's your position about the time zone issue?

DR. SHARON WELDON:  My position about the time zone, when it comes to looking at the educational realm of things, I go -- when I was at Valley High School as an assistant principal and access first started, we lost out on our instruction for the first part of the day, and we missed out on things that happened at the end of the day because we operated Valley High School on Eastern time.  So instead of having access available all day long, we had a much more abbreviated time.

THE COURT:  LaFayette is in Central zone; right?

DR. SHARON WELDON:  Yes, sir, it is.

THE COURT:  All right.  Well, I've checked, and I didn't order anyone to do anything about the time zone.  But it's a crazy situation that's lasted about a hundred years, and it's probably time to undo it.

DR. SHARON WELDON:  Yes, sir.

THE COURT:  And I -- you know, that's going to be your call, but if there's any discriminatory effect of trying to operate two systems with LaFayette being in Central, I expect you to get that corrected.

DR. SHARON WELDON:  Absolutely.  Absolutely.

THE COURT:  And to be a leader, not a follower.

DR. SHARON WELDON:  Yes, sir.

THE COURT:  Okay.  What happened to the Desegregation -- the DAC, the Desegregation Advisory Committee?  It seems to have fallen into disrepair, if not a defunct status, at the time of our last hearing.

Document 493 is one of the most -- it's the second most important order in this case.  It's a short order, so everybody should be able to read it.  And I required, based on the agreement of the parties, that we have this committee and that it meet twice a year and it have regular access to the superintendent and to the Board.

DR. SHARON WELDON:  Yes, sir.

THE COURT:  So do you know the status of that?

DR. SHARON WELDON:  I don't know the status of that.  I know --

THE COURT:  If you don't know, that's --

DR. SHARON WELDON:  Thank you.

THE COURT:  -- a good answer.

DR. SHARON WELDON:  That's my answer, then.

THE COURT:  Yeah.  All right.  I would say before we meet again, that that needs to be reviewed, and maybe someone on the Board or someone in your office should be in charge of seeing that --

DR. SHARON WELDON:  Well, I think our assistant superintendent and I have had that conversation, and so that -- that's something he's already -- he's already on.

THE COURT:  Okay.  Had any buses been bought before you got here, but since our last -- say, in the last year?

DR. SHARON WELDON:  Yes.

THE COURT:  Those air-conditioned buses, have they --

DR. SHARON WELDON:  Yes, sir.

THE COURT:  -- been purchased?

DR. SHARON WELDON:  They are.  And I just had that conversation because we have some more that are coming in, and I don't remember the exact number that we were told.  We know we have four that have rolled in that are air-conditioned buses.

THE COURT:  Okay.  Okay.  That's all on my list.  I'm going to give plaintiffs' counsel, Mr. Gray first -- is there anything you want to follow up on or bring up while we have the superintendent here?

MR. GRAY:  I was thinking my colleagues may have -- just one -- one area.

Dr. Weldon, first of all, congratulations.

DR. SHARON WELDON:  Thank you, sir.

MR. GRAY:  Have you given any thought as to how you would develop a process where students from LaFayette High School and Valley High School, those who will be part of this

combined school, can work together as one as they move toward a new schedule?

DR. SHARON WELDON:  You know, we have -- one of the things that we've relied on -- and I think we have to be more intentional with what we're doing -- but Career Tech has given us the opportunity to have Valley High students and LaFayette High students working together for several years.  And I think it helped us to understand how powerful it could be for both of them.  And so I think we've done that, but I also know that we have to be more intentional with possibly bringing some club opportunities together that -- we have clubs that are the same at the high schools and to bring those students together.

Career Tech has given us the opportunity to have Valley High students taking classes or LaFayette High students taking classes on different -- because we have different programs in different locations, so they come together.  I really feel like that we probably need to move on to how can we do this now to begin with our middle schools because those are the students that are really going to have to be coming into this as one.

MR. GRAY:  And, I guess, one of the concerns has been -- and I think you answered this with the Judge, but I just want to ask it a different way -- does the school district have access or the finances to build a new school that we've been talking about?

DR. SHARON WELDON:  We do have the finances.  And I think we have the -- we have the knowledge base to make sure we're going -- we're going forward and that we're going to be cautious and careful.  I am my daddy's child, and if you tell me I'm good for 5.5, then I'm going to say, Well, then I need to operate as close to 5 as I can because I don't want to put our school system in a position buying new stuff that we can't meet the needs that we have for our students.

MR. GRAY:  What is the current status of the STEAM program that's been -- the STEAM program?

DR. SHARON WELDON:  The STEAM program, we are -- it's growing and building slowly.  We have people -- I don't want to just say "people" -- but we have experts that have come in.  I discovered recently that our federal programs director was actually working previously in a STEAM academy when I was having a conversation with her, and so I feel like we just tapped into a whole new area of resources so that we can continue to grow that and to build that.

I think that's one of those examples of right now our space.  You know, I -- a STEAM operation academy, that takes more space than just the regular classroom, and I think when we are able to then move into a bigger space, it's going to be something that grows more.

MR. GRAY:  And is this -- you talked about overcrowding.  Were you referring to Eastside Elementary

School?

DR. SHARON WELDON:  Yes, sir.  Especially in terms of it being a STEAM academy, I think we have some -- some overcrowding issues that we've got to look at just so we've got that space to grow and develop the way I think it should.

MR. GRAY:  Because Eastside has the J. P. Powell -- the former J. P. Powell students?

DR. SHARON WELDON:  Yes, sir.

MR. GRAY:  So that goes to what?  7th or 8th grade?

DR. SHARON WELDON:  It goes to 8th grade.

MR. GRAY:  8th grade.  One other question.  With the STEAM program, if you know -- do you know whether or not at this point it has been successful in drawing white students from the Valley Area?

DR. SHARON WELDON:  I don't know.  I don't know for sure how many we have grown.  And that's one of those things I should have looked at, and I apologize.

MR. GRAY:  That's all that I have.  My colleague may --

MS. TRIGG:  Your Honor, if I -- may I?

THE COURT:  You may.

MS. TRIGG:  Dr. Weldon, congratulations again.  We are looking forward to working with you.  I don't want to beat the same -- you know, beat a dead horse, but I do have just a follow-up question about the financing.

In the District's last filing, it seemed that the exact cost of the new high school was still undetermined how much it would cost.  Is there any concern that it's possible that you will not be able to raise enough funds for the plans as they currently stand?

DR. SHARON WELDON:  I think as they currently stand, I think we're going to have to look at what's in phase one, what's in phase two, and what was actually included in all of it; and we're going to have to be very intentional in what we select, I mean, because we're also going back years.  And -- just a couple of years, but I think that the cost is -- there's going to be a difference.  And we're just going to have to look.

It's very important to me that things that are in that first phase are the things that are about instruction and that includes not only our academic classrooms, but also our Career Tech classrooms.  So I think we do have to do some revamping in what we were looking at and what was in the whole package of what we wanted to do.

MS. TRIGG:  And if it turns out that the financing is not a possibility, would you recommend to the Board to reconsider the location of the high school?

DR. SHARON WELDON:  I would recommend.  You know, my thoughts on this is that we're in a position where we have been that there are so many tax dollars that have been invested in

this, the location -- you know, I've kind of come into this with:  The location has been decided on by the Board.  It's been approved by the federal judge and with no appeals filed before that.  I'm a huge respecter of following the rules, and so at this point, that location -- I guess I don't understand how changing a location could change the money value pertaining to that question.

MS. TRIGG:  Sorry.  So kind of a combo of my prior question.  If it turns out that the plans and the location just make the budget unfeasible to be financed, would one of your suggestions be reconsidering the location, if that could lower the budget and make it feasible to finance it?

DR. SHARON WELDON:  I mean, if that's going to help us and lower the budget.  But that's also -- just that would be a thing that I think the Board makes that decision.  I mean, I'm not a solo act.  I can recommend, but those are -- those are the decision-makers.

MS. TRIGG:  Understood.  And I'm going to switch gears back to discussing the overcrowding at Eastside.  I know that's an issue that's very important to the community.

Have you-all discussed any plans to move the maybe 7th and 8th graders to LaFayette to use that space which we understand is being underutilized because the population declined at the high school?  Is that something that you-all have started to talk about?

DR. SHARON WELDON:  It absolutely is.

MS. TRIGG:  Okay.

DR. SHARON WELDON:  We have talked about that.  We already started those conversations, yes.

MS. TRIGG:  Okay.  That's fantastic.  And also, relatively, are there any discussions about renovating LaFayette and Eastside to better facilitate an actual STEAM program that could drop students from across the district?

DR. SHARON WELDON:  Yes.  That has been conversations because that was already actually in the orders that we -- we have discussed and talked about, and we've read.

MS. TRIGG:  Thank you.

MR. GRAY:  Judge, may I ask just one question?

THE COURT:  Sure.

MR. GRAY:  Just one, I think.  I -- well, I shouldn't say that.

THE COURT:  You don't want me to hold you to one?

MR. GRAY:  No.  No.  Judge, you did that at the other hearing.

When you took office, did you consider any other location than the site that had been previously approved by the Board?  And if so, what were those, and what were the results?

DR. SHARON WELDON:  So at the point that I took office, our Board had made that decision.  I came into this knowing that that decision -- and -- it was decided, and I

respect that.  And I --

THE COURT:  The answer is no?

MR. GRAY:  No?

DR. SHARON WELDON:  The answer is no, yes, sir.

MR. GRAY:  Okay.

DR. SHARON WELDON:  Thank you.

MR. GRAY:  Thank you.

THE COURT:  There was some discussion before about what to do with the LaFayette High School site --

DR. SHARON WELDON:  Yes, sir.

THE COURT:  -- after the consolidation.  So is that something that can't be decided now?  I know that would be another cost factor that would have to be considered, but you've got overcrowding over there.  How long do you think it will take to get into the new high school so that you can then look at -- or in the meantime be looking at the LaFayette campus?

DR. SHARON WELDON:  How long before we can get into that new high school?  And I'm going to humbly and boldly say I don't know.

THE COURT:  Okay.

DR. SHARON WELDON:  I really -- I don't know.  I don't know when we will get to that -- that point because I feel like -- I feel like, in a lot of ways, we're not starting over but we are starting over, and -- but we're moving forward.

THE COURT:  All right.  Does the Government have any questions?

MS. COLEMAN:  Your Honor, we don't have any questions for Dr. Weldon at this time.  But we do have a request of the Court that we can present now or later.

Basically, we would like to see more progress reports more frequently.  Right now I think the Court order is for every 90 days, and we would like to see the District report its progress on the construction every 45 to 60 days.  And we would like, you know, more detailed information like a date certain for when the financing would be in place, dates for when construction will begin, and when the high school will open.

THE COURT:  Okay.  I intend to order that.

MS. COLEMAN:  Okay.

THE COURT:  And it's just that we're -- she's only three or four weeks into her tenure, so we've got to give her some time --

MS. COLEMAN:  Thank you.

THE COURT:  -- to get up to speed.

All right.  Mr. Meadows, did you want to follow up with anything?

MR. MEADOWS:  Yes, sir, if I may.

THE COURT:  You may.

MR. MEADOWS:  Dr. Weldon, I want to just fill in some gaps, if I may.  Okay?

DR. SHARON WELDON:  Yes, sir.

MR. MEADOWS:  Let's start, first, with your background.  The Judge asked you about that.  In total you've worked for the Chambers County system for what?  In excess of 25 years; is that right?

DR. SHARON WELDON:  Yes, sir.

MR. MEADOWS:  You've worked in various capacities; teacher, principal, Central office, et cetera?

DR. SHARON WELDON:  Yes, sir.

MR. MEADOWS:  In fact, you were deposed in this case by the other lawyers in '21 -- 2021 -- September of 2021, I believe, in this particular case, were you not?

DR. SHARON WELDON:  Yes, sir, I was.

MR. MEADOWS:  So you've been aware of it for a while?

DR. SHARON WELDON:  Yes, sir.

MR. MEADOWS:  Okay.  And you worked in the Central office for, I think, ten-plus years before you went back into the classroom?

DR. SHARON WELDON:  Yes, sir.

MR. MEADOWS:  Okay.  And you've attended -- since you were elected in the primary -- since you won the primary last spring, you've attended almost all the Board meetings, have you not?

DR. SHARON WELDON:  Yes, sir, I have.

MR. MEADOWS:  So you've kept up with what's been going

on?

DR. SHARON WELDON:  Yes, sir.

MR. MEADOWS:  Okay.  And you've -- since you've actually became superintendent in January of this year, you've put forth substantial efforts, as you've described, to contact people.  One of those being Joe Jolly.  Now, what role does Mr. Jolly play?

DR. SHARON WELDON:  He will be our -- he'll be the money man.  He --

MR. MEADOWS:  Is he the underwriter, the bondman?

DR. SHARON WELDON:  He is the underwriter.

MR. MEADOWS:  Okay.

DR. SHARON WELDON:  He is -- yeah.  And he's one that is well-known with the different governmental agencies in Chambers County and goes back generations.  So I have lots of confidence in him.

MR. MEADOWS:  Okay.  And now, the previous administration was using a different underwriter.

DR. SHARON WELDON:  Yes, sir.

MR. MEADOWS:  You didn't have any problems with that underwriter; you just felt more comfortable with this gentleman; is that right?

DR. SHARON WELDON:  Yes, sir.

THE COURT:  You're using a personal name, but what company are we talking about?

MR. MEADOWS:  Joe Jolly is the name of the company, I think --

DR. SHARON WELDON:  Yeah.

MR. MEADOWS:  -- Your Honor.

Is that right?

DR. SHARON WELDON:  He's in Birmingham.

THE COURT:  So Stifel is not in --

MR. MEADOWS:  Stifel -- Stifel was the previous company.

THE COURT:  So we're changing -- Stifel is no longer involved?

MR. MEADOWS:  That's my understanding, yes, sir.

DR. SHARON WELDON:  Yes, sir.

THE COURT:  Well, that's news to me.

MR. MEADOWS:  Yes, sir.  That's what I wanted to bring out to be sure because Joe Jolly is not with Stifel.

THE COURT:  Is Joe Jolly a local person?

DR. SHARON WELDON:  He is out of Birmingham.

THE COURT:  Okay.  Is he in the courtroom today?

MR. MEADOWS:  No, sir.

DR. SHARON WELDON:  No, sir.

MR. MEADOWS:  I don't think so.

THE COURT:  All right.

MR. MEADOWS:  And he's used by, as I'm told -- let me ask you this:  Is Mr. Jolly utilized by a number of different

public agencies for bond work in the Chambers County area?

DR. SHARON WELDON:  Yes.  And has been for years.

MR. MEADOWS:  Okay.  And he's well-known there.

DR. SHARON WELDON:  Yes, sir.

MR. MEADOWS:  Did you get references to go to him?

DR. SHARON WELDON:  Yes, sir.

MR. MEADOWS:  Okay.  And just with respect to the bond lawyer, there will have to be one of those.  Is that the same -- does he use the same lawyer that Stifel would have used?

DR. SHARON WELDON:  He does.  He does.  It was a name that he -- when I first talked with him, he mentioned and then found out that it was the same --

MR. MEADOWS:  Lawyer?

DR. SHARON WELDON:  -- bond attorney, counsel --

THE COURT:  The same firm?

MR. MEADOWS:  Yes, sir.  He's with Bradley Arant, Your Honor.

DR. SHARON WELDON:  Yes, sir.

THE COURT:  And that counsel will be who?

MR. MEADOWS:  I think -- and I'm not sure -- but I believe his name is Lee --

DR. SHARON WELDON:  Lee --

MR. MEADOWS:  -- Birchall.

DR. SHARON WELDON:  Birchall, yeah.

MR. MEADOWS:  Something like that.  I believe that's right.

And he's the same one that Stifel would have used; is that correct?

DR. SHARON WELDON:  Yes, sir.

MR. MEADOWS:  Okay.  So you'll be just using a different underwriter but the same process would be utilized that would be utilized with Stifel?

DR. SHARON WELDON:  Yes, sir.

MR. MEADOWS:  Okay.  All right.  There were some questions about the STEAM program now.  Is that still under the direction of Dr. Sheila Jones in your office?

DR. SHARON WELDON:  Yes, sir, it is.

MR. MEADOWS:  And she's been spearheading that or dealing --

DR. SHARON WELDON:  She has been spearheading it.  It -- you know, I think Ms. Tiffany Dean-Johnson is just going to -- she's an extra with some extra connections and knowledge there.

MR. MEADOWS:  Okay.

DR. SHARON WELDON:  But it is under Dr. Jones.

MR. MEADOWS:  All right.  There were some questions about -- from the Judge about whether or not the land that the City of Valley had agreed to donate was still available.

Is your understanding that that is still available?

DR. SHARON WELDON:  Yes, sir.

MR. MEADOWS:  And, I guess, Mayor Riley is here.  He could confirm this one way or the other.  Is it your understanding that the City has -- since we last dealt with court -- has put a substantial amount of money into investing into that property to make it more readily available to a school?

DR. SHARON WELDON:  Yes, sir, they have.

MR. MEADOWS:  What is the figure you have been told?

DR. SHARON WELDON:  Well, the newspaper reported about 3 million, and I think that was maybe from one of the counsel members, but there has been substantial spending.  And a lot of that is probably in time and labor.  I didn't have that exact-amount conversation with Mr. Riley when I spoke with him, but he -- he did read off a list of the things that have already been done that would enhance the school location.

MR. MEADOWS:  Okay.  In which -- which the Board wouldn't have to pay for if they had that site themselves when starting from scratch?

DR. SHARON WELDON:  Yes, sir.

MR. MEADOWS:  All right.  And that, of course, is in addition to the donation of the land and its value; correct?

DR. SHARON WELDON:  Yes, sir.

MR. MEADOWS:  Okay.  Do you want to also proceed with the development of a consent decree which would hopefully

ultimately lead to unitary status in this case?

DR. SHARON WELDON:  Yes, sir.

MR. MEADOWS:  Okay.  And you understand that that was a part of the pausing, was to hold off until you got involved in that and could --

DR. SHARON WELDON:  Yes, sir.

MR. MEADOWS:  -- could weigh in on the needs of the school system; is that right?

DR. SHARON WELDON:  Yes, sir.

MR. MEADOWS:  Okay.  You mentioned some overcrowding in response to some questions about Eastside.  Are there overcrowding in other schools that you've got to deal with in order to move forward?  Not at the high school level, but other schools?

DR. SHARON WELDON:  Yes, sir, there are.

MR. MEADOWS:  And would you describe that for the Court, please.

DR. SHARON WELDON:  Fairfax Elementary is also overcrowded.  When schools are combined, you can't just look at student capacity, and I think that's what had gone into the thought process, was student capacity.  But if I'm trying to decide how many students can be housed in a building, I can't just say there's this many classrooms, and I'm going to put 25 kids in each classroom.  I have to go back, and I have to think.

When I have this many students, I have to have special education teachers. I may have to have that -- the special education self-contained room. I have to have interventionists. I have to have reading coaches. All of those teachers need that same private-type of location that I can't say I'm going to have 25 kids in there, because you can't do small group or the intensive support that's needed when there's that many students. Those programs have a lower student capacity. And I think that we count classrooms and we say this is how many it can hold, and that's kind of the situation that we're in on those campuses.

MR. MEADOWS: Okay. So you may have to look at rezoning, for example, for some of the elementary schools?

DR. SHARON WELDON: Yes, sir. And I think it goes back to one of these wonderful people -- I don't know who -- asked me the question about have we had those conversations about moving some grades from one area -- from one school to the next; and, yes, we've definitely had those conversations. And that's another example of one.

MR. MEADOWS: Okay. So those are issues that are coming up that we've got to deal with in terms of potentially a consent decree to present to this Court?

DR. SHARON WELDON: Yes, sir.

MR. MEADOWS: Okay. All right. Staffing -- have you had any major losses on your staff when you -- since you've

come on board?

DR. SHARON WELDON:  Just throughout the system?

MR. MEADOWS:  Well, no.  Let's just talk about the Central office.  Is it correct that Mr. Owen here, who is the assistant superintendent, has retired -- or is in the process of retiring; is that right?

DR. SHARON WELDON:  He's in the process of retiring.

MR. MEADOWS:  Okay.

DR. SHARON WELDON:  He's -- he --

MR. MEADOWS:  So you will need to replace him?

DR. SHARON WELDON:  Possibly, yes.

MR. MEADOWS:  Okay.  But there have been no other people in the Central office that have retired, have there?

DR. SHARON WELDON:  No, sir.  In the Central office, no.

MR. MEADOWS:  Okay. All right.  Dr. Weldon, I want to -- last night the Board voted five to nothing to withdraw the motion for leave to pause; is that correct?

DR. SHARON WELDON:  Yes, sir.

MR. MEADOWS:  And was that done at your recommendation?

DR. SHARON WELDON:  Yes, sir, it was.

MR. MEADOWS:  And I want to read you something that's frankly -- and I apologize for this -- but it quoted you in the newspaper this morning.  It says you "feel very confident that

we're moving in the right direction," the school system is moving in the right direction, with respect to this construction.  Is that your opinion?

DR. SHARON WELDON:  Yes, sir.

MR. MEADOWS:  Okay.

That's all I have, Your Honor.  Thank you.

THE COURT:  Okay.  Thank you, Dr. Weldon.  You can stand down.

DR. SHARON WELDON:  Thank you, sir.

THE COURT:  Now, for a bit of a discussion of history. I think this morning in AL.com, there's an article about a school system in -- well, the Jefferson County school system in charge of schools, and in that article, Chambers County was mentioned as being one of four or five systems who are -- that are left under the control -- or under the -- I don't want to say control of the federal courts, but they're, just say, involved in litigation that goes back actually to 1963, at least in the Middle District of Alabama, in *Lee v. Macon*.

There are very few people in here older than I am, and you already know from my discussions -- or my comments in prior hearings that my own high school in Troy was subject to this kind of proceeding in 1969.  And I'm sitting in a chair where Frank Johnson used to sit, and he was the judge.  And he took hundreds of these cases and had hearings on Saturdays in the '60s and '70s in dealing with school systems.

And Charles -- the city schools in Troy -- the city school system in Troy had a Saturday hearing with Judge Johnson, and -- to -- on the issue of consolidating an all black school inside the city limits of Troy, which was right next to the campus of the so-called white junior high school, the old high school, whether it should be combined with Charles Henderson High School.  And based on the testimony of one witness, who was an 11th grader, Linda Felton, who was one of nine children -- and she testified as to the conditions at Academy Street High School, all black, compared to Charles Henderson High School, which was partially integrated by 1969, and based on her testimony, and her testimony alone, Judge Johnson entered a decree in the spring, if I'm not mistaken, of '69, that the two schools would be consolidated the upcoming school year in August.

Now, *Brown v. Board* was in 1954.  There are a lot of school systems in Alabama that didn't fight -- I say "a lot." Certainly not a majority -- but there were several school systems in Alabama which did not fight vigorously the orders of the federal courts, and then there were school boards that did. And you can just about mark where private schools are as to which school systems those are that fought it.

By 1969, Brown had been the law of the land -- there's three kinds of people:  those who can count and those who can't -- but I'm going to say 15 years anyway, and

Judge Johnson was done with it.  The Troy City Board dragged its feet and fought, and we wound up with a private school.  You didn't have that in Enterprise and Andalusia.  They didn't end up with private schools.

So based on the testimony of this one person, Judge Johnson ordered that the two schools be consolidated.  Our superintendent of education was Dr. Paul Hubbert.  When that order came out, he resigned, and I guess he started -- went with AEA straight from the Troy City system.  A new superintendent was appointed, George Saunders -- I mean, Charles Saunders, S-a-u-n-d-e-r-s.  He was my neighbor for years and years.  He just passed last year at age of 96.

This is his account of taking over, like you have in the superintendent's office, Dr. Weldon.  He called Judge Johnson.  He gets this order.  He's got to combine two schools in about six months.  He's got a staff of 85 at Academy Street and a staff of 125 at Charles Henderson.  He's got a football team at each place, a band at each place.  He's got teachers, and he figures he's got a mess.  So he did something that wouldn't happen today -- this is his personal story to me -- he called Judge Johnson, and he said, "I need to come talk to you about this order."  And something happened there that will never happen today.  Judge Johnson said, "Come on up."

And so Mr. Saunders, who had nothing to do --

Dr. Saunders, who had nothing to do with the situation, he simply inherited it, and he said he walked into Judge Johnson's office -- chambers in our courthouse in Montgomery, and he said, "I didn't even get to sit down."  He said, "Judge Johnson said, 'Why are you here?'"  And he said, "I didn't have anything to do with this mess."  I think it's a saying in some counties in Alabama:  I didn't plant these taters; I just dig them.  And he said, "I can't do this."  And Judge Johnson said, "Dr. Saunders, can you read?"

And he said, "Yes, sir, I can read."

He said, "Read my order, and do it.  Good day."  And so Dr. Saunders had to comply with that.

Now, obviously, you're looking at me.  I'm not Frank Johnson, but there is an order here.  And I understand and appreciate, because of my own experience and because I've been a judge now for 20 years, and I understand that politically this county has not been able to manage this situation particularly since 1993, when there was a specific order, because there was no money, and federal courts don't print money.

But the political situation has not allowed for these two schools to be consolidated, and now it falls to the Board and to the superintendent --

Did Mr. Siggers walk in?  Did I see him walk in?

MEMBER OF THE AUDIENCE:  No.

THE COURT:  No?  Okay.

-- to get this done.  Goals have to be measurable to see whether you've met them or not.  Intentions are not measurable.  So from this point on, I want to find, as soon as I can, that this school system has met unitary status.  And since 1970, we've been playing fiddle-faddle with it and footsies with it, and that is over.  It's time to move it forward.

You may not get all the school that you want.  You may have to save some of that money to spend on the LaFayette campus to get the STEAM academy going, to get overcrowding done.  Those are your calls, not mine.  But the fact of the matter is as long as you operate a dual system, you're out of compliance with the Constitution and have been since 1993.  So that's going to have to change.

Now, we can argue about how far we have to go, particularly in Alabama.  Troy came out from under -- Troy City Board came out from under that decree 20 or 30 years later, and my law firm handled it -- my partner handled it.  And they went before a different judge because Judge Johnson had already passed, and so they went in front of Judge Albritton to get the system declared unitary.  And there was one witness who appeared at that hearing for the Troy City School Board, and it was Dr. Linda Felton-Smith, Superintendent of Education.  The same little girl that had appeared when this case started.

This is not an impossible task.  We've come a long way.  This county has come a long way.  You've come a long way economically with industry.  Now it's time to apply that energy -- that economic energy to getting your schools straight and out from under federal court supervision, but it's not going to happen without you putting a lot of energy into it and sooner -- not in the fourth quarter, but the first quarter, and that's what I'm going to hold you to.

Is there anything else from the plaintiffs?

MR. GRAY:  No, sir, Your Honor.

THE COURT:  From the Government?

MS. COLEMAN:  No, Your Honor.

THE COURT:  From the defendant?

MR. MEADOWS:  Nothing further, Your Honor.  Thank you.

THE COURT:  Okay.  I'll get an order out.  There's going to be more frequent and measurable reporting requirements involved here.  You-all just might as well expect it.  And we need to move this project along, and -- so that we can get to the goal of declaring the system in compliance.

Thank you for coming.  We are adjourned.

MR. MEADOWS:  Judge?

THE COURT:  Yes, sir.

MR. MEADOWS:  May I ask one matter for housekeeping?

THE COURT:  You may.

MR. MEADOWS:  Do you need me to file a motion to

withdraw that motion for leave, or will you just go ahead and enter an order?

THE COURT:  I'll do it with a text order.

MR. MEADOWS:  Okay.

THE COURT:  Thank you.  We're adjourned.

(The proceedings concluded at 10:25 a.m.)

**COURT REPORTER'S CERTIFICATE**


     I certify that the foregoing is a correct transcript from the record of the proceedings in the above-entitled matter.

     This 21st day of February, 2025.


                              **/s/ Katie Silas**

                              **Official Court Reporter**

                              **Registered Professional Reporter**